

**PEARLE VISION**®
Clearly Different®

## Franchise
## Agreement

LRNA FDD Amendment 11072011

# FRANCHISE AGREEMENT

## BY AND BETWEEN

## LUXOTTICA RETAIL NORTH AMERICA INC.

## AND

## GUTMAN VISION, INC.

## FOR

## PEARLE VISION STORE

## LOCATION #8655

# LUXOTTICA RETAIL NORTH AMERICA INC.
# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "*Agreement*") is made and entered into by and between Luxottica Retail North America Inc., an Ohio corporation and franchisor of Pearle Vision® ("*Pearle Vision*"), having an office at 4000 Luxottica Place, Mason, Ohio 45040, and **Gutman Vision, Inc.** ("*Franchisee*"), whose address is set forth in Section 1.15 of this Agreement.

## RECITALS:

A.  Pearle Vision has developed and operates a system (the "*Pearle Vision System*") for operating retail optical shops as set forth in the Franchise Operations Manual and such other manuals or policies that Pearle Vision may develop from time to time upon notice to you (the "*Manual*"). The Pearle Vision System is identified by trade names, service marks, trademarks, logos, emblems, and indicia of origin (the "*Marks*"), including "PEARLE®" and "PEARLE VISION®." The Pearle Vision System also includes proprietary rights in certain copyrights, software, office decor, layouts, design, color schemes, equipment, signs, methods of inventory and operation control, bookkeeping and accounting, advertising, promotional and marketing programs, access to private label products, and business practices and policies. Except as permitted by law, the Pearle Vision System does not specify or control any standards or procedures for the practice of optometry or ophthalmology.

B.  Franchisee desires to acquire the right to adopt and use the Pearle Vision System in the operation of a brick and mortar retail optical store (the "*Franchise Business*").

C.  Franchisee has received a copy of Pearle Vision's Franchise Disclosure Document ("*FDD*") and has had an opportunity to review it for at least fourteen (14) days before signing this Agreement, and an opportunity to consult with financial and legal counsel of Franchisee's own choosing. Franchisee is entering into this Agreement after making an independent investigation of Pearle Vision's business and not upon any representation or promises by Pearle Vision, which are not contained in this Agreement or in the FDD.

LRNA FDD Amendment 11072011

## AGREEMENT:

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

1.    **Basic Terms.**

1.1    **Advertising Contribution.**  The "***Advertising Contribution***" shall be defined as eight percent (8%) of Gross Revenues.

1.2    **Business Entity.**  Franchisee is a "***Business Entity***" as shown below:

☐ Individual                    ☒ Corporation                    ☐ Partnership

☐ LLC                          ☐ Limited Partnership            ☐ Other (please specify):
                                                                 _____

If Franchisee is not an individual, Franchisee's state of formation is **Texas**.

1.3    **Designated Operator**.  The "***Designated Operator***" of Franchisee shall be defined as a single individual contact person with authority to act in all matters for Franchisee and have primary responsibility for operating the Franchise Business.  The Designated Operator Franchisee has chosen is the following individual:

**Milana Gutman**

1.4    **Designated Developer**.  The "***Designated Developer***" of Franchisee shall be defined as an individual who will have primary responsibility for the development activities under this Agreement.  The Designated Developer Franchisee has chosen is the following individual:

**Milana Gutman**

1.5    **Effective Date**.  The "***Effective Date***" of this Agreement shall be defined as **11/23/2011**.

1.6 **Equity Owners**. The "*Equity Owners*" of the Franchisee shall be defined as individuals who are direct and indirect Owners of all equity in the Franchisee, as more fully described below:

| Equity Owner's Name | Equity Owner's Ownership Percentage (%) |
|---|---|
| Milana Gutman | 50% |
| Alex Gutman | 50% |
| | |
| | |

1.7 **Existing Franchisee**. An "*Existing Franchisee*" shall be defined as an individual or entity that currently operates one (1) or more Pearle Vision franchises.

1.8 **Expiration Date**. The "*Expiration Date*" of this Agreement shall be defined as **11/22/2021**.

1.9 **Franchise Type**. The "*Franchise Type*" granted under this Agreement shall be a Traditional Large Store, Traditional Medium Store, Traditional Small Store, Non-Traditional Independent Dispensary Store, Corporate Conversion Store, Independent Conversion or Renewal as more fully defined below:

| Franchise Type | Definition |
|---|---|
| ☒ "*Traditional Large Store*" | which shall be defined as a store with an optical retail dispensary, retail area, optometric waiting area, exam lane, pre-test room, contact lens fitting room and finishing lab. The Traditional Large Store must be 1,500 to 2,000 or more square feet, unless otherwise agreed to by the parties, with a 750 to 900 unit or more frame capacity and located in a free-standing strip center or mall location. |
| ☐ "*Traditional Medium Store*" | which shall be defined as a store with an optical retail dispensary, retail area, optometric waiting area, exam lane, pre-test room, contact lens fitting room and finishing lab. The Traditional Medium Store must be 1,200 to 1,500 square feet, unless otherwise agreed to by the parties, with a 700 to 750 unit frame capacity and located in a free-standing strip center or mall location. |

| Franchise Type | Definition |
|---|---|
| ☐ *"Traditional Small Store"* | which shall be defined as a store with an optical retail dispensary, retail area, optometric waiting area, exam lane, pre-test room, contact lens fitting room and finishing lab (if the store is at least 1,000 square feet). The Traditional Small Store must be 700 to 1,200 square feet unless otherwise agreed to by the parties with a 500 to 700 unit frame capacity and located in a free-standing strip center or mall location. |
| ☐ *"Non-Traditional Independent Dispensary Store"* | which shall be defined as a store with a dispensing area within a medical office building or hospital setting. The Non-Traditional Independent Dispensary Store must be less than 500 square feet with a 200 to 250 unit frame capacity devoted to Pearle Vision products or services. |
| ☒ *"Corporate Conversion Store"* | which shall be defined as an existing Pearle Vision store operated by Pearle Vision which Franchisee wishes to franchise pursuant to this Agreement and which contains an optical retail dispensary, retail area, optometric waiting area, exam lane, pre-test room, contact lens fitting room and finishing lab (if the store is at least 1,000 square feet). Generally, the Corporate Conversion Store averages between 2,000 to 3,000 square feet with a 750 to 900 unit or more frame capacity and located in a free-standing strip center or mall location. |
| ☐ *"Independent Conversion"* | which shall be defined as an existing, independently-operated optical store that Franchisee converts to a Pearle Vision. The Pearle Vision store must be located at the same site where the independently-operated optical store was located. Franchisee may convert their independent optical retail store to either a Traditional Large, Medium or Small Store. Generally, the Independent Conversion Store averages between 700 to 1,500 square feet with a 500 to 900 unit frame capacity and located in a free-standing strip center or mall location. |
| ☐ *"Renewal"* | which shall be defined as an extension of Franchisee's right to franchise the Location, and as further defined in Renewal Addendum of this Agreement. |

LRNA FDD Amendment 11072011

1.10   **Grand Opening Amount**.  The "*Grand Opening Amount*" is defined as an amount Franchisee shall spend to advertise the grand opening of the Franchise Business, which shall be Five Thousand and 00/00 Dollars ($5,000.00).

1.11   **Gross Revenues**.  "*Gross Revenues*" shall be defined as all amounts, whether direct or indirect, that are generated or received from, through, or by, or which are in any fashion connected with the retail operation of the Franchise Business, including the the following:  (a) an optometric professional's gross receipts related to optical product sold in accordance with an Optical Product Agreement (as defined in Section 5.4) or Package Price Discount Transaction (as defined in Section 8.2); (b) the sale of warranties, breakage protection plans, other services, and/or co-payments; and (c) any and all other products or services generated or received that are in any fashion related to the operation of the Franchise Business.  Gross Revenues shall not include Professional Fee Revenues (as defined in Section 1.17).

1.12   **Initial Franchise Fee**.  The "*Initial Franchise Fee*" shall be defined as one of the following:

| Initial Franchise Fees |
| --- |
| ☒ Thirty Thousand Dollars ($30,000) if Franchisee is a New Franchisee (as defined below) |
| ☐ Twenty Thousand Dollars ($20,000) if Franchisee is an Existing Franchisee (as defined above) |

1.13   **Location**.  The "*Location*" shall be the physical address where the Franchise Business is located as described below:

**Preston Park Shopping Center**
**1713 Preston Road, Suite A**
**Plano, Texas 75093**

1.14   **New Franchisee**.  A "*New Franchisee*" shall be defined as an individual or business entity that does not currently operate a Pearle Vision franchise.

1.15   **Notice Address**.  The "*Notice Address*" for notices delivered to Franchisee (as contemplated by Section 21.4) shall be defined as the following:

**Preston Park Shopping Center**
**1713 Preston Road, Suite A**
**Plano, Texas 75093**

1.16   **Open Date**:  The "*Open Date*" shall be defined as no later than twelve (12) months after the Effective Date of this Agreement.

1.17   **Professional Fee Revenues**.  "*Professional Fee Revenues*" shall be defined as all amounts, whether direct or indirect, that are generated or received by the optometric or ophthalmologic office operated in proximity to the Location for professional services rendered,

including eye exams and medical treatment, but exclusive of sales of any optical product or materials.

    1.18    **Renewal Fee**. The Renewal Fee shall be defined as Two Thousand, Five Hundred Dollars ($2,500), or if the Renewal Fee must be prorated based upon the term of this Agreement, the Renewal Fee shall be N/A.

    1.19    **Royalty**. The "*Royalty*" (as contemplated by Section 8.2) shall be defined as seven percent (7%) of Gross Revenues, unless Franchisee participates in the Royalty Rebate Program (as defined below), or as otherwise provided below:

| Royalty Type | Definition |
|---|---|
| ☐ Independent Conversion Royalty | Which is three percent (3%) of Gross Revenues during Year One (1), five percent (5%) of Gross Revenues during Year Two (2) and seven percent (7%) of Gross Revenues during Year Three (3) and thereafter.  Year 1 shall commence on the Effective Date of the Agreement and shall end twelve months thereafter, Year Two (2) shall commence at the end of Year One (1) and end twelve (12) months thereafter, and Year Three (3) shall commence at the end of Year Two (2). |
| ☐ Non-Traditional Independent Dispensary Royalty | Which is three percent (3%) of Gross Revenues during Year One (1), five percent (5%) of Gross Revenues during Year Two (2) and seven percent (7%) of Gross Revenues during Year Three (3) and thereafter.  Year One (1) shall commence on the Effective Date of the Agreement and shall end twelve (12) months thereafter, Year Two (2) shall commence at the end of Year One (1) and end twelve (12) months thereafter, and Year Three (3) shall commence at the end of Year Two (2). |

    1.20    **Royalty Rebate Program**. The "*Royalty Rebate Program*" which is defined as a program enabling Franchisee to receive a quarterly rebate of one and one-half percent (1.5%) of the Royalty upon satisfying the terms and conditions outlined in a Royalty Rebate Addendum attached hereto.

    1.21    **STARS**. The "*STARS*" program shall be defined as a a vendor-managed inventory program that allows Franchisee to receive frame inventory on consignment as outlined in the STARS Consignment Agreement.

1.22    **Trade Area**. If the Franchise Business will be located in a new facility, the "***Trade Area***", which shall be defined as the geographical area where Franchisee must find the Location as contemplated by Section 2.2 and as described below: N/A

_____

_____

_____

1.23    **Under Construction and Open Date**.  Franchisee shall be "***Under Construction***" as defined below:

(i)    **Single Use Free Standing Facility**: At the time the plans and specifications have been approved by Pearle Vision, the excavation has been completed and all footings are formed and poured for the building.

(ii)    **Multiple Tenant Facility**: At the time the plans and specifications have been approved by Pearle Vision and the landlord of the facility has provided Franchisee access to the site for purpose of finish-out construction.

(iii)    **Remodeling Existing Facility**:  At the time the plans and specifications have been approved by Pearle Vision and the remodeling work has actually commenced (as required in Section 4.1A) no later than six (6) months after the Effective Date of this Agreement.  If the Franchise Business is an Independent Conversion, Franchisee shall, simultaneously with the execution of this Agreement, enter into the Independent Optical Retail Store Conversion Addendum attached hereto.

2.    **Grant of Franchise and Development Rights.**

2.1    **Grant of Franchise**.   Pearle Vision grants to Franchisee for the stated term the non-transferable, non-exclusive right, license, and privilege to use the Pearle Vision System solely in connection with the operation of the Franchise Business at the Location specified in Section 1.13 (or, if no address is specified in Section 1.13, at the address to be specified in an amendment to this Agreement).  Franchisee agrees to use only the Marks designated by Pearle Vision and to use them only in the manner prescribed by Pearle Vision.

Franchisee agrees that the Franchise Business may be operated only at the Location. Franchisee agrees to use the Location exclusively for the purpose of operating the Franchise Business in accordance with the Pearle Vision System.

2.2    **Grant of Development Right**. If Pearle Vision has not approved a Location for the Franchise Business on the Effective Date of this Agreement, Pearle Vision grants to Franchisee, for a period of one hundred and eighty (180) days from the Effective Date, the right to develop a Pearle Vision store within the Trade Area.

Promptly following the effective Date of this Agreement, Franchisee will identify a site within the Trade Area as the proposed Location, and will submit to Pearle Vision the materials required by Pearle Vision for evaluation and approval of the proposed Location. Franchisee should not sign a lease or purchase agreement for any facility until Pearle Vision has approved the proposed Location. Once Pearle Vision has approved the Location, the parties will sign an amendment to this Agreement identifying the Location at which Franchisee will operate the Franchise Business, and Franchisee will then develop the Franchised Business at the Location in accordance with Section 4.1.

Pearle Vision will not grant a license or franchise to anyone other than Franchisee for the operation of a Pearle Vision store at any location within the Trade Area until the earlier of (a) the date on which Pearle Vision and Franchisee sign an amendment to this Agreement identifying the Location at which Franchisee will operate the Franchise Business, or (b) one hundred and eighty (180) days after the Effective Date.

**3.      Territorial Protections and its Exceptions.**

3.1      **Franchisee's Right of First Refusal**. If Pearle Vision elects to establish a Pearle Vision store at any site within a one mile radius of the Location (the "***Proposed Site***") and if no other franchisee-owned Pearle Vision Store is closer to the Proposed Site, Pearle Vision will first offer the Franchisee, by written notice, the opportunity to develop the Pearle Vision Store at the Proposed Site. If there are other franchisee-owned Pearle Vision Store or Stores closer to the Proposed Site, Franchisee will be given an opportunity to develop a Pearle Vision Store at the Proposed Site only if the other franchisee or franchisees decline the right of first refusal or are otherwise ineligible in accordance with the terms of this Section 3.1. Franchisee will have thirty (30) days after receipt of Pearle Vision's notice to exercise its right of first refusal by executing Pearle Vision's then-current form of franchise agreement for the franchise to be operated at the Proposed Site and paying the then-current Franchise Fee and any other applicable fees in connection with the granting of the franchise for the Proposed Site. However, this right of first refusal will not apply if:

A.      Pearle Vision has given Franchisee notice that Franchisee is in default of this Agreement, as defined in Section 18;

B.      Franchisee has been served with more than one notice of default of this Agreement within the twelve (12) month period before the date of Pearle Vision's notice; or

C.      Before Pearle Vision and Franchisee have signed an amendment to this Agreement identifying the address of the Location, if Pearle Vision has not approved a Location for the Franchise Business on the Effective Date of this Agreement.

If for any reason Franchisee fails to pay the applicable initial franchise fee and execute the franchise agreement within thirty (30) days after the date of Pearle Vision's notice, Franchisee's right of first refusal with respect to the Proposed Site will be waived and Franchisee will have no further claims against Pearle Vision in connection with the development, franchising, or operation of the Proposed Site.

3.2.     **Restricted Conversion Area**.  For purposes of this <u>Section 3.2</u>, the "*Restricted Conversion Area*" is the area within a one-mile radius of Franchisee's Location (unless the parties agree to a Restricted Conversion Area smaller than a one (1) mile radius, in which case the parties will do so by an addendum to this Agreement).   Pearle Vision will not grant to any existing non-Pearle optical location within the Restricted Conversion Area a franchise for the purpose of converting that location to a Pearle Vision store, unless:

A.     Franchisee has committed one of the material events of default listed in <u>Sections 18.1</u> and <u>Section 18.2</u>; or

B.     the existing non-Pearle optical location is a limited public access dispensary location.

3.3     **No Other Exclusivity**.  The grant of the rights to develop a Pearle Vision store within the Trade Area and to open and operate the Franchise Business at the Location as provided in <u>Section 2</u> neither expressly nor impliedly confers upon Franchisee any territorial or exclusive marketing rights, protections, or exclusivity whatsoever within or without any "territory," "market," or other geographic zone of any nature.  Except as otherwise provided in <u>Section 3.1</u> and <u>Section 3.2</u> of this Agreement, Pearle Vision and its affiliates retain the following rights:

A.     To establish and operate a Franchise Business using the Marks, under a joint-venture, license, or franchise agreement in any area, and that Franchise Business may solicit, service, and sell optical products and professional services identical and/or competitive to those that Franchisee will be offering and selling under this Agreement;

B.     To establish and operate a business that uses other trademarks proprietary to  Pearle Vision or its Affiliate, under a joint-venture, license, or franchise agreement in any area, and that business may solicit, service, and sell optical products and professional services identical and/or competitive to those that Franchisee will be offering and selling under this Agreement; and

C.     To establish and operate a mail order, direct mail, catalog, telemarketing, wholesale, distribution, direct marketing, e-commerce, or Internet based site, or similar business, which permits customers, wherever those customers are located, to purchase optical products and professional services without being present at a Pearle Vision Store or any other specific location.  Franchisee will have no rights to such sales by Pearle Vision or its Affiliates.

4.     **Development and Opening of Store.**

4.1     **Development of Location**.  Franchisee agrees to develop, open, and operate a Pearle Vision store at the Location in accordance with Pearle Vision's then-current standards and specifications and Section 4 of this Agreement.  Unless Pearle Vision has agreed to an extension, Franchisee's Pearle Vision Store must be Under Construction within six (6) months from the Effective Date of this Agreement and the Pearle Vision Store must open for business no later than within twelve months from the Effective Date of this Agreement.  If Franchisee has not chosen a definitive site for the Location, Pearle Vision shall grant to Franchisee the non-exclusive right to develop a Pearle Vision Store within the Trade Area at an approved Location

LRNA FDD Amendment 11072011

by the date the Pearle Vision store must be Under Construction and open and operating by the Open Date and in accordance with Section 4 of this Agreement.  Franchisee may not use any of the Marks until the Location is Under Construction in preparation to commence operations and Franchisee has submitted proof of insurance in accordance with Section 11.2 of this Agreement.

      A.     **Notification the Location is Under Construction**.  Franchisee must notify Pearle Vision when Franchisee is ready to begin construction at the Location, and must notify Pearle Vision within seven (7) days after the site is Under Construction.  Franchisee will give also notice to Pearle Vision of the intended commencement of operations at the Location at least two weeks in advance of the anticipated Open Date.

      B.     **Designated Developer**.  If Franchisee is not an individual, Franchisee will designate, subject to Pearle Vision's prior written approval, a Designated Developer who will have at all times not less than a twenty-five percent (25%) equity interest (including a division of profits) in Franchisee and the Location.

      C.     **Development Requirements**.  Unless otherwise agreed in writing by Pearle Vision, within ninety (90) days after the date of execution of this Agreement by Pearle Vision, Franchisee agrees:

      (i)     To obtain Pearle Vision's review of all plans and specifications for the development of the Location before the commencement of any construction or build out of the Location.

      (ii)     To obtain any financing necessary in order to purchase and develop the Location.

      (iii)     To secure a lease or a binding purchase agreement for the Location that is acceptable to  Pearle Vision and which includes a contingency which provides that the lease or purchase agreement is subject to  Pearle Vision's approval, which approval if not obtained, allows the lease or purchase agreement to terminate without penalty or obligation upon the Franchisee.  If the Location is to be leased, Franchisee must comply with Pearle Vision's requirements for leases as set forth in the Manual.

      D.     **Effect of Non-Compliance with Development Requirements**.  Franchisee acknowledges that timely development of the Location in accordance with the deadlines set forth in this Section 4.1 is of great importance to Pearle Vision and Franchisee.  If Franchisee fails to submit the materials required under this Agreement or reach a level of reasonable expectation to be Under Construction by the deadline set forth in this Section 4.1, Pearle Vision may, at its option, immediately terminate this Agreement.  In that event, Pearle Vision will refund, without interest, an amount equal to the Franchise Fee (less Five Thousand Dollars ($5,000) as payment for Pearle Vision's administrative and out-of-pocket expenses related to this Agreement).  Unless otherwise prohibited by law, Franchisee agrees to execute Pearle Vision's general release of any and all claims against  Pearle Vision and its Affiliates, and their respective officers, directors, agents, employees, representatives, successors, and assigns relating to this Agreement.

      E.     **Franchisee Insurance**.  At least two (2) weeks before the Open Date and taking position of the store premises, and as a condition precedent to opening the Location for

business, Franchisee will supply Pearle Vision with certificates of insurance verifying that all required coverage described in <u>Section 11.1</u> is in effect.

F.      **Limited Waiver of Cross Default**.  Notwithstanding anything to the contrary contained in this Agreement, if the Location is Under Construction and open by the Open Date, then during the first full twenty-four (24) months following the Open Date of the Location, an act of default under this Agreement will not constitute an act of default under any other agreement (unrelated to the Location) to which Pearle Vision or its Affiliates and Franchisee are parties.  Any event of default that occurs during or after the 25th full month following the Open Date of the Location will constitute an act of default under all agreements (including this Agreement) to which Pearle Vision or its Affiliates and Franchisee (or any of them if more than one) are parties.

4.2     **Site and Equipment Requirements.**

A.      **Design and Construction Services.**     If the Franchise Business is a Traditional Large Store, Traditional Medium Store, Traditional Small Store, Non-Traditional Independent Dispensary Store or Independent Conversion, the Initial Franchise Fee defined in Section **Error! Reference source not found.** includes, at no additional charge, the Design and Construction Services as defined below.   If Franchisee is remodeling or relocating the Franchise Business for an existing Pearle Vision Store, whether or not in connection with the renewal of the Franchise Agreement, Franchisee shall not be entitled to receive the Design and Construction Services set forth in this Section 4.2(A), but rather, Franchisee shall enter into and comply with all obligations set forth in Pearle Vision's then-current form of Site Development Services Addendum (the "*SDSA*"), which shall set forth the scope of work Pearle Vision requires in connection with any such remodeling or relocation, and pay to Pearle Vision all fees required thereunder.

The "*Design and Construction Services*" shall be interpreted to mean the following services:

(i)      "*Store Layout Services*", which shall include a preliminary schematic that is a one-page floorplan of the application of the standards and specifications to fit your space according to the Lease Outline Drawing, Letter of Understanding with your Landlord, and the site survey. We will provide no more than three (3) additional revisions to the preliminary schematics if necessary and reserve the right to charge a fee to Franchisee for any additional revisions.

(ii)     "*Architectural Services*", which shall include three (3) sets of construction documents for bidding, permitting, and recording.  Construction Documents will contain architectural, mechanical, electrical, plumbing and structural (if required) plans and details based on field site surveys. The architectural Construction Documents include the preliminary design and architectural, mechanical, electrical and plumbing construction drawings that comply with applicable governmental building codes and regulations.  The cost of these Architectural Services are included in the Initial Franchise Fee.  Pearle Vision will provide Franchisee with revisions to the construction drawings after submission to the Landlord,

LRNA FDD Amendment 11072011

Building Department or other governmental agency at a cost of up to Five Hundred Dollars ($500) per hour, and as assessed by the Landlord, Building Department or governmental agency.

(iii)   "***Construction Management Support Services***" which shall include reviewing orders that include fixture or materials, and review of contractor bids, preparing an initial cost estimate ("***ICE***") and scheduling.  In addition, we will conduct an initial site visit before you begin construction, and a punch list visit before your Store opens for business.   The cost of these Construction Management Services are included in the Initial Franchise Fee.

(iv)   However, if Franchisee is remodeling or relocating the Franchise Business for an existing Pearle Vision Store, whether or not in connection with the renewal of the Franchise Agreement, Pearle Vision will provide Design and Construction Services to Franchisee for a fee of Fourteen Thousand Dollars ($14,000) for a full remodel to the current design or Ten Thousand, Five Hundred Dollars ($10,500) if Franchisee qualifies for a reduced scope remodel, plus a fee per hour for additional schematics.

B.   **Lease Requirements**.  If Franchisee proposes to lease the property on which the Franchise Business will be located, Franchisee's lease must contain the following terms and conditions in a Rider to, or in the body of, the lease agreement:

1.   The Premises must be used for the sale of eyeglasses, contact lenses, sunglasses, and other optical and optical-related products and accessories; eyewear repair; an optical laboratory to grind, cast and finish lenses and fabricate and repair eyewear; eye exams (including separate rooms for that purpose); vision correction procedures; and storage and offices necessary to conduct Tenant's business, under the Pearle Vision trade name or such other trade name as Pearle Vision may require.

2.   At Pearle Vision's request, but not more than once a year, Landlord will give Pearle Vision copies of all information submitted to Landlord by Tenant.

3.   Landlord simultaneously will mail to Pearle Vision copies of all notices of Tenant's default(s) and give Pearle Vision the same opportunity as Tenant to cure such default(s). If Tenant fails to cure the defaults(s), Pearle Vision will have ten (10) days from the expiration of Tenant's cure period in which to cure the default(s).  Notice to Pearle Vision must be mailed by U.S. certified mail or overnight courier service to Pearle Vision at Luxottica Retail North America Inc., Attention: Legal Department, 4000 Luxottica Place, Mason, OH 45040.

4.   Landlord will permit Pearle Vision, at Pearle Vision's option, to assume the Lease:  (a) upon termination or expiration of the Franchise Agreement, or (b) upon cure of the Tenant's default(s) (whether or not the Franchise Agreement is then in effect).  Pearle Vision may assign the Lease to another Pearle Vision franchisee with the Landlord's written approval of the new franchisee, which approval will not be unreasonably withheld or delayed.

5.   Upon expiration or termination of the Franchise Agreement, Landlord will permit Pearle Vision to enter the Premises and, without damaging the Premises, Pearle Vision may remove all signs and sign-faces and other items identifying the Premises as a Pearle Vision store.

LRNA FDD Amendment 11072011

6.     Landlord will not restrict the right of Tenant, Pearle Vision (whether or not Pearle Vision succeeds to the rights of Tenant under the Lease), or any other franchisee of Pearle Vision from operating a Pearle Vision store at any other location.

7.     If any inconsistency exists between this Rider (if applicable), and the Lease, this Rider (if applicable), will supersede and control.

8.     Unless otherwise agreed to by Landlord and Pearle Vision, Landlord acknowledges that Tenant alone is responsible for all debts, payments and performances due under the Lease, unless and until such time that Pearle Vision becomes and remains the tenant of the Lease by exercising its rights under this Rider.

C.     **Construction of the Location and Conformance to Plans**.  It shall be, and remain Franchisee's sole responsibility, to diligently construct, equip and otherwise ready and open the Location by the Open Date in compliance with plans and specifications approved by Pearle Vision. Franchisee will be responsible, at Franchisee's expense, for obtaining all zoning classifications, permits, clearances, certificates of occupancy and center clearances, which may be required by governmental authorities.  Franchisee shall only use licensed contractors that have been approved by Pearle Vision in performing construction work at the Location.   Pearle Vision expressly disclaims any warranty of the quality or merchantability of any goods or services provided by architects, contractors or any persons or entities to which it may refer Franchisee, including, without limitation, any construction work.  Pearle Vision is not responsible for delays or defects in the construction of the Location or for any loss resulting from the Location  construction since Pearle Vision has no control over the landlord or developer and numerous construction and/or related problems which could occur and delay the opening of Franchisee's Location.  Franchisee must ensure, prior to opening the Location, that the Location is accessible to and useable by persons with disabilities and meets the Standards for Accessibility Design for any new construction in the ADA Accessibility Guidelines, or any more stringent accessibility standards under federal, state or local law.

D.     **Furnishings and Equipment.**  Franchisee agrees to use only the fixtures, equipment, signs and promotional materials and employ contractors and others to construct the Location, that have been previously approved by Pearle Vision.  Franchisee agrees to establish and maintain the Location, fixtures, equipment, signs, and parking area (if applicable) in good, clean condition and repair.  Franchisee agrees to add, replace, or remove any fixtures, equipment, and signs designated by Pearle Vision.  Franchisee agrees to pay all talent residuals and other costs resulting from Franchisee's failure to remove designated signs and promotional materials.  Notwithstanding anything to the contrary herein, upon Pearle Vision's reasonable request, Franchisee agrees to refurbish the Location to Pearle Vision's current standards implemented in at least fifty percent (50%) of  Pearle Vision® stores operated by Pearle Vision (the "*Company Stores*").

E.     **Written Authorization Prior to Opening.**  Franchisee shall give written notice to Pearle Vision of the intended commencement of operations at the Location at least two (2) weeks in advance of the Open Date.  Pearle Vision will conduct an inspection of the Location

prior to the Open Date to determine whether the Store is constructed in compliance with this Agreement and Pearle Vision's then-current standards and specifications.  Pearle Vision will provide a punch list identifying any items that must be corrected prior to opening.   Franchisee shall not open the Location for business without having first obtained Pearle Vision's written authorization and an acknowledgment that all requirements set forth in Section 4 of this Agreement and the SDSA, as applicable, have been satisfied, including, without limitation, a correction of all items set forth on any punch list provided by Pearle Vision.  Franchisee shall have no right to use the Marks in connection with the operation of the Store without having first obtained Pearle Vision's written authorization to open the Store.

    4.3    **No Warranty/Acknowledgments.**

    A.    The decision by Pearle Vision to approve a proposed site for the Location of the Franchise Business is based on Pearle Vision's judgment that the proposed site appears to comply with Pearle Vision's site selection criteria.  Approval of the proposed site by Pearle Vision is not an express or implied warranty by Pearle Vision regarding the viability, satisfactory nature, or profitability of a Pearle Vision store at the proposed site.   Pearle Vision will have no liability to Franchisee arising out of (a) Pearle Vision's suggestions to Franchisee about sites; (b) Pearle Vision's exercise of its rights to inspect and approve sites; or (c) Pearle Vision's leasing or subleasing a site to Franchisee.  Franchisee further acknowledges that nothing herein shall create an express or implied duty or obligation on the part of Pearle Vision to enter into a lease or sublease with Franchisee for the Location or to renew or extend any lease or sublease agreement entered into with Franchisee.

    B.    Franchisee acknowledges that Pearle Vision is not, and has not represented that it is a professional architectural firm, surveyor, engineer, or general contractor. Franchisee understands that while Pearle Vision will provide the Design and Construction Services, as applicable under this Agreement, it is Franchisee's responsibility for hiring licensed or otherwise certified construction professionals who have been approved by Pearle Vision to perform all construction work.  Franchisee is solely responsible for satisfying the Location development and construction requirements imposed by the Franchise Agreement or any other governmental regulation, rule, law or policy.  Pearle Vision makes no guarantees, expressed or implied as to the accuracy or sufficiency of such services.

    4.4    **Relocation.**  Franchisee may not relocate the Franchise Business without Pearle Vision's prior written consent.

    A.    **Damage to Location**.  If the Location is damaged to the extent that it cannot be repaired within one hundred and twenty (120) days after the damage occurs or if, as a result of the damage, the underlying lease is terminated, this Agreement will terminate. However, Pearle Vision and Franchisee may agree to allow Franchisee to relocate the Franchise Business for the remaining term of this Agreement in accordance with Section 4.4B.

    B.    **Relocation of Franchise Business**.  Franchisee may request Pearle Vision's approval to relocate the Franchise Business to a new site that is within a three (3) mile radius of the Location and is acceptable to  Pearle Vision, in its sole discretion, or Pearle Vision may demand Franchisee relocate the Franchise Business to a new site, if any, of the following

events occur:  (i) Franchisee's lease or sublease for the Location expires or terminates through no fault of Franchisee; (ii) the Location is destroyed or condemned or becomes otherwise unable to reasonably satisfy  Pearle Vision's then-current standards; or (iii) there is a change in the character of the environment surrounding the Location that, in  Pearle Vision's sole judgment, is sufficient to warrant relocation of the Location.

Franchise must request approval in writing to relocate the Franchise Business not less than ninety (90) days before the date Franchisee proposes to cease operation at the Location.  The relocation request will be reviewed in accordance with Pearle Vision's then-current site approval or franchise renewal criteria.  If the relocation request is approved, then Franchisee will (at Franchisee's sole cost and expense) relocate the Franchise Business to the approved new site at the earliest opportunity following the expiration or termination of Franchisee's current lease or sublease.  Franchisee shall enter into the SDSA immediately upon receiving Pearle Vision's approval of Franchisee's relocation request.  Franchisee shall strictly comply with its obligations under the SDSA, including, without limitation, completion all remodel work and payment of all fees required thereunder.

5.     **Operations.**

5.1     **Strict Compliance with the Pearle Vision System**.  Franchisee agrees to operate the Franchise Business in a manner that strictly adheres to Pearle Vision's standards and policies as prescribed in the Manual, the contents of which are detailed in a Table of Contents which Franchisee acknowledges was received by Franchisee with the FDD, and which is incorporated herein by reference.   Pearle Vision may, from time to time, revise, supplement, or delete the Manual by bulletin, notice, electronic or video materials, revisions to the Manual, or otherwise (***Supplements to the Manual***").  Supplements to the Manual shall be binding on Franchisee upon delivery by Pearle Vision as if they were set forth in the Manual.  In the event of any dispute concerning Franchisee's compliance with the Manual (including any Supplements to the Manual), the terms of  Pearle Vision's then current copy of the Manual (including any Supplements to the Manual) maintained by  Pearle Vision at its principal office(s) shall be controlling.  In the event these materials are revised, Franchisee will comply with each revision to the extent the revision does not materially revise this Agreement.

5.2     **Future Changes to the Pearle Vision System; Pearle Vision Services**.  Pearle Vision continuously reviews and analyzes the optical industry and the Pearle Vision System and based on Pearle Vision's evaluation of this information, Pearle Vision may make changes in the designated Marks and in other various aspects of the Pearle Vision System, including adding new components to the Pearle Vision System or deleting existing components from the Pearle Vision System.  Franchisee agrees, at Pearle Vision's request, to modify Franchisee's operation to comply with any such changes and to be responsible for all related costs.  Except as otherwise provided in <u>Section 7.1D</u> concerning changes related to the Marks, Pearle Vision will not require Franchisee to implement these changes unless Pearle Vision has implemented the same changes within at least fifty percent (50%) of Pearle Vision's then current Company Stores.

5.3     **Operating Standards**.  Franchisee will operate the Franchise Business during the prescribed hours, maintain sufficient inventory and supplies as designated by Pearle Vision, and employ adequate personnel so as to maximize the sales of the Franchise Business.  Franchisee,

LRNA FDD Amendment 11072011

Franchisee's Designated Operator, Franchisee's Designated Developer and Franchisee's employees shall adhere to the prescribed appearance and dress code and to render competent and courteous service to customers as described in the Manuals.

      A.    **Pearle Vision Programs.**  Franchisee will extend and honor the current eyeglass guarantee further described in the Manual and such other guarantees, breakage protection plans, quality audits and customer service evaluation programs Pearle Vision designates.   Franchisee shall be responsible for the cost of Franchisee's participation in those programs.

      B.    **EyeMed or Managed Vision Care Agreements**.  Because Franchisee and all other operators of Pearle Vision Stores benefit by having all Pearle Visions Stores participate EyeMed's managed vision care plans, Franchisee will apply to become a provider in EyeMed upon signing this Agreement, unless prohibited by law.  Franchisee also agrees to honor any customer who may participate in any internet, mail order, direct mail, catalog, telemarketing, wholesale, distribution, or direct marketing program developed for EyeMed by Pearle Vision or its affiliates.

5.4    **Optometric Professionals.**  Unless prohibited by law, Franchisee agrees to provide optometric or ophthalmologic services from the Franchise Business.

      If Franchisee is not permitted by law to provide optometric or ophthalmologic services directly, then Franchisee will enter into an agreement to lease or sublease space in or near the Franchise Business to a duly licensed optometrist or ophthalmologist (an "*Optometric Professional*").  The lease or sublease to the Optometric Professional must be in a form acceptable to Pearle Vision and consented to by Pearle Vision prior to its execution.

      Franchisee agrees that no optical products may be dispensed from the optometric or ophthalmologic office operated in proximity to the Franchise Business unless Pearle Vision agrees otherwise in writing, or Franchisee enters into an agreement concerning the sale of optical products with the Optometric Professional (the "*Optical Product Agreement*"), which Pearle Vision approves in writing prior to execution.

5.5    **Compliance with Law; Required Licenses.**  Franchisee will comply with all laws, regulations and ordinances concerning the development, operation, management and maintenance of the Franchise Business.  Franchisee will secure and maintain all licenses needed, including, but not limited to those necessary to operate the Franchise Business.  Franchisee will comply with all applicable wage, hour, and other laws and regulations as required under federal, state, and local governments; and obtain and keep in good standing all necessary licenses, permits, and other required forms of governmental approval required of Franchisee in connection with the Franchise Business.  Franchisee agrees to immediately notify  Pearle Vision of any compliance or licensing problems which arise under any federal, state or local laws and regulations relating to the practice of opticianry, optometry and ophthalmology, including Health Insurance Portability and Accountability Act ("*HIPAA*"); compliance with all federal, state and local laws and regulations prohibiting discrimination, including Title VII of the Civil Rights Act of 1964, as amended ("*Title VII*"), the Age Discrimination in Employment Act ("*ADEA*"),  the Americans with Disabilities Act (the "*ADA*"), including its provisions requiring that the

Franchise Business be accessible to the disabled;  compliance with all building codes, fire and safety codes, environmental laws, Occupational Safety and Health Administration laws, health laws, sanitation laws; and adherence to all applicable wage, hour, and other laws and regulations. Franchisee will at all times remain current in its knowledge and understanding of all laws as they relate to the operation of the Franchise Business. Franchisee agrees to immediately notify Pearle Vision of any licensing issues or claims that it has violated laws or regulations as set forth above.

If state laws or licensing requirements limit the ability of optometrists or ophthamalogists to be employed by optical shops, then Franchisee will sublease space to one or more optometrists or ophthamalogists in or adjoining the Franchise Business or will otherwise arrange for an optometrist or ophthamalogist to practice as near as possible to the Franchise Business.

5.6     **Taxes.**  Franchisee will prepare and file all necessary tax returns and pay all taxes imposed upon Franchisee related to the Franchise Business.  Franchisee shall also pay when due all sales, transfer (including real property transfer or gains) and/or use taxes, unemployment contributions, and any other charges (whether by taxing authorities, vendors, or others) levied or assessed against  Pearle Vision or Franchisee in connection with Franchisee's purchase and operation of the Franchise Business, including all taxes payable on the Initial Franchise Fee, Royalty, and other payments made to  Pearle Vision or to any of its Affiliates (excluding income taxes payable by  Pearle Vision).  If it is later determined by audit or otherwise that any taxes reported and paid were not sufficient, Franchisee will be responsible for and will promptly pay to Pearle Vision or the appropriate taxing authority any additional amount required.  In the event of any bona fide dispute concerning any tax assessed against Franchisee relating to the Franchise Business, Franchisee may, at Franchisee's expense, contest the validity or the amount of the tax in accordance with the procedures of the taxing authority.  Franchisee agrees to handle any such contest in a timely manner and not to permit any related tax sale, seizure, or impoundment to occur.

5.7     **Trade Accounts.**  Franchisee will maintain Franchisee's trade accounts in a current status and will seek to promptly resolve any disputes with trade suppliers.  Should Franchisee fail to maintain Franchisee's trade accounts in this fashion, Pearle Vision may, but is not required to, pay any or all such accounts on behalf of Franchisee, in which event Franchisee agrees to immediately repay Pearle Vision in the manner provided by this Agreement.

5.8     **Retail Sales Only.**  Franchisee is restricted to the retail sale of Pearle Vision System optical products and professional services.  Franchisee is expressly prohibited, without the express written consent of  Pearle Vision, from engaging in the wholesale sale and/or distribution of any Pearle Vision service, optical product, or other product, equipment, or component that comprises (or may in the future comprise) a part of the Pearle Vision System, or any product or service related thereto.

5.9     **POS Systems, Computers, and Software.**

A.      **POS System.**  Franchisee must purchase and install a point-of-sale computer hardware system (the "***POS System***") that complies with Pearle Vision's specifications and  Pearle Vision's current  network and operating system components and related software

LRNA FDD Amendment 11072011

designated by Pearle Vision. Franchisee expressly agrees to purchase and install the number of work stations determined by Pearle Vision to adequately fulfill the computer system needs at the Location. Pearle Vision may require Franchisee to upgrade or replace the hardware and software of the POS System as outlined in the then current license and maintenance agreement for the POS System (the "*POS Agreement*").

B.     **POS Agreement.**  Franchisee will sign  the POS Agreement which, to the extent permitted by law, will include, but not be limited to, the following:  (i) Franchisee's obligation to provide any assistance required by Pearle Vision to bring the POS System on-line with  Pearle Vision's headquarters computer at the earliest possible time, (ii) Franchisee's obligation to input and maintain in Franchisee's POS System such data and information as Pearle Vision prescribes, (iii)  Pearle Vision's right to electronically retrieve all sales and other data (except customer's names, addresses, and telephone numbers, which Pearle Vision may not retrieve without Franchisee's approval) as Pearle Vision deems necessary or desirable, (iv) Franchisee's obligation to electronically transmit sales data from Franchisee's POS System to  Pearle Vision, (v) installation of new software upgrades as licensed to Franchisee in the POS Agreement (exclusive of operating and network system upgrades) for which Pearle Vision reserves the right to charge Franchisee an additional fee prior to installation, (vi) installation of operating and network system upgrades as designated by  Pearle Vision (such upgrades at Franchisee's expense), and (vii) payment by Franchisee of a monthly maintenance fee.

C.     **Upgrades and Replacements.**  Franchisee will upgrade or replace the POS System and any other computer hardware as required by Pearle Vision at Franchisee's own expense.

D.     **Patient Scheduling Software.**   Pearle Vision offers a Web-based (Internet-only) program called "The Appointment Book" (or "*TAB*") to schedule patients with the optometric professionals who work for Franchisee or are subleasing an optometric office from the Franchise Business. Franchisee must use TAB for scheduling patients upon execution of this Agreement, but may discontinue use at any time upon Pearle Vision's receipt of notice sixty (60) days prior to termination.  Pearle Vision reserves the right to modify the features of TAB without notice and/or charge a membership fee or other cost to administer TAB upon ninety (90) days notice to Franchisee.

E.     **Other Software.**  From time to time, Pearle Vision may designate the use of additional software or copyrighted and patented items in relation to the Pearle Vision System. Franchisee will abide by the terms and conditions prescribed by Pearle Vision in the Manual, Supplements to the Manual, and other materials prepared by Pearle Vision for Franchisee relating to these items.  Franchisee acknowledges that the prescribed materials may cover such matters as warranty disclaimers, limitations on use, damages, rights of reproduction, retention of ownership rights, and other typical user provisions.  Franchisee will also adhere to any use requirements prescribed by third parties holding license rights to any portion of the designated software, copyright, and patented materials.

5.10    **Inspections.**  Pearle Vision may inspect the Franchise Business periodically, may conduct field visits to advise Franchisee, and may have "secret shoppers" visit the Franchise Business and report their experiences.  Addtionally, at Pearle Vision's option, Franchisee will

LRNA FDD Amendment 11072011

participate in and be responsible for the costs for Pearle Vision to conduct not more than two (2) quality audits during any twelve (12) month period, in accordance with Pearle Vision's then-current store quality assurance program.

**5.11    Telephone Line.**  If the Franchise Type granted hereunder is not a Renewal or an Independent Conversion, Pearle Vision will grant to franchisee the telephone line, which may include any and all telephone lines, whether through utility lines, cables, fiber optic networks, or the Internet, which provide telephone service to the Location, with the exception of any long-distance telephone service (the "*Telephone*").  Franchisee shall enter into and comply with all obligations set forth in the telephone addendum (the "*Telephone Addendum*"), which shall set forth Franchisee's obligations regarding the Telephone, and pay to Pearle Vision all fees required thereunder.

**6.    Training and Assistance.**

6.1    **Training Programs**.

A.    **Initial Training.**  Franchisee acknowledges the importance of having properly qualified and trained people involved in the operation of the Franchise Business. Accordingly, Franchisee agrees that Franchisee, Franchisee's Designated Operator, Franchisee's Designated Developer, Franchisee's store manager(s), and all other individuals who will have an interest in the Franchise Business must be qualified to the satisfaction of Pearle Vision.  Unless otherwise agreed to in writing and at Pearle Vision's sole discretion, Franchisee, Franchisee's Designated Operator and Franchisee's Designated Developer must satisfactorily complete Pearle Vision's required initial training. The cost of initial training for Franchisee's Designated Operator, Franchisee's Designated Developer and one other person designated by Franchisee is included in the Initial Franchise Fee, however, all travel, lodging, food and other costs associated with attending the training shall be solely borne by Franchisee.

B.    **Additional Training.**   Pearle Vision may designate other mandatory training for Franchisee, Franchisee's Designated Operator, Franchisee's Designated Developer Franchisee's store manager(s) and other employees of Franchisee during the term of this Agreement.  The training must be completed in accordance with the schedule designated by Pearle Vision (and at the training facility designated by Pearle Vision, if any) and Franchisee will be responsible for all costs, if any, related to conducting the training.  In addition, Franchisee may elect to attend other training programs; however, Franchisee must schedule that additional training in accordance with Pearle Vision's then current training policy.  Pearle Vision may charge an additional fee for Franchisee, Franchisee's Designated Operator, Franchisee's Designated Developer or any other individual having an interest in the Franchise Business to attend the training.

C.    **Retraining**.  If Pearle Vision believes that Franchisee is not fully adhering to the Pearle Vision System, Pearle Vision may, in its discretion, require that Franchisee, Franchisee's Designated Operator or Franchisee's Designated Developer attend and successfully complete another session of the initial training program.

D.     **Failure to Attend Training.**  If Pearle Vision, in its sole and exclusive discretion, determines that Franchisee, Franchisee's Designated Operator or Franchisee's Designated Developer has failed to attend or successfully complete all mandatory training programs, that failure constitutes an event of default under <u>Section 18.1</u>, subject to cure in accordance with that Section.

E.     **Travel Costs.**  Franchisee is responsible for all fees, travel expenses, and related costs, if any, incurred by Franchisee, Franchisee's Designated Operator, Franchisee's Designated Developer and Franchisee's employees related to all training.

F.     **Other Training-Related Matters.**  Pearle Vision will not compensate Franchisee's trainees for any services they perform that are incidental to Pearle Vision's required training programs or any subsequent training.   Pearle Vision reserves the sole and exclusive right to determine the duration of, and what subjects are included in, the curriculum of its training programs, and to train any number of individuals from any number of Pearle Vision stores, whether franchised or otherwise affiliated with Pearle Vision, at the same time.

6.2     **Consultation and Operating Assistance.**  Pearle Vision will advise and consult with Franchisee periodically in connection with the operation of the Franchise Business.   Pearle Vision will communicate its know-how, new developments, techniques, standards, and specifications for the Pearle Vision System through visits by field representatives, seminars, manuals, bulletins, letters, videos, email, POS System or other methods of communication.

6.3     **Inspections.**  Pearle Vision may enter and inspect the Location during all reasonable times, regardless of whether the Franchisee is present.

## 7.     Licensed Marks.

As part of the grant of the right to use the Pearle Vision System, Pearle Vision grants to Franchisee the license to use the Marks in accordance with this Agreement.

7.1     **The Marks.**

A.     **Ownership of Marks**.  The Marks are the exclusive property of Pearle Vision, and nothing in this Agreement gives Franchisee any right, title, or interest in or to any of the Marks except as a mere privilege and license during the term of this Agreement to display and use the Marks according to the limitations set forth in this Agreement.  All uses of the Marks by Franchisee inure to the benefit of Pearle Vision.  The limited license to utilize the Marks granted by this Agreement applies only to the Marks designated by Pearle Vision, and which have not been designated by Pearle Vision as being withdrawn from use, together with those which may in the future be designated by Pearle Vision in writing.  During and after the term of this Agreement, Franchisee will neither (i) represent in any manner that Franchisee has acquired any ownership or equitable rights in any of the Marks by virtue of the limited license granted in this Agreement or of Franchisee's use of the Marks, nor (ii) in any way dispute or impugn the validity of the Marks, the rights of Pearle Vision in the Marks, or the rights of Pearle Vision or other franchisees of Pearle Vision to use the Marks.  Franchisee may not apply for or obtain any trademark or service mark registration of any of the Marks or any confusingly similar marks in Franchisee's name.  Following the expiration or termination of this Agreement for any reason, no

monetary amount shall be deemed attributable to any goodwill associated with Franchisee's use of the Marks, or in connection with Franchisee's operation of the Franchise Business.

B.   **Use of Marks.**   Franchisee may only use and display the Marks in full compliance with rules prescribed from time to time by Pearle Vision in the Manual, Supplements to the Manual or otherwise.  Franchisee may not use any of the Marks in connection with the sale of any unauthorized product or service or in any manner not explicitly authorized in writing by Pearle Vision.  Franchisee will use the Marks only for the operation of, or in advertising for, the Franchise Business.  Franchisee's right to use the Marks is limited to those uses that are authorized by this Agreement, and any unauthorized use of the Marks will constitute an infringement of Pearle Vision's rights and a material and incurable breach of this Agreement which, unless waived by Pearle Vision, will entitle Pearle Vision to terminate this Agreement unilaterally and immediately upon notice to Franchisee, with no opportunity to cure.

C.   **Use of Marks in Business Names or on Internet.**   If Franchisee is not an individual, Franchisee may not use any of the Marks, or any words or symbols confusingly similar to the Marks or any part of the Marks, in Franchisee's business name.  In particular, if Franchisee is not an individual, Franchisee may not use the words "Pearle," "Pearle Vision," or any variant of those words as part of its name.

Except with the express permission of Pearle Vision (which may be withheld arbitrarily), Franchisee may not use any of the Marks or any identifiable portion of any of the Marks (such as the words "Pearle" or "Pearle Vision" or any variant of those words) on the Internet, including as part of a Web site name, URL (uniform resource locator), or e-mail address.

D.   **Modification of Marks.**   Pearle Vision may, in its sole discretion, and at any time, modify or discontinue use of any Mark and/or adopt or use one or more additional or substituted Marks.  Pearle Vision will notify Franchisee of those changes, and Franchisee will comply with the instruction by Pearle Vision.  Pearle Vision will not require Franchisee to implement any changes of this type until Pearle Vision has determined to implement (rather than having completed implementation) the same changes within at least fifty percent (50%) of the Company Stores.  The sole obligation of Pearle Vision in the event of any change of this type will be to reimburse Franchisee for Franchisee's documented expenses (such as changing signs, stationery, etc.) of compliance with the change, and Franchisee waives any other claim arising from or relating to any such Mark change, modification, or substitution.  Except as provided in this <u>Section 7.1D</u>, Pearle Vision will not be liable to Franchisee for any expenses, losses, or damages sustained by Franchisee as a result of any addition, modification, substitution, or discontinuation of any of the Marks, and Franchisee covenants not to commence or join in any litigation or other proceeding against Pearle Vision for any such expenses, losses, or damages.

7.2   **Infringements of Marks and Pearle Vision's Related Indemnification.**

A.   **Infringement of Marks by Third Parties.**   If Franchisee receives notice, is informed, or learns that any third party that Franchisee believes is not authorized to use the Marks is using the Marks or any variant of the Marks, Franchisee will promptly notify Pearle Vision of the facts relating to that alleged infringing use.  Thereupon, Pearle Vision will, in its

sole and exclusive discretion, determine whether or not it wishes to take any action against the third party on account of the alleged infringement.  Franchisee has no right to make any demand against any alleged infringer of the Marks or to prosecute any claim of any kind or nature against any alleged infringer of the Marks for or on account of the alleged infringement.

      B.    **Claims Against Franchisee.**  Franchisee must notify Pearle Vision immediately of any claim against Franchisee alleging that Franchisee's use of the Marks constitutes an infringement of someone else's rights.  So long as Franchisee has complied with this Agreement and the Pearle Vision System in Franchisee's use of the Marks, Pearle Vision will indemnify Franchisee against any liability assessed Franchisee in favor of the claimant, including Franchisee's reasonable costs of defending the claim.   Pearle Vision will not be liable for any other damages, costs, expenses, or for any loss of profits or business opportunities or incidental or consequential damages of any kind or nature of Franchisee relating to any such claim.   Pearle Vision reserves the right to defend, compromise, and settle any such action. If Pearle Vision undertakes Franchisee's defense, Pearle Vision will not be responsible for the cost of any independent counsel Franchisee retains.   Pearle Vision shall have no obligation to defend or indemnify Franchisee pursuant to this Section 7.2B if the claim, suit, or demand against Franchisee arises out of or relates to Franchisee's use of the Marks in violation of the terms of this Agreement.

7.3    **Pearle Vision's Enforcement Rights.**  Franchisee explicitly affirms and recognizes the unique value and secondary meaning attached to the Pearle Vision System and the Marks. Accordingly, Franchisee agrees that any non-compliance with the terms of this Agreement, or any unauthorized or improper use of the Pearle Vision System or the Marks, will cause irreparable damage to Pearle Vision and other franchisees of Pearle Vision.  If Franchisee engages in any non-compliance with the terms of this Agreement, or in any unauthorized and/or improper use of the Pearle Vision System or Marks, during or after the termination or expiration of this Agreement, Pearle Vision will be entitled to both temporary and permanent injunctive relief against Franchisee from any court of competent jurisdiction, in addition to all other remedies that Pearle Vision may have at law or in equity.  Franchisee consents to the entry of temporary and permanent injunctions of that type, and Franchisee waives the posting of any bond by Pearle Vision in connection with those injunctions.

8.    **Fees Payable to Pearle Vision.**

Franchisee will pay the fees described below to Pearle Vision. All payments made by Franchisee to Pearle Vision are deemed to be made in Mason, Ohio.

    8.1    **Franchise Fees.**  On or before the date of delivery to Pearle Vision of a copy of this Agreement executed by Franchisee, Franchisee will pay to Pearle Vision the Initial Franchise Fee.  No portion of the Initial Franchisee Fee is refundable except as provided in Section 4.1 of this Agreement.

    If, as noted in Section 1.9, this Agreement is for the renewal of a Franchise Agreement for an existing Pearle Vision franchise, Franchisee must sign this Agreement and remit the Renewal Fee in full before expiration of the term of Franchisee's current franchise agreement.  If the lease or sublease for the Location has not been

LRNA FDD Amendment 11072011

executed as of the execution date of this Franchise Agreement, then the term will be set at ten (10) years, and the Renewal Fee shall be prorated based upon the term.  If a lease or sublease for the Location is later executed for a term less than ten years from the Effective Date, the term of this Agreement will be adjusted and any overpayment of the Renewal Fee shall be credited to Franchisee's business account.  No portion of the Renewal Fee shall be refundable.

8.2     **Royalty.**  Each month, Franchisee will pay Pearle Vision the Royalty based upon Franchisee's Gross Revenues for the preceding month.  However, Gross Revenues will be adjusted to exclude federal, state, county, and city sales taxes or other similar taxes levied upon customers on the basis of sales transactions (duly documented and timely paid by Franchisee to the appropriate taxing authority); the balance due on customers' unclaimed orders ninety (90) days or older; documented reimbursements and price adjustments paid by Franchisee to insurance carriers and governmental agencies; coupon discounts related to optical product, or any other product and cash refunds to customers.  No other adjustments may be made without the approval of Pearle Vision.  All sales of the Franchise Business that comprise the Gross Revenues must be processed in numerical sequence, through the POS System and situated in Franchisee's Location, which system has legible non-resettable totals and can produce printed legible detail and summary listings in sequential order.

Unless prohibited by law, Franchisee, or an Optometric Professional may offer to the general public the opportunity to purchase services that combine a professional service with the purchase of an optical product for a single price.  Each transaction of this nature is referred to as a "***Package Price Discount Transaction***."  Notwithstanding anything to the contrary, fifty percent (50%) of the total price charged by Franchisee (or an Optometric Professional) for each Package Price Discount Transaction involving contact lenses (and any related contact lens products) will be reported by Franchisee to Pearle Vision as part of Franchisee's Gross Revenues.  If a Package Price Discount Transaction is offered that includes a professional service and any optical product other than contact lenses, and related contact lens solutions, the greater of the following will be reported as Gross Revenues:  (a) the retail price charged for the optical product by Franchisee when it is not sold in combination with the professional service, or (b) the total package price less the Optical Professional's standard and customary fee charged for a similar professional service.  This allocation of the price is solely for Franchisee's reporting purposes to Pearle Vision and does not, in any manner, affect the price that Franchisee (or an Optometric Professional) may charge for any exam or optical product.

Each third party, credit or other deferred payment transaction will be treated as a sale for the full price in the month during which the transaction was made, regardless of when Franchisee is to receive payment.

No payment required under this Agreement will permit Pearle Vision directly or indirectly to interfere with or control the independent professional judgment of any Optometric Professional.  Further, the right to receive any payment will not permit Pearle Vision to have access to any confidential information related to patients served by Franchisee or any Optometric Professional.  No payment under this Agreement will be made, directly or indirectly, as an inducement for the referral of patients, and Pearle Vision will not solicit or refer patients to Franchisee.

8.3     **Advertising and Marketing Contribution.**  Each month, Franchisee will pay Pearle Vision the Advertising Contribution.  The Advertising Contribution shall be based upon Gross Revenues unless prevented by law.

If Franchisee ceases to be a Provider for EyeMed for any reason, the Advertising Contribution will immediately become nine percent (9%) of monthly Gross Revenues for the then-remaining term of the Franchise Agreement.

8.4     **Reports and Payments.**

A.     **Business Account.**  All fees due to Pearle Vision by Franchisee, including the Franchise Fee and the Renewal Fee, may, at Pearle Vision's option, be charged to Franchisee's business account as provided by Franchisee to Pearle Vision in a bank authorization form (the "***Business Account***").  All fees will be due and payable at the time or on the due date stated in this Agreement.

B.     **Monthly Franchise Report.**  Franchisee must complete and submit a monthly franchise report, in a format prescribed by Pearle Vision, to report all Gross Revenues and Professional Fee Revenues for the preceding month (the "***Monthly Franchise Report***" or "***MFR***").  Franchisee must certify that the MFR is accurate.  Franchisee must submit each MFR in the manner specified by Pearle Vision no later than the tenth (10th) day of each month.

C.     **Payment of Royalty.**  Franchisee acknowledges that the Royalty is due monthly and Pearle Vision will initiate payment from Franchisee's Business Account no sooner than the fifteenth (15th) day of the month following the month during which the Gross Revenues were generated.  If Franchisee knows that Pearle Vision cannot initiate payment from Franchisee's Business Account for any reason, Franchisee will ensure that Pearle Vision receives the payment due by check, wire transfer, or such other means acceptable to Pearle Vision by no later than the fifteenth (15th) day of the month in question.  Should Franchisee fail to timely submit Franchisee's MFR, in addition to pursuing any other rights available under this Agreement, Pearle Vision will initiate payment from Franchisee's Business Account on or after the 15th day of the month based on the highest monthly amount of Gross Revenues reported by Franchisee during the preceding twelve (12) month period.  If Franchisee later files an MFR that reflects that more funds were withdrawn from Franchisee's Business Account than were due for the month, Pearle Vision will credit the excess against Franchisee's royalty obligations under Franchisee's MFR due for the following month.  No portion of the royalties due to and collected by Pearle Vision will be refundable under any circumstances.

D.     **Mechanics of Payment.**  Franchisee will pay all fees, charges, assessments, and any other sums owed Pearle Vision or its Affiliates when they are due.  Franchisee will make all payments through an electronic transfer process that will provide Pearle Vision the right to initiate electronic debit or credit entries to Franchisee's Business Account for payment of all obligations due and other charges assessed in connection with this Agreement.  Franchisee will enter into a bank authorization form or such other documents in whatever form may be required by Franchisee's financial institution and Pearle Vision for this purpose.

If the electronic system is not functioning at any time and for any reason, Franchisee will ensure that a payment is received by Pearle Vision by the date on which it is due in the form of a check, other type of electronic transfer, money order, or another form that is acceptable to Pearle Vision. Franchisee will ensure that sufficient funds are available to meet Franchisee's obligations to Pearle Vision or its Affiliates. Each time Pearle Vision initiates an electronic transfer that is returned unpaid due to insufficient funds in Franchisee's Business Account, Pearle Vision may impose, in a calendar year, a charge of: Thirty-five ($35) for the first incident and One Hundred Dollars ($100) for each additional incident (the "*NSF Fee*"), however, Pearle Vision reserves the right, in its sole discretion, to increase in the NSF Fee in the future, upon notice to Franchisee.

Pearle Vision will initiate all applicable debit transactions in accordance with the following schedule and as described in this Section:

| | |
|---|---|
| Promissory Note installment(s) | 1st of each month |
| Rent and related monthly expenses | 8th of each month |
| Monthly Franchise Report obligations | 15th of each month |
| Consolidated Statement obligations | 25th of each month |
| All other expenses or charges | No sooner than ten (10) business days after Pearle Vision's invoice to Franchisee |

F.      **Other Payment Issues.**  Pearle Vision may apply any payments received against any part of Franchisee's total obligation as Pearle Vision elects, including application against Franchisee's oldest obligations, unless otherwise required by law.   Pearle Vision may, at its option, assess interest on any overdue amount at the rate of eighteen percent (18.0%) per annum or the maximum rate permitted by law, whichever is lower.   Pearle Vision's imposition or collection of an interest charge will be in addition to any other remedies Pearle Vision may have, including the imposition of the NSF Fee.  Franchisee may not withhold payment of any amounts due to Pearle Vision or its Affiliates on the grounds of alleged non-performance by Pearle Vision of any of its obligations under this Agreement.  Should a dispute arise between Pearle Vision and Franchisee concerning a sum that has been debited from Franchisee's Business Account, Pearle Vision will use all reasonable efforts to resolve the dispute in an expedient manner and Pearle Vision will credit Franchisee's Business Account if a refund is appropriate.  Should a dispute arise between Pearle Vision and Franchisee concerning a sum which will be debited from Franchisee's Business Account in the future, Pearle Vision will use all reasonable efforts to resolve the dispute in an expedient manner; however, if the dispute is unresolved by the due date for the payment, the payment will be debited on the due date based on Pearle Vision's calculations, subject to a subsequent credit, if appropriate.

G.      **Security Interest**.  To secure the due and punctual payment of all fees owed by Franchisee to Pearle Vision, Franchisee hereby agrees that Pearle Vision shall have, and hereby grants to and creates in favor of Pearle Vision, a security interest in Franchisee's assets whether now owned or existing, acquired or arising in the future, or in which Franchisee in the

future have any rights, and wherever located (collectively referred to as the "*Collateral*") in a security agreement by and between Franchisee and Pearle Vision.

**9.      Confidential Information.**

        9.1      **Confidentiality.**  Franchisee may not ever, during the term of this Agreement, any renewal term, or at any time thereafter, divulge or use for the benefit of any other person, partnership, proprietorship, association, corporation, or entity, any knowledge, trade secrets, or know-how concerning the systems of operation, programs, services, products, customers, or practices of Franchisee and/or of Pearle Vision, and/or pertaining to the Pearle Vision System, which may be communicated to Franchisee (the "*Confidential Information*"), except information that Franchisee can demonstrate lawfully came to Franchisee's attention before the disclosure thereof by  Pearle Vision or which, at or after the time of disclosure by Pearle Vision to Franchisee, has become a part of the public domain through publication or communication by others, but in no event through any act of Franchisee.

        9.2      **Definition of Confidential Information.**  Franchisee specifically understands and affirms that the following has been deemed to constitute Confidential Information (without limitation):  all optical products, professional services, equipment, technologies and procedures relating to the Pearle Vision System; all systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications, and criteria which now comprise or in the future may comprise a part of the Pearle Vision System; the Manual; Supplements to the Manual; all other components, specifications, standards, requirements and duties imposed by Pearle Vision or its Affiliates; all plans, specifications, drawings and other information related to the development and construction of a Pearle Vision Store; and, any other information designated as confidential by  Pearle Vision or its Affiliates.

        9.3      **Disclosure of Information.**  Franchisee agrees that Pearle Vision, upon notification to Franchisee, may disclose any information Pearle Vision possesses relating to this Agreement and the Franchise Business.  Additionally, Pearle Vision may, without notification to Franchisee, disclose information related to this Agreement and the Franchise Business obtained in accordance with this Agreement within Pearle Vision's then current FDD.

        9.4      **Employee Confidentiality Agreements**.  Franchisee will require its store manager(s) and other employees to execute Pearle Vision's standard form Employee Confidentiality Agreement (the "*ECA*") in a form acceptable to Pearle Vision.  At Pearle Vision's request, Franchisee will submit a signed copy of each ECA to Pearle Vision for its records promptly following execution of the ECA.  Franchisee acknowledges that the ECAs impose obligations upon Franchisee's store manager(s) and towards Pearle Vision and its Affiliates, and that the ECAs do not impose any obligations upon those individuals towards Franchisee.   Pearle Vision has no obligation to Franchisee to enforce the ECAs for the benefit of Franchisee, and Pearle Vision may refuse to enforce and/or waive enforcement of the ECAs in its sole and exclusive discretion.  The consideration for the execution of the ECA by each employed individual will be Franchisee's employment of the individual.

**10.     Relationship of the Parties.**

LRNA FDD Amendment 11072011

10.1    **Best Efforts.**  Franchisee will assure that Franchisee's Designated Operator and/or Franchisee's Designated Developer will devote their full time and best efforts to the Franchise Business.  Franchisee may not engage in any directly or indirectly conflicting or competing enterprises or any other activities that would be detrimental to or interfere with the operations, reputation, or goodwill of the Franchise Business, Pearle Vision, its Affiliates, or the Pearle Vision System.  Upon Pearle Vision's request, Franchisee will develop and submit to Pearle Vision business plans that will establish the means necessary to maximize the Franchise Business's sales.

10.2    **Parties to Agreement; Designated Operator.**

A.    **Designated Operator.**  The Designated Operator of Franchisee defined in Section 1.3 need not be Franchisee or an Equity Owner of Franchisee; however, if the Designated Operator is not the Equity Owner of at least a twenty-five percent (25%) interest in Franchisee, the Designated Operator must be approved by Pearle Vision.

B.    **Entity Franchisees.**  If Franchisee is a Business Entity, each of the Equity Owners must: (i) be identified in Section 1.6 with a statement of the percentage interest in the Franchise Business; (ii) agree to be personally and individually, jointly and severally with all other Equity Owners, liable to  Pearle Vision for all obligations owing by the Franchisee to Pearle Vision; and (iii)  personally guarantee Franchisee's obligations under this Agreement by executing a separate personal guaranty, in the form approved by  Pearle Vision.

C.    **Equity Ownership and Activities.**  If Franchisee is a Business Entity, the sole purpose of Franchisee must be the operation of the Franchise Business or such other  Pearle Vision franchise operations that  Pearle Vision approves in writing.  All of Franchisee's organizational documents must contain provisions limiting the number of the Equity Owners to not more than five individuals, and restricting the issuance, encumbrance, assignment, and transfer of shares/interest in Franchisee without Pearle Vision's prior written approval.  Each stock certificate or similar ownership documentation must contain Pearle Vision's required restrictive legend.  All Business Entity documentation required by Pearle Vision must be completed by Franchisee and approved by Pearle Vision before the Business Entity begins operation of the Franchise Business.

10.3    **Independent Contractor.**  Franchisee will conduct all aspects of the Franchise Business in a manner that makes it clear that Franchisee is an independent contractor and not in any way an agent, employee, partner, or joint venturer with Pearle Vision.  Franchisee agrees that nothing in this Agreement creates a fiduciary or similar relationship with Pearle Vision.

A.    **Identification.**  Franchisee will conspicuously identify Franchisee, the Franchise Business, and the Location as an independent franchisee of Pearle Vision in all dealings with Franchisee's patients, clients, customers, contractors, suppliers, public officials, and others.  Franchisee will place on all forms, business cards, stationery, advertising, signs, and other materials a notice of independent ownership in such fashion that  Pearle Vision may, at its sole discretion, specify and require from time-to-time, in the Manual or otherwise.

LRNA FDD Amendment 11072011

B.     **No Agency.**  Franchisee will not, without the prior written approval of Pearle Vision, have any power to obligate Pearle Vision for any expenses, liabilities, or other obligations, other than as is specifically provided in this Agreement.   Pearle Vision shall not have the power to hire or fire or have any control over the terms and condition of employment of Franchisee's employees and, except as expressly provided in this Agreement, Pearle Vision may not control or have access to Franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the Franchise Business.  Neither Franchisee nor any employee of Franchisee whose compensation for services is paid by Franchisee may, in any way, directly or indirectly, expressly or by implication, be construed to be an employee or agent of Pearle Vision for any purpose, most particularly with respect to any mandated or other insurance coverage, tax or other contributions, or requirements pertaining to withholdings levied or fixed by any city, county, state, or federal governmental agency.

## 11.     Insurance and Indemnification.

11.1     **Franchisee Insurance.**  Franchisee will acquire and maintain in effect all insurance coverage required by any lease or sublease for the Location.  Franchisee also agrees to acquire and maintain at least the following insurance coverages:

A.     **Commercial General Liability.**  Commercial general liability  with at least a combined single limit of One Million Dollars ($1,000,000) per occurrence and a Two Million Dollars ($2,000,000) per location, combined single limit aggregate for bodily injury/property damage, including products liability, completed operations, personal and advertising injury and blanket contractual liability if the Location does not have an on-site surfacing lab. For stores with an on-site surfacing lab, a combined single limit of Two Million Dollars ($2,000,000) per occurrence and a Four Million Dollars ($4,000,000) per location combined single limit aggregate for bodily injury/property damage, including products liability, completed operations, and a blanket contractual liability.

B.     **Professional Liability.**  An occurrence form of professional liability (malpractice) written with a Two Million Dollars ($2,000,000) per medical incident limit and at least a Four Million Dollars ($4,000,000) aggregate.

C.     **Automobile.**  Automobile liability covering owned, non-owned, and hired automobiles with at least a combined single limit of One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage.

D.     **Property Damage.**  Property damage insurance covering all real (if applicable) and personal property, including leasehold improvements, furniture, fixtures, equipment, and inventory.  The amount of insurance should be for the full replacement cost value of the property. The policy (or policies) should provide coverage for loss or damage caused by "all risk" perils (special causes form is acceptable), including the perils of flood and earthquake where appropriate or when required by Pearle Vision or a leasing or lending institution.

E.     **Business Interruption**.  Business interruption insurance with a limit sufficient to insure at least six months loss of earnings and continuing expenses.

F.     **Workers' Compensation.** Workers' compensation insurance as required by law in the state in which the Franchise Business is located.

G.     **Employer's Liability.** Employers liability insurance with at least a Five Hundred Thousand Dollars ($500,000) each accident/ Five Hundred Thousand Dollars ($500,000) disease each accident/ Five Hundred Thousand Dollars ($500,000) disease policy limit.

H.     **Required Coverage by the State or Locality.** Other insurance required by the state or locality in which the Franchise Business is located and/or required by the underlying lease.

I.     **Additional Insurance Requirements**.  In addition to the insurance required throughout the term of the franchise agreement, upon expiration or termination of this agreement, Franchisee must purchase a "tail" policy with the same coverage as required in this Section 11 and Franchisee's managed vision care participation agreement for any policies on a "claims-made" form.  All insurance policies must expressly provide that it is not subject to cancellation for five years following termination or expiration of this agreement and Franchisee's managed vision care participation agreement and must name Luxottica Retail North America Inc., its subsidiaries, divisions and affiliates, and such other parties that Pearle Vision may direct Franchisee to name as additional insureds.

11.2     **Other Insurance Requirements.**   Pearle Vision may increase the minimum protection or coverage requirements and may require different or additional kinds of insurance to reflect changes in the circumstances surrounding the Franchise Business.

Franchisee will supply Pearle Vision with a certificate of insurance indicating compliance with this Section 11 before taking possession of the store premises and before each annual renewal of Franchisee's insurance policies during the term of the franchise agreement.  All insurance must be placed with carriers approved by Pearle Vision with an A.M. Best rating of at least A-/VII.  All policies required by this Agreement, except workers' compensation related policies, must name Luxottica Retail North America (Pearle Vision), the other Indemnitees (as defined in Section 11.3) and any other parties specified by Pearle Vision as additional insured.  These policies must provide that, even though Pearle Vision is named as an additional insured, Pearle Vision is entitled to recover any losses it incurs by reason of the negligence of Franchisee or Franchisee's agents or employees (cross liability coverage).  All policies must include a provision prohibiting cancellations or material changes to the policy until thirty (30) days' written notice has been given to Pearle Vision.  Franchisee agrees to supply Pearle Vision certificates of insurance five (5) days prior to the Effective Date as a condition precedent to entering into this Agreement, and five (5) days prior to the date of expiration of any coverage in effect, verifying that all required coverage is in effect.  All policies must be renewed prior to their expiration dates.

If Franchisee fails to acquire or maintain in effect the required insurance, Pearle Vision may, but need not, obtain such insurance coverage on behalf of Franchisee.  Franchisee agrees to complete the required documents and pay for such insurance.

LRNA FDD Amendment 11072011

None of the requirements contained herein as to types, limits and approval of insurance coverage to be maintained by Franchisee are intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by Franchisee under this agreement.

Additionally, all policies of insurance will provide that each policy will be primary and any other valid and collectible insurance available to Pearle Vision will be excess. All deductibles and self-insured retentions will be in a commercially reasonable amount and will be the sole financial responsibility of the Franchisee.

Pearle Vision does not make any representation that the types of insurance and limits specified to be carried by Franchisee under this Agreement are adequate to protect Franchisee.  If the Franchisee believes that any such insurance coverage is insufficient, Franchisee shall provide, at its own expense, such additional insurance as Franchisee deems adequate.

11.3    **Indemnity.**  Franchisee will at all times agree to defend, at Franchisee's own cost, and indemnify to the fullest extent permitted by law, Pearle Vision, its Affiliates, successors, assigns, and designees of each such entity, and the respective directors, officers, employees, agents, attorneys, shareholders, designees, and representatives of each (collectively, the "*Indemnitees*") from all losses and expenses (as defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof which arises out of or is based upon any of the following, whether or not founded in whole or in part upon negligence of the Indemnitees:  Franchisee's alleged or actual infringement or violation of any patent, trademark, or copyright or other proprietary right owned or controlled by third parties; Franchisee's alleged violation or breach of any contract, federal, state, or local law, regulation, ruling, standard, or directive or of any industry standard; libel, slander or any other form of defamation by Franchisee; Franchisee's alleged violation or breach of any warranty, representation, agreement, or obligation in this Agreement; any acts, errors, or omissions of Franchisee or any of Franchisee's agents, servants, employees, contractors, partners, proprietors, affiliates, or representatives; latent or other defects in the Location, whether or not discoverable by  Pearle Vision or Franchisee; any product or service provided by Franchisee at, from, or related to the operation of the Franchise Business or the Location; any action by any customer of the Franchise Business or visitor to the Location; any damage to the property of Franchisee or  Pearle Vision, their agents, or employees, or any third person, firm, or corporation; and the transfer of any interest in this Agreement, the Location, the Franchise Business or any of the assets used in the operation of the Franchise Business.

The above notwithstanding, specifically excluded from the indemnity given hereby is any liability arising solely and directly from the gross negligence of the Indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein shall extend to any finding of comparative negligence or contributory negligence attributable to Franchisee or any of the Indemnitees, as applicable).

For the purpose of this Section 11.3, the term "*losses and expenses*" means all losses; compensatory, exemplary or punitive damages; fines; charges; costs; expenses; lost profits; attorneys' fees; experts' fees; court costs; settlement amounts; judgments; compensation

for damages to Pearle Vision's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time or space, and costs of changing, substituting, or replacing same; and all expenses of recall, refunds, compensation, public notices, and other such amounts incurred in connection with the matters described.

Franchisee will give Pearle Vision notice of any action, suit, proceeding, claim, demand, inquiry, or investigation that names any of the Indemnitees. At the expense and risk of Franchisee, the Indemnitees may elect to assume (but under no circumstance are obligated to undertake) the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry, or investigation, provided that the Indemnitees will seek the advice and counsel of Franchisee, and will keep Franchisee informed with regard to any proposed or contemplated settlement(s). Such an undertaking by the Indemnitees will in no manner or form diminish Franchisee's obligation to indemnify the Indemnitees. Franchisee acknowledges that Franchisee has no authority to accept any service of process on behalf of Pearle Vision or any of the other Indemnitees.

Pearle Vision may, at any time and without notice as it in its judgment deems appropriate, offer, order, consent, or agree to settlements or take any other remedial or corrective actions it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry, or investigation if, in Pearle Vision's sole judgment, there are reasonable grounds to believe that any of the acts or circumstances enumerated in this Section 11.3 have occurred, or that any act, error, or omission of Franchisee may result directly or indirectly in damage, injury, or harm to any person or any property. All losses and expenses incurred under this Section 11.3 shall be chargeable to and paid by Franchisee pursuant to Franchisee's obligations of indemnity under this Section 11.3, regardless of any actions, activity, or defense undertaken by Pearle Vision or any of the Indemnitees or the subsequent success or failure of such actions, activity, or defense.

The Indemnitees do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee may contract, regardless of the purpose. Franchisee will indemnify the Indemnitees for all losses and expenses which may arise out of any acts, errors, or omissions of these third parties.

Under no circumstances are the Indemnitees required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by the Indemnitees from Franchisee.

## 12. Inventory and Purchasing.

All optical products and professional services sold at or from the Franchise Business must be approved by Pearle Vision. Pearle Vision reserves the right to approve each source. Franchisee will also provide such other optical products and professional services as are and may be designated from time to time by Pearle Vision.

12.1 **Inventory**. If the Franchise Business is a new store (that is, this Agreement is neither a renewal nor a transfer), Franchisee must participate in STARS as defined in Section 1.21 and, upon execution of this Agreement, sign a STARS

LRNA FDD Amendment 11072011

Consignment Agreement by and between Pearle Vision and Franchisee (the "***STARS Consignment Agreement***").  The STARS Consignment Agreement shall require Franchisee to, among other things, purchase from Pearle Vision the Initial Frame Assortment on consignment as defined therein, and replenish a specific amount of the initial frame assortment by consignment through the term of the STARS Consignment Agreement.  Pearle Vision reserves the right to terminate the STARS Consignment Agreement upon notice as outlined therein, and upon termination, require Franchisee to participate in a different inventory program as determined by Pearle Vision in its sole discretion. Prior to opening the Location, Franchisee must purchase additional inventory that either Pearle Vision requires, or determines, in its sole discretion, is necessary to operate the Location.  Depending upon the type of Franchise Business, this additional inventory will include, but not be limited to stock lenses, contact lenses, shopping bags, receipt holders, receipt paper, and other accessories ("***Additional Inventory***").  Franchisee shall purchase that Additional Inventory from Pearle Vision or an approved supplier as outlined in this Section 12.

12.2   **Sourcing.**  If Franchisee desires to offer optical products from sources that have not been previously approved by Pearle Vision, Franchisee must submit a written request, along with samples of the optical products or professional services, to Pearle Vision for approval.  The request must include the name and address of the source.  Pearle Vision will have the right to require that its representative be permitted to inspect the source's facilities.  Pearle Vision will notify Franchisee of its approval or disapproval in writing within ninety (90) days after receipt of Franchisee's request and samples.  Pearle Vision will have the right to impose specifications governing the minimum standards of optical products, professional services, and equipment obtained by Franchisee from third parties and reasonable limits on the number of approved optical products.

12.3   **Designated Supplier Status.**  If Franchisee desires, Franchisee may submit the Location for Pearle Vision's approval as a designated supplier ("***Designated Supplier***").  As a Designated Supplier, Franchisee may utilize its on-site laboratory services to supply Franchisee's identically-owned Pearle Vision franchise location(s) as outlined in the Manual or Supplement to the Manual.  Franchisee agrees that Franchisee may not attempt to utilize Designated Supplier services for such locations without first obtaining Pearle Vision's prior written consent.

12.4   **Purchases from Pearle Vision's Affiliates**.  Among the approved suppliers for optical products are various affiliates of Pearle Vision.  If Franchisee chooses to purchase optical products from affiliates of Pearle Vision, Pearle Vision or its affiliates will invoice Franchisee for all products purchased.  Within fifteen (15) days after receipt of each invoice, Franchisee must notify Pearle Vision in writing of any inaccuracy in or questions about the invoice.  Any inaccuracies not raised in writing within fifteen (15) days after delivery of the invoice are waived.  Pearle Vision and its affiliates will rely on this provision in determining the retention of back-up documentation for sales transactions.  Franchisee's failure to deliver a written objection within that fifteen (15) day period constitutes an acknowledgment that the invoices are accurate, and an agreement that Pearle Vision is not required to retain or obtain further documentation beyond the invoice itself.

LRNA FDD Amendment 11072011

## 13.   Marketing.

13.1   **Marketing Funds.**   The Advertising Contribution by Franchisee pursuant to
Section 8.3 will be combined with all similar contributions made by other franchisees of Pearle
Vision to form the "***Fund***."   Pearle Vision will contribute an amount to the Fund each month
equal to eight percent (8%) of the Monthly Gross Revenue of Company Stores.

The Fund will be divided into two portions—the "***Local Co-op Advertising
Fund***" and the "***System-Wide Advertising Fund***"—and administered as follows:

A.   **Local Co-Op Advertising Fund.**   Two percent (2%) of the Advertising
Contribution will be allocated to the Local Co-op Advertising Fund, and will be used by Pearle
Vision, from time to time, to purchase and place advertising in Franchisee's local market as well
as such other uses as may be authorized by the terms of this Agreement.   Unless otherwise
agreed in writing, Franchisee must comply with all policies, procedures and the charter
applicable to the local advertising co-op through which Pearle Vision controls the Local Co-op
Advertising Fund of which Franchisee, by this Agreement, is a member.

B.   **System-Wide Advertising Fund.**   Six percent (6%) of the Advertising
Contribution will be allocated to the System-Wide Advertising Fund, and will from time to time
be used by Pearle Vision to purchase and place national, regional, and local advertising relating
to the promotion of all Pearle Vision System stores, whether franchised or Company Stores, as
well as such other uses as may be authorized by the terms of this Agreement.

C.   **Termination of Fund.**   Although the Fund is intended to be of perpetual
duration, Pearle Vision maintains the right to terminate either or both parts of the Fund.   Neither
part of the Fund will be terminated, however, until all monies in that portion of the Fund have
been expended for advertising and promotional purposes.

13.2   **Use of Fund.**   The Fund will be used for the following:   (a) national,
regional, and local advertising and marketing: (b) brand management and merchandising; (c)
advertising agency fees and charges; and to defray costs associated with production, placement,
creative fees, Pearle Vision's in-house marketing administrative expenses, and related activities.
With regard to Pearle Vision's in-house marketing expenses described herein, Pearle Vision may
withdraw and expend up to ten percent (10%) of the Fund in any fiscal year for Pearle Vision's
reasonable administrative costs and overhead incurred in activities reasonably related to the
administration or direction of the Fund and advertising programs for franchisees (including
conducting market research, preparing marketing and advertising materials, and collecting and
accounting for assessments for the Fund).   All final decisions regarding the use of the Fund,
including the creative concepts, materials, media used, and placement and allocation thereof, will
be within the sole discretion of Pearle Vision.   Pearle Vision may commingle all Advertising
Contributions and Corporate Contributions, whether from Franchisee or Company Stores, with
its own funds pending future application of these funds to the cost of the advertising and
marketing activities or such other uses as may be authorized pursuant to the terms of this
Agreement.

A.     **Annual Expenditures.**  Pearle Vision may spend, in any fiscal year, an amount greater or less than the aggregate contributions of franchise and Company Stores to the Fund in that year.  No portion of the Advertising Contribution will be refundable under any circumstances.  At the end of each fiscal year, Pearle Vision will prepare and make available at Franchisee's request an annual report certified by an officer of Pearle Vision summarizing the total expenditures of the Fund for Pearle Vision's prior fiscal year.  If Pearle Vision expends less than the total sum available in the Fund during any fiscal year, it will expend the unused sum for any segment of the Fund during the following fiscal year.  If Pearle Vision expends an amount greater than the amount available in the Fund in any fiscal year (after expenditure of any sum required to be expended because of its failure to expend all the sums available in the Fund during the preceding year), Pearle Vision may reimburse itself from the Fund during the next fiscal year.

B.     **Allocation of Expenditures.**  The Fund is intended to further general public recognition and acceptance of the Marks and the Pearle Vision brand for the benefit of the Pearle Vision System.  Pearle Vision and its designees undertake no obligation to make advertising expenditures for Franchisee that are equivalent or proportionate to Franchisee's Advertising Contribution, or to ensure that any particular franchisee benefits on a *pro rata* basis from the placement of advertising.

13.3     **Other Advertising.**  So long as Franchisee obtains Pearle Vision's prior written consent to all advertising and promotional materials proposed for use by Franchisee, Franchisee may engage in additional advertising and promotion of the Franchise Business at Franchisee's sole cost.  Even though Franchisee obtains Pearle Vision's consent, Franchisee understands that Franchisee will be solely responsible for complying with all laws and regulations relating to the advertising.

13.4     **Grand Opening.**  Within sixty (60) days after the Open Date, Franchisee will spend the Grand Opening Amount on advertising in connection with the Store's grand opening.  The placement and content of this grand opening advertising must be approved by Pearle Vision.

13.5     **POP Materials**.  With regard to Pearle Vision's system-wide and local advertising campaigns, Pearle Vision, at Pearle Vision's cost, will provide Franchisee with corresponding in-store advertising and promotional materials ("*POP Materials*").  Franchisee is required to display the then-current POP Materials at the Location.

**14.     Covenants Against Competition.**

For purposes of this <u>Section 14</u>, a "*Competitive Business*" is any business that:  (i) offers or sells retail optical products and professional services; (ii) offers or sells any products or services related thereto; (iii) engages in any of the activities which this Agreement contemplates will be engaged in by Franchisee; or (iv) offers or sells any other product or service which comprises or may in the future comprise a part of the Pearle Vision System (or any product or service confusingly similar thereto).

14.1     **In-Term Covenant.**  Throughout the term of this Agreement, Franchisee will not, either directly or indirectly, engage in any Competitive Business other than operation of other

franchises from Pearle Vision.  Franchisee is prohibited from engaging in any such Competitive Business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, adviser, or consultant thereof.  Additionally, Franchisee may not divert any business that could be handled by the Franchise Business to any other entity.

14.2    **Post-Term Covenant.**  For a period of one (1) year beginning on the later of (a) the expiration, termination, transfer or assignment of this Agreement, or (b) the date that Franchisee is in full compliance with this Section 14.2, Franchisee will not, either directly or indirectly, engage in any Competitive Business that is located at or within a three (3) mile radius of the Location.  This prohibition includes engaging in any such Competitive Business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, adviser, tenant, or consultant thereof.

14.3    **Indirect Competition.**  The prohibitions of Section 14.1 and Section 14.2 include not only direct competition but also all forms of indirect competition, such as consultation for Competitive Businesses, service as an independent contractor for such Competitive Businesses, or any assistance or transmission of information of any kind or nature that would be of any material assistance to a Competitive Business.

The provisions of Section 14.1 and Section 14.2 are not intended, however, to prevent Franchisee from owning for investment purposes up to an aggregate of five percent (5%) of the capital stock of any competitive business that is a publicly held corporation whose stock is listed and traded on a national or regional stock exchange, or through the National Association of Securities Dealers Automated Quotation System (NASDAQ), provided that Franchisee is not an officer or director and does not control any such company.

14.4    **Third-Party Covenants.**  Franchisee will require and obtain the execution of Pearle Vision's standard form of confidentiality/covenant not to compete agreement (the "***CCNCA***"), in a form acceptable to Pearle Vision from Franchisee's Designated Operator, Franchisee's Designated Developer and each of Franchisee's Equity Owners, officers and directors.  Franchisee will submit a signed copy of each CCNCA to Pearle Vision for its records promptly following execution of the CCNCA.  Franchisee acknowledges that the CCNCAs impose obligations upon Franchisee's Equity Owners, Designated Operator, Designated Developer, officers, and directors towards Pearle Vision and its Affiliates, but the CCNCAs do not impose obligations upon those individuals towards Franchisee.  Pearle Vision has no obligation to Franchisee to enforce the CCNCAs, and Pearle Vision may refuse to enforce and/or waive enforcement of the CCNCAs in its sole and exclusive discretion.  It is understood by the parties that the consideration for the execution of the CCNCA by each employed individual will be Franchisee's employment of the individual.

14.5    **Other Employees.**  Franchisee expressly covenants not to employ any person who is concurrently involved in any way with any business that is competitive with the Franchise Business, except that Franchisee may employ (where allowed by law) part-time optometrists, ophthalmologists, and/or licensed opticians.

14.6    **Remedies.**  Violation of the covenants not to compete in this Agreement would result in immediate and irreparable injury to Pearle Vision for which no adequate remedy at law

may be available.  Franchisee expressly agrees that it may conclusively be presumed that any violation of the terms of the covenants relating to competition was accomplished by and through Franchisee's unlawful utilization of Pearle Vision's confidential information, know-how, methods, and procedures.  Accordingly, Franchisee expressly agrees that in addition to all other remedies, Pearle Vision is entitled to the remedy of injunctive relief and other equitable remedies in enforcing its rights under this Agreement and the customary rules of equity respecting application therefore and defenses thereto, and Franchisee waives the posting of any bond by Pearle Vision in connection therewith.

14.7    **Revision of Covenants.**  If all or any portion of the covenants not to compete set forth in this Agreement are held unreasonable, void, vague, or illegal by any court or agency having competent jurisdiction over the parties and subject matter, the court or agency is empowered to revise and/or construe the covenants so as to fall within permissible legal limits and will not by necessity invalidate the entire covenants.  Franchisee expressly agrees to be bound by any lesser covenants subsumed within the terms of this Section 14 as if the resulting covenants were separately stated in and made a part of this Agreement.

## 15.    Recordkeeping; Reports; Audits.

Throughout the term of this Agreement, Franchisee will prepare and maintain full, complete, and accurate books, records, and accounts of the Franchise Business.  Franchisee will maintain those records on an accrual basis in accordance with generally accepted accounting principles, and in the form and manner prescribed by Pearle Vision.  Franchisee agrees to prepare, preserve, and report all of the information in accordance with Pearle Vision's directions.

15.1    **Submission of Financial Statements.**  Franchisee acknowledges the importance of Pearle Vision having access to full and accurate information and records regarding the operation of the Franchise Business.  Franchisee will submit the following financial statements to Pearle Vision, each signed and verified as true and correct by Franchisee (or if Franchisee is a Business Entity, by its duly authorized Equity Owner).

A.    **Quarterly Statements.**  Commencing as of the next full quarter following the Effective Date of this Agreement, Franchisee will provide Pearle Vision on a quarterly basis a profit and loss statement and balance sheet (the "***Quarterly Financial Statements***") on Pearle Vision's forms or substantially similar forms showing the results of the Franchise Business.

B.    **Annual Statements.**  Franchisee will provide Pearle Vision on an annual basis, annual financial statements that reflect the period from January 1 through December 31 of the prior year ("***Year-End Financial Statements***"), which must include (at a minimum) a profit and loss statement, balance sheet, statement of cash flow, and explanatory footnotes.

C.    **Financial Statements**.  Franchisee's Quarterly Financial Statements and Year-End Financial Statements are referred to collectively as the "***Financial Statements***."  The

LRNA FDD Amendment 11072011

Financial Statements must be submitted in accordance with the following schedule:

| Reporting Period | Due Date |
|---|---|
| January, February, March | April 30 |
| April, May, June | July 31 |
| July, August, September | October 31 |
| Year-End (12/31) | March 31 |

D.     **Confidentiality.**  Pearle Vision will maintain the confidentiality of Franchisee's Financial Statements; however, Franchisee agrees that Pearle Vision may use any information obtained from Franchisee's Financial Statements for such analytical purposes as Pearle Vision may deem appropriate.  Pearle Vision may also use financial information extracted from Franchisee's Financial Statements in Pearle Vision's FDD, provided that Franchisee is not individually identified.

E.     **Compliance**.  If Franchisee fails to submit either of the Quarterly Financial Statements or Year-End Financial Statements within fifteen (15) days after the designated due date, Pearle Vision may, in addition to any other remedies it has, impose a monthly late charge in accordance with Pearle Vision's then current policy until such time as Franchisee provides the Quarterly or Year-End Financial Statements.  The late charge may not exceed One Thousand Dollars ($1,000) per month.  If Franchisee fails to timely submit either the Quarterly or Year-End Financial Statements twice in a twelve (12) month period, Pearle Vision may elect to perform a full audit of the Franchise Business.  Franchisee will pay for all costs and fees including travel and *per diem* costs incurred by Pearle Vision, if any, associated with an audit pursuant to this paragraph.

15.2     **General Audit Rights.**  Franchisee agrees that it is Franchisee's responsibility to accurately report all information requested by Pearle Vision in accordance with this Agreement. In addition to Pearle Vision's audit right described in Paragraph F of Section 15.1, Pearle Vision may periodically examine and audit the Franchise Business to verify the accuracy of the information reported.  Franchisee will execute a HIPAA Privacy Business Associate Addendum attached hereto to enable Pearle Vision to gain full access to audit its books and records, as well as to fully cooperate with Pearle Vision in the conduct of those examinations and audits.

A.     **Costs of Audits.**  Generally, Pearle Vision will bear the costs of routine examinations and audits.  If the audit or examination reveals that Gross Revenues have been under reported, Franchisee will immediately pay Pearle Vision the deficit.  If Franchisee under-reported Gross Revenues by two percent (2%) or more, Franchisee will reimburse Pearle Vision for the costs and fees associated with conducting the audit (including travel and *per diem* costs incurred by Pearle Vision, if any).

B     **Gross Under-Reporting.**  If any audit concludes that Franchisee has under-reported its Gross Revenues by at least two percent (2%) or more, Franchisee shall be in material default of this Agreement, with a right to cure.  If any audit concludes that Franchisee has under-reported Gross Revenues by eight percent (8%) or more, Pearle Vision may, in addition to all other remedies available to Pearle Vision, immediately terminate this Agreement upon notice to Franchisee, but without a right to cure as described in Section 18.2 herein. If

Franchisee has under-reported more than twice during the term of this Agreement (with at least one time being by two percent (2%) or more), Pearle Vision may, in addition to declaring a default of this Agreement, contract with an independent certified public accountant of its choice to conduct a full audit of the Franchise Business, for which Franchisee will bear all related costs.

15.3   **Access to Other Records.**   Franchisee will provide Pearle Vision, at Pearle Vision's request, access to any other information, regardless of who possesses it, that relates in any way to the Franchise Business, including a copy of each of Franchisee's final prior year annual city, county, state, and federal tax returns for the Franchise Business and Franchisee's personal financial statements and tax returns.  Pearle Vision will maintain Franchisee's confidentiality related to those other financial information.

## 16.   Assignments.

16.1   **By Pearle Vision.**   Pearle Vision may transfer or assign this Agreement to any third party that Pearle Vision believes will fulfill the contractual obligations under this Agreement.

16.2   **By Franchisee.**   This Agreement is personal to Franchisee.  Pearle Vision entered into this Agreement in reliance upon and in consideration of the singular personal skill and qualifications of Franchisee (or, if Franchisee is a Business Entity, the Equity Owners) and the trust and confidentiality that Pearle Vision reposed in Franchisee (or its Equity Owners).  Therefore, except as specifically provided in this Agreement, Franchisee and its Equity Owners may not transfer, assign, sell, share, redeem, sublicense, or divide, voluntarily or involuntarily, directly or indirectly, by operation of law or otherwise, in any manner, any interest in the Franchise Business without the prior written consent of Pearle Vision procured in accordance with the terms and conditions set forth in this Section 16.2.  For purposes of this Section 16.2, an "interest in the Franchise Business" includes Franchisee's interest in this Agreement, Franchisee's rights and privileges under this Agreement, the Location or any interest in the Location, and the Equity Owners' interest in a Franchisee Business Entity.

A.   **Conditions to Consent.**   Pearle Vision will not unreasonably withhold its consent to a transfer or sale of any interest described in this Section 16.2.  Franchisee acknowledges that it will not be unreasonable for Pearle Vision to impose, among other requirements, the following conditions precedent to its consent to any transfer:

(i)   That the proposed transferee, and all Equity Owners of the transferee if the transferee is a Business Entity (individually and collectively the "***Transferee***") will apply to Pearle Vision for acceptance as a franchisee, and furnish to Pearle Vision all application forms, documents, information, and references that Pearle Vision requests to determine the Transferee's skills, qualifications, and economic resources, and to evaluate the proposed transfer;

(ii)   That the Transferee demonstrates that Transferee has the skills, qualifications, ethics, moral values, and economic resources necessary, in Pearle Vision's sole judgment, reasonably exercised, to conduct the Franchise Business contemplated by this Agreement, and to fulfill Transferee's obligations to the transferor;

(iii)    That the proposed Transferee, Transferee's proposed designated operator or designated developer, and any store manager(s) employed by the proposed Transferee have attended and successfully completed Pearle Vision's initial training programs (or other training that Pearle Vision reasonably requires), at the Transferee's own expense (which will include a training fee and any expenses incurred by the trainees in connection with attendance at the training class);

(iv)    That as of the date of any the transfer, the Franchisee and all Equity Owners of a Franchisee Business Entity (individually and collectively the "*Transferor*") have fully complied with all of Transferor's obligations to Pearle Vision, both monetary and otherwise, whether under this Agreement or any other agreement, arrangement or understanding with Pearle Vision or its Affiliates;

(v)    That the Transferor will obtain in writing and transmit to Pearle Vision any necessary third party consents (such as the consent of the lessor or sublessor of the Location to the assignment of the Location lease or sublease or the consent of any promissory note holder to the assignment of such note);

(vi)    That the holder of any financial instrument to which Transferee is a party and grants a security interest in the Location or any assets of Transferee must enter into an intercreditor or subordination agreement with Pearle Vision in a form acceptable to Pearle Vision;

(vii)    That Transferor: (a) will indemnify Pearle Vision against all liabilities incurred by Pearle Vision pursuant to the Location lease (if Pearle Vision is the sublessor) or any guaranty by Pearle Vision of the Location lease for a period of thirty-six (36) months after the effective date of the transfer or assignment, and will execute all instruments reasonably requested by Pearle Vision to evidence that indemnity, and (b) execute a full release of all claims, demands, and causes of action that Transferor, and its executors, administrators and assigns may or might have against Pearle Vision and its Affiliates, and their respective officers, directors, shareholders, agents, attorneys, contractors and employees in their corporate and individual capacities;

(viii)    That the Transferee's designated operator, equity owners, officers and directors of Transferee have executed Pearle Vision's standard form CCNCA (as referenced in Section 14.4);

(ix)    That the Transferee's store manager(s) and employees have execute Pearle Vision A's standard form ECA (as referenced in Section 9.4);

(x)    That before the transfer, the Transferor has furnished to Pearle Vision a fully-executed copy of the proposed transfer/purchase agreement with all exhibits and supporting documents (which must state that the transfer/purchase is subject to Pearle Vision's prior written approval and to the approval of any third parties, as required by any obligation or agreement related to the franchise granted hereunder);

(xi)    That the Transferor remains liable for all of Transferor's obligations to Pearle Vision arising out of or related to this Agreement before the effective date

of the transfer or assignment, and has executed all instruments reasonably requested by Pearle Vision to evidence that continuing liability;

(xii)     That the Transferee, at Transferee's expense, commits to upgrade the Location to conform to Pearle Vision then-current standards and specifications, and complete such upgrading within the time reasonably specified by Pearle Vision;

(xiii)    That, if applicable, in those cases where the Location has been identified as a Designated Supplier for other Pearle Vision stores owned by Transferor, Transferor must at the time of any transfer make arrangements acceptable to Pearle Vision for the supply of those other stores; and

(xiv)     That the Transferor complies with the terms of the post-term covenant not to compete provisions set forth in Section 14.2 of this Agreement, commencing upon the effective date of the transfer.

B.     **Transfer Fee.** At the time any transfer request is submitted, Franchisee must pay Pearle Vision a non-refundable transfer fee in the amount of Five Thousand Dollars ($5,000.00) (the "***Transfer Fee***"). The Transfer Fee is in addition to any other costs Franchisee may incur to third parties related to Franchisee's request for transfer. If less than Franchisee's entire interest under this Agreement is being transferred, the Transfer Fee will be pro-rated based on the percentage of interest being transferred. The Transfer Fee is not refundable, and Pearle Vision reserves the right to reduce or waive this fee.

No Transfer Fee will be payable for the first transfer of an interest in this Agreement and the Franchise Business to a Business Entity if: (i) the Transferor is neither a Business Entity nor an owner of an interest in a Business Entity; and (ii) the owners of the Transferee Business Entity are identical to Equity Owners of the Franchisee immediately before the transfer. Franchisee must obtain Pearle Vision's prior written approval and Franchisee must provide Pearle Vision with any documentation necessary to effectuate the transfer at Franchisee's sole expense.

C.     **Death or Disability.** Promptly after the death or permanent incapacity of anyone holding an interest in the Franchise Business, arrangements satisfactory to Pearle Vision must be made to dispose of that interest within one hundred eighty (180) days, otherwise, Pearle Vision may terminate this Agreement in accordance with Section 18.1. In addition, upon the death or permanent incapacity of the Designated Operator or Designated Developer for the Pearle Vision Store at the Location, whether an Equity Owner or an employee, arrangements satisfactory to Pearle Vision must be made to designate a subsequent Designated Operator or Designated Developer within sixty (60) days. During this interim period, Pearle Vision may assume operation of the Franchise Business if Pearle Vision determines that there is no heir, other principal, or immediate replacement for the Designated Operator capable of operating the Franchise Business or a Designated Developer capable of developing the Franchise Business, whichever is applicable. Pearle Vision will account for the proceeds and costs of the Franchise Business while operating it on behalf of Franchisee but will not be responsible for any losses it incurs. As compensation for the services provided, in addition to the other fees due hereunder, Pearle Vision will be entitled to a monthly fee of eight percent (8%) of Gross Revenues.

D.     **Right of First Refusal.**  Franchisee will give Pearle Vision the first right of refusal on any offer by a third party to purchase Franchisee's entire interest in the Franchise Business.  If the consideration is not money, the purchase price will be cash equal to the fair market value of the proposed consideration.  Pearle Vision will have thirty (30) days from the time Franchisee provides all of the requested information and documents in which to notify Franchisee of its decision.  Franchisee's failure to close the sale of the Location within one hundred and twenty (120) days following Franchisee's notice to Pearle Vision of the offer will immediately revive Pearle Vision's right of first refusal described herein.

E.     **Compliance by Equity Owners.**  All persons, whether an individual or a Business Entity, acquiring any portion of Franchisee's interest in the Franchise Business must sign Pearle Vision's then-current form of personal guaranty, and complete Pearle Vision's initial training program as contemplated by Section 6.1.

## 17.   Term and Renewal.

17.1   **Term.**  This Agreement will be for a term of not less than ten (10) years, commencing on the Effective Date identified in Section 1.5 and shall expire on the Expiration Date identified in Section 1.8 or upon the occurrence of one of the following:  (i) termination of this Agreement in accordance with the provisions of Section 18; (ii) expiration or termination of the lease for the Location; or (iii) the date otherwise specified in any applicable addendum to this Agreement.

17.2   **Renewal.**  When this Agreement expires, Pearle Vision will offer Franchisee a new franchise agreement for the Franchise Business for a term not less than five (5) years, in accordance with the terms and conditions then being offered by Pearle Vision for new franchisees (or, if Pearle Vision is not then offering franchises for new franchisees, on the terms and conditions then being offered by Pearle Vision for renewing franchisees), if Franchisee is in compliance with the conditions to renewal described in Section 17.3.  If Franchisee appears to be eligible for issuance of a new franchise agreement upon expiration of this Agreement, Pearle Vision and Franchisee will follow the procedures in this Section 17.2.

A.     **Notice of Eligibility.**  At least one hundred eighty (180) days before expiration of this Agreement, or such longer period as required by law, Pearle Vision will notify Franchisee whether Franchisee appears to be eligible to sign a new franchise agreement, and if not, what steps would be necessary for Franchisee to become eligible.  Within thirty (30) days after receiving Pearle Vision's notice, Franchisee must notify Pearle Vision if Franchisee desires to continue operating the Franchise Business and, if Franchisee subleases the Location from Pearle Vision whether Franchisee desires to continue as a subtenant of Pearle Vision.

B.     **Disclosure.**  If Franchisee gives timely notice of desire to sign a new agreement, Pearle Vision will deliver its then-current FDD to Franchisee.  Franchisee should then promptly sign a receipt for the disclosure document as required by law and return it to Pearle Vision.  Franchisee understands that the Renewal Documents (as defined below), may contain terms and conditions that are significantly different from this Agreement.

C.     **Execution of Franchise Documents.**  No sooner than fourteen (14) days after Franchisee receives Pearle Vision's disclosure document, Franchisee must execute Pearle Vision's then-current franchise agreement and other documents required by Pearle Vision at that time (collectively, the "***Renewal Documents***") and pay the then-current renewal fee.

Among other things, the Renewal Documents Franchisee must execute will contain a release of all claims against Pearle Vision or its Affiliates arising out of or related to this Agreement and the lease/sublease (if any); the offer and sale of this Agreement; the franchise relationship; and all other claims, demands, or accounts at law or equity.  The release will not purport to release Pearle Vision or its Affiliates from any future claims arising out of or related to the renewal franchise agreement being entered into between Franchisee and Pearle Vision.

D.     **Lease/Sublease.**  If Franchisee leases or subleases the premises of the Location from Pearle Vision, Pearle Vision is under no obligation to enter into any lease, extend any lease, or exercise any lease option or purchase agreement for the benefit of Franchisee as subtenant or tenant.

E.     **Continuing Compliance.**  Pearle Vision will be released from any obligation to sign a new franchise agreement with Franchisee if, at the time of expiration of this Agreement, Franchisee no longer satisfies any of the conditions to renewal described in Section 17.3.

17.3     **Conditions to Renewal.**  When this Agreement expires, Pearle Vision will offer Franchisee a new franchise agreement for the Franchise Business, on the terms and conditions then being offered by Pearle Vision for new franchisees (or, if Pearle Vision is not then offering franchises for new franchisees, on the terms and conditions then being offered by Pearle Vision for renewing franchisees), if Franchisee complies with the following conditions:

A.     **Operations.**  Franchisee has been operating the Franchise Business in a manner that complies with the Pearle Vision System and the business plans, if any, developed for maximizing sales of the Franchise Business.  Additionally, Franchisee has demonstrated to Pearle Vision's satisfaction Franchisee's history of positive and constructive actions to enhance the Pearle Vision System image and Pearle Vision System brand through such means as: (1) Franchisee's local trade area marketing promotions; and (2) Franchisee's use of and participation in Pearle Vision programs including meetings, seminars and merchandising techniques.

B.     **No Defaults.**  Franchisee is not then in default or in the process of curing a default of its franchise agreement.

C.     **Monetary Obligations.**  Franchisee, Franchisee's Equity Owners and each guarantor of Franchisee's obligations has satisfied all monetary obligations owed by Franchisee, Franchisee's related entities or entities controlled by Franchisee's Equity Owners, to Pearle Vision,

D.     **Property.**  The Location complies with Pearle Vision's then-current requirements for new Pearle Vision stores, or Franchisee has obtained Pearle Vision's approval for relocation of the Franchise Business in accordance with Section 4.3.

E.    **Refurbishment.**  Franchisee has made arrangements agreeable to Pearle Vision for the refurbishment of the Location, including execution of the SDSA, the repair, replacement, or acquisition of specified furniture, fixtures, equipment, and computer hardware and software components, in accordance with Pearle Vision's instructions and the Pearle Vision System standards.

F.    **Training.**  Franchisee, Franchisee's Designated Operator and any other individuals involved in the Franchise Business and that Pearle Vision designates have completed Pearle Vision's required training to the satisfaction of Pearle Vision.

## 18.    Termination.

18.1.    **Termination Subject to Cure.**  Except as otherwise provided in <u>Section 18.2</u> or <u>Section 18.3</u>, Franchisee will have thirty (30) calendar days after receiving a written notice of termination from Pearle Vision (the "***Notice of Termination***") within which to remedy any default under this Agreement (or, if the default cannot reasonably be cured within thirty (30) calendar days, to initiate within that time all available substantial and continuing action to cure the default), and to provide evidence thereof to Pearle Vision.  If Franchisee has not cured any default within that time (or, if appropriate, Franchisee has not initiated substantial and continuing action to cure the default within that time), or such longer period as applicable law may require, this Agreement will terminate immediately upon expiration of the thirty (30) day period or such longer period as applicable law requires.  Franchisee will be in default of this Agreement for any failure to substantially comply with any of the requirements imposed upon Franchisee by this Agreement, as it may from time to time be supplemented by Pearle Vision's Manual and all Supplements to the Manual, or otherwise, or to carry out the terms of this Agreement in good faith.  Defaults include the occurrence of the following events:

A.    **Breach of Agreement.**  Franchisee fails to comply with any of the provisions of this Agreement not specified elsewhere in this <u>Section 18</u>.

B.    **Improper Operations.**  Franchisee fails to maintain and operate the Franchise Business in accordance with this Agreement and the standards and specifications prescribed by Pearle Vision.

C.    **Non-Payment.**  Franchisee fails to pay when due any amount owed Pearle Vision (or any amount guaranteed by Pearle Vision on Franchisee's behalf), its Affiliates, or any other person or entity in connection with the operation of the Franchise Business.

D.    **Failure of Standards.**  Franchisee fails to adhere to the quality and service standards prescribed by Pearle Vision.

E.    **Other Agreements.**  Franchisee fails to comply with any Franchise Agreement or other agreement between Pearle Vision or its Affiliates and Franchisee, any Equity Owner of Franchisee or business entity owned wholly or partially by Franchisee or Equity Owner.

F.     **EyeMed.**  If Franchisee terminates its participation in EyeMed as required by Section 5.3 (unless otherwise permitted by law), or fails to comply with EyeMed's provider agreements.

18.2    **Termination Upon Notice.**  Each of the following events is a material breach of this Agreement.  Pearle Vision may, at its option, terminate this Agreement and all rights granted to Franchisee under this Agreement, immediately upon notice to Franchisee, without affording Franchisee any opportunity to cure the breach.

A.     **Breach of Agreement.**  Franchisee fails to comply with the following provisions of this Agreement:  (a) Section 4.1 (Development of the Location); (b) Section 4.2 (Site and Equipment Requirements); (c) Section 4.4 (Relocation of Franchise Business); (d) Section 5.5 (Compliance with Laws; Required Licenses); (e) Section 7.1 (the Marks); (f) Section 9 (Confidential Information); (g) Section 14 (Covenants Against Competition); and (h) Section 16.2 (Assignments by Franchisee).

B.     **Criminal Conviction.**  Franchisee is convicted of, or enters a plea of no contest to, any felony charge or to any crime or offense that Pearle Vision believes is reasonably likely to have an adverse effect on the Franchise Business.

C.     **Business-Related Dishonesty.**  Franchisee participates in any dishonest or unethical conduct in relation to the Franchise Business.

D.     **Failure to Pay Judgment.**  Entry of a final judgment against Franchisee, which remains unsatisfied of record for thirty (30) days, unless a supersedeas bond or other appeal bond has been filed.

E.     **Unauthorized Closure.**  Franchisee abandons the Franchise Business or closes it for three or more consecutive days without the prior written approval of Pearle Vision.

F.     **Loss of Possession.**  Franchisee's right to possession of the premises on which the Franchise Business is located is terminated for any cause whatsoever.

G.     **Impairment.**  Pearle Vision's reasonable belief that the prospect of payment of any indebtedness or the performance of Franchisee's obligations under this Agreement is impaired.

H.     **Public Danger.**  Pearle Vision's reasonable determination that continued operation of the Location by Franchisee will result in an imminent danger to public health or safety.

I.     **Under-Reporting Sales.**  Franchisee's under-reporting of Franchisee's Gross Revenues by eight percent (8%) or more.

J.     **Failure to Attend Training.**  Continuing failure of Franchisee, Franchisee's Designated Operator, Franchisee's Designated Developer, or any other individuals identified in this Agreement, to attend and successfully complete Pearle Vision's required initial training or subsequent training.

K.      **Multiple Defaults.**  Two or more defaults of this Agreement within a twelve (12) month period, regardless of whether the defaults are ultimately cured.

18.3    **Automatic Termination.**  Franchisee will be in default of this Agreement, and all rights granted to Franchisee by this Agreement will immediately and automatically terminate and revert to Pearle Vision without notice to Franchisee, if:  (a) Franchisee or the Franchise Business is adjudicated as bankrupt or insolvent or all or a substantial part of the assets thereof are assigned to or for the benefit of any creditor; (b) a petition in bankruptcy is filed by or against Franchisee or the Franchise Business and is not immediately contested and/or dismissed within sixty (60) days from filing; (c) a bill in equity or other proceeding for the appointment of a receiver or other custodian of Franchisee, the Franchise Business, or the assets of either is filed and consented to by Franchisee; (d) a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; (e) proceedings for a composition with creditors under any state or federal law are instituted by or against Franchisee or the Franchise Business; (f) Franchisee is dissolved; (g) execution is levied against Franchisee, the Franchise Business or the property thereof, or the real or personal property of the Franchise Business is sold after levy by any governmental body or agency, sheriff, marshal or constable.

19.     **Obligations upon Termination.**

The following provisions will apply upon the expiration or termination of this Agreement.

19.1    **Use of Marks and System.**  Franchisee's right to use the Pearle Vision System and the Marks ceases immediately upon the Expiration Date or upon termination of this Agreement.  To avoid infringement of the Marks, Franchisee will cease and desist from the use of the Marks in any manner, including but not limited to the following (collectively referred to as the "***Listings***"):  (a) telephone number(s) listed in the "Yellow Pages" or "White Pages"; (b) any telephone directories under the name "Pearle Vision" or "Pearle"; (c) any domain names, internet search engines, hyperlinks, hot links, or Internet and mobile-based tools used for disseminating the Franchise Business address and/or sharing and discussing information. Franchisee agrees to transfer the Listings to Pearle Vision or Pearle Vision's designee.  Franchisee will refrain from publicizing or promoting itself as a former franchisee of Pearle Vision.  Franchisee will not pursue publication of any other name confusingly similar to Pearle Vision within the Listings or any other media.

19.2    **Accounts Payable.**  Franchisee, Franchisee's Equity Owners and/or Franchisee's guarantors will immediately pay all sums due and owing to Pearle Vision or its Affiliates, as well as all sums due and owing to any third parties.

19.3    **Leased Location.**  If Franchisee is leasing or subleasing the Location from Pearle Vision, Franchisee will immediately return possession to Pearle Vision.  Franchisee will surrender the Location to Pearle Vision in as good condition as when received by Franchisee, reasonable wear and tear excepted.  Pearle Vision will also have the right to lease from Franchisee or assume Franchisee's third-party lease.  If Pearle Vision exercises this right, Pearle Vision will also have the right to immediate possession of the Location.  If Pearle Vision is not taking possession and agrees to allow Franchisee to continue to operate the Location, Franchisee

agrees to change the Location's appearance in accordance with Pearle Vision's directions so as to clearly distinguish it from a Pearle Vision System store at Franchisee's expense.

19.4    **Interim Operation.**  If Franchisee disputes the validity of any termination of this Agreement, Pearle Vision may, pending a resolution of the dispute, immediately enter and take possession of the Location in order to maintain continuous operation of the business and to protect Pearle Vision's interests.  In that case, Pearle Vision will operate the business for the benefit of the prevailing party.  In the event of a final binding, unappealed determination by a court of competent jurisdiction that the termination was not valid, Pearle Vision will make a full and complete accounting for the period during which it operated the business.

19.5    **Impairment of Value; Return of Materials.**  After the expiration or termination of this Agreement, Franchisee will not do anything that will diminish any security interest Pearle Vision has in any assets of the Franchise Business.  As permitted by law, Franchisee agrees to provide to Pearle Vision a copy of all records relating to optometric or ophthalmologic services that were provided in connection with the Franchise Business.  Franchisee agrees to return to Pearle Vision the Manual, Supplements to the Manual, and all other Pearle Vision System materials.

19.6    **Repurchase of Assets.**  At the expiration or termination of this Agreement, Pearle Vision, at its option, may purchase Franchisee's right, title and interest in and to any usable and undamaged leasehold improvements, moveable signs, furniture, fixtures, equipment, supplies, and merchandise inventory of the Location, and the Accounts Receivable.  However, Pearle Vision will not have this right to purchase if this Agreement expires by its terms and the Franchisee is current on and pays all obligations owing to Pearle Vision or its Affiliates at the time of expiration. Pearle Vision will not be obligated to pay Franchisee for any intangible assets of the Franchise Business. Pearle Vision's purchase price shall be equal to the sum of the following:

A.    The depreciated balance of Franchisee's original purchase price (using ten year straight-line amortization) of all usable and undamaged leasehold improvements; moveable signs; furniture, fixtures, and equipment; and other fixed assets, not including any amount paid by Franchisee for the Initial Franchise Fee, option deposit fee (if any), miscellaneous costs, UCC filing fees, and Inventory; *plus*

B.    The original cost to Franchisee of the ending merchandise and supply inventory as determined by a physical inventory taken at Pearle Vision's discretion on the date of purchase; *plus*

C.    Ninety percent (90%) of the trial balance amount of the Accounts Receivable on the date of purchase that is not older than ninety (90) days.

Pearle Vision need not purchase any damaged, unusable, or obsolete inventory or other assets of the Franchisee. Pearle Vision may deduct from the purchase amount any indebtedness due Pearle Vision, including any trade indebtedness of Franchisee to a third party which Pearle Vision may pay (but is not obligated to pay) to protect its interests.  Title to the assets will be transferred to Pearle Vision by an appropriate bill of sale. Franchisee

acknowledges that the foregoing method of deriving Pearle Vision's purchase price for Franchisee's tangible assets constitutes a commercially reasonable disposition of those assets under applicable law.

If Pearle Vision purchases the assets of Franchisee, Franchisee will cooperate with Pearle Vision to provide for an orderly change of management.  If Pearle Vision elects not to purchase the assets of the Franchise Business, Franchisee will cooperate with Pearle Vision in an orderly disposition of the assets used in the operation of the Franchise Business.

19.7     **Survival of Provisions.**  Any provision of this Agreement which imposes an obligation after termination or expiration of this Agreement will continue to be enforceable in spite of the termination or expiration of the Agreement for any reason, including termination by a trustee in any bankruptcy proceeding.

**20.     Alternate Dispute Resolution.**

20.1     **Mediation.**  Except as otherwise specified in this Agreement, if any dispute arises between the parties concerning this Agreement, any related agreement, the Franchise Business, the offer and sale of the Franchise Business, or the relations between the parties, which cannot be settled through negotiation after diligent effort, before resorting to litigation the parties will first attempt in good faith to settle the dispute or claim by non-binding mediation conducted under the auspices and then-prevailing rules of the National Franchise Mediation Program (or, if that program is discontinued, under the auspices and then-prevailing commercial non-binding mediation rules of the American Arbitration Association).  This provision applies only to disputes that are specific to Franchisee and not to issues that affect franchisees of Pearle Vision generally.  The parties agree to participate in at least six (6) hours of mediation and to split equally the costs of the mediation, including the mediator's fees and expenses.  The mediation will be confidential and non-discoverable.  The parties' obligation to mediate will be deemed to be satisfied when six (6) hours of mediation have been completed, whether or not the parties have resolved their differences.  The demanding party's duty to mediate will be deemed satisfied thirty (30) days after a mediation demand has been made if the non-demanding party fails to appear or participate in good faith in the mediation.  Neither party will unreasonably withhold consent to the selection of a mediator.  Pearle Vision and Franchisee may agree to replace mediation with some other form of ADR, such as neutral fact-finding or a mini-trial.  If Pearle Vision and Franchisee are still unable to reach an accord upon satisfaction of the parties' obligation to mediate as provided above, then either party may submit the matter to the courts for resolution.

20.2     **Reserved Court Issues.**  Notwithstanding the foregoing, disputes and controversies of the following types between Pearle Vision and Franchisee that cannot be resolved by Pearle Vision and Franchisee through good faith discussions and negotiations will not require mediation prior to instituting litigation, and either party may submit the matter directly to the courts for resolution:  (a) any disputes arising between Pearle Vision and Franchisee relating to the failure to pay amounts owed (or amounts guaranteed by Pearle Vision on Franchisee's behalf); (b) any dispute involving termination of this Agreement; (c) any dispute involving the Marks or the Pearle Vision System, including matters of ownership of the Pearle Vision System or the Marks; (d) any dispute involving enforcement of the confidentiality

provisions of this Agreement; (e) any dispute involving enforcement of the covenants not to compete set forth in this Agreement; (f) any judicial proceeding in equity seeking temporary restraining orders, preliminary injunctions, or other interlocutory relief.  Furthermore, nothing in this <u>Section 20</u> is intended to prevent either party from resorting to judicial intervention if any other species of interim relief from a court is necessary to prevent serious and irreparable injury to either party or to others.

**21.    Enforcement.**

21.1    **Governing Law; Venue.**  This Agreement is deemed to be entered into in Mason, Ohio, and all payments by Franchisee to  Pearle Vision are deemed made in Mason, Ohio.  Any and all disputes pertinent to this Agreement; the offer and sale of the Franchise Business; the franchise relationship between the parties; and, any claims at law or equity advanced by Franchisee against  Pearle Vision shall be governed by and construed in accordance with the laws of the state of Ohio, and that the United States District Court for the Southern District of Ohio - Western Division, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Agreement.  Nothing in this <u>Section 21.1</u> is intended to invoke application of any franchise or any similar law, rule or regulation, of the state of Ohio or of any other state, which would not otherwise apply.

21.2    **Construction; Severability; Waivers.**  All references in this Agreement to the singular include the plural where applicable.  Paragraph captions should not be construed to limit the scope of the paragraphs.  If any part of this Agreement were for any reason to be held invalid, the remaining parts will continue in full force and effect.   Pearle Vision will not be held to have waived any portion of this Agreement as a result of not insisting upon strict compliance by Franchisee or any other franchisee of Pearle Vision of any particular provision.  The Recitals found on page 1 of this Agreement are fully incorporated by reference as part of this Agreement.  The modal auxiliary verb "will" is mandatory and a party will be in default of this Agreement if it fails to do something that the Agreement states that the party "will" do.  The auxiliary verb "may" is permissive, and means that the party has the right to do what it stated (and, by extension, if this Agreement states that a party "may not" do an act, the party is forbidden from doing that act).  The verb "include" and its variations (such as "including") are non-exclusive.

21.3    **Costs of Enforcement.**  Franchisee agrees to reimburse Pearle Vision for any reasonable attorneys' fees, experts' fees, court costs and expenses of litigation Pearle Vision incurs related to its successful enforcement of this Agreement.

21.4    **Notices.**  Any notice required under this Agreement must be in writing and may be delivered by certified mail, registered mail, fax, overnight courier, or by physically delivering the notice in person.  All notices to Pearle Vision should be sent to Luxottica Retail North America Inc., *Attention*:  Legal Department, 4000 Luxottica Place, Mason, Ohio  45040, or to such other address as Pearle Vision designates in writing.  All notices to Franchisee may be addressed to the Notice Address or at the Location, pursuant to Pearle Vision's reasonable discretion.  If there are extenuating circumstances involving Franchisee, Pearle Vision may pursue alternative forms of notice such as publication.

LRNA FDD Amendment 11072011

Notices sent by certified mail or registered mail will be deemed to have been received upon delivery of the notice or the first attempted delivery by the postal service.  All other forms of notice will be deemed received on the date of actual delivery.

21.5   **Entire Agreement.**  This document, together with the referenced attachments, comprises this Agreement.  This Agreement represents the understanding the parties have reached regarding the Franchise Business and it supersedes all prior understandings regarding the Franchise Business, except those disclosures, which are contained in the Franchise Disclosure Document.  This Section 21 is not intended and shall not be construed to disclaim the disclosures contained in the Franchise Disclosure Document.   It incorporates the standards and specifications of the Pearle Vision System as communicated by Pearle Vision from time to time.  Otherwise, it may not be amended without the written agreement of both parties.

22.   **Franchisee Acknowledgments and Representations.**

22.1   <u>Acknowledgments.</u>  Franchisee acknowledges:

A.   No representations or warranties have been made by Pearle Vision regarding Franchisee's future success relating to the Franchise Business, and Franchisee did not rely on any incidental statements about success made by Pearle Vision, its affiliates or employees.

B.   This Agreement does not grant to Franchisee any right or interest in or to any part of the Pearle Vision System, including any goodwill associated with it, other than the right to use the Pearle Vision System for a specified period of time in accordance with this Agreement.

C.   No representations or warranties have been made by Pearle Vision regarding Franchisee's ability to procure any required license or permit that may be necessary to the offering of one or more of the services contemplated to be offered by the Franchise, and Franchisee did not rely on any incidental statements about permits that may have been made by Pearle Vision or its affiliates or employees.

D.   The covenants not to compete set forth in this Agreement are fair and reasonable, and will not impose any undue hardship on Franchisee, since Franchisee has other considerable skills, experience, and education that afford Franchisee the opportunity to derive income from other endeavors.

E.   This Agreement will not be effective or binding on Pearle Vision unless and until it has been accepted and signed by an authorized officer of Pearle Vision.

F.   Franchisee has read all of this Agreement and accepts and agrees to be bound by each and all of the provisions, covenants and conditions contained in this Agreement.

22.2   <u>Representations.</u>  Franchisee represents and warrants to Pearle Vision that:

A.     Except for the express representations contained in this Agreement and the material in the FDD, no other representations of any kind were made by Pearle Vision or its affiliates or employees to induce Franchisee to execute this Agreement.

B.     Franchisee has reviewed each provision of this Agreement.

C.     Before signing this Agreement, Franchisee investigated the Pearle Vision System to Franchisee's satisfaction and had the opportunity to consult with appropriate legal and business advisors with respect to this Agreement.

D.     The information in Item 19 of the FDD was the only financial performance information received or relied upon by Franchisee.  No other representations have been made by Pearle Vision (or any employee, agent, or salesperson of Pearle Vision) and relied upon by Franchisee as to the future expenses, sales volume, or potential profitability, earnings, or income of the Franchise Business or any other Pearle Vision business.

E.     Before signing this Agreement, Franchisee had the opportunity to contact existing and former franchisees of Pearle Vision, and Franchisee contacted as many of those existing and former franchisees of Pearle Vision as Franchisee considered appropriate.

F.     All information that Franchisee set forth in all applications, financial statements, and submissions to Pearle Vision is true, complete, and accurate in all respects, and Franchisee expressly acknowledges that Pearle Vision is relying upon the truthfulness, completeness, and accuracy of that information.

LRNA FDD Amendment 11072011

The parties have executed this Agreement as of the dates set forth below their respective signatures, but effective for all purposes as of the Effective Date set forth in Section 1.5.

**FRANCHISEE:**

Gutman Vision, Inc.

By: _____
    Milana Gutman

Title: _Secretary_

Date: _11/23/2011_

By: _____
    Alex Gutman

Title: _Pres._

Date: _11/23/11_

**FRANCHISOR:**

Luxottica Retail North America Inc.,
franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title: _____
CARLO PRIVITERA
CHIEF OPERATING OFFICER

Date: _12/23/2011_

By: _____

Title: _____
JAMES NEITZKE
SVP, Finance & Accounting

Date: _12/23/2011_

LRNA FDD Amendment 11072011

Location No. **8655**

## HIPAA PRIVACY
## BUSINESS ASSOCIATE ADDENDUM

This Business Associate Agreement (this "Agreement") is entered into effective as of **11/23/2011**, by and between **Gutman Vision, Inc.** ("Covered Entity") and Luxottica Retail North America Inc. (herein "Luxottica Retail") in order to comply with the regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 (P.L. 104-191), 42 U.S.C. Section 1320d, et. seq., as amended from time to time (statute and regulations hereafter collectively referred to as "HIPAA") [Luxottica Retail and Covered Entity may be referred to herein individually as a "Party" or collectively as the "Parties"].  Terms used, but not otherwise defined, in this Agreement shall have the same meaning as those terms in HIPAA.

STATEMENT OF AGREEMENT

§1.    HIPAA Compliance and Agents.  Luxottica Retail hereby agrees to fully comply with the "Business Associate" requirements under HIPAA, including, without limitation, 45 C.F.R. §§ 164.314(a)(2), 164.502(e), and 164.504(e), throughout the term of this Agreement.  Further, Luxottica Retail agrees that to the extent it has access to PHI, Luxottica Retail will fully comply with the requirements of HIPAA and this Agreement with respect to such PHI; and, further, that every agent, employee, subsidiary, and affiliate of Luxottica Retail to whom it provides PHI received from, or created or received by Luxottica Retail on behalf of, Covered Entity will be required to fully comply with HIPAA, and will be bound by written agreement to the same restrictions, terms and conditions as set forth in this Agreement.  Covered Entity maintains a Notice of Privacy Practices ("Notice") and Luxottica Retail acknowledges that it has received a copy of such Notice (attached hereto), has read and understands its terms, conditions, and hereby agrees to the extent applicable, to comply and act in accordance with such Notice as it may be amended from time to time by Covered Entity.

For purposes of this Agreement, PHI is defined as health information created, received, maintained, or transmitted by Luxottica Retail on behalf of Covered Entity, including demographic information collected from an individual, and that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to the individual; or the past, present or future payment for the provision of health care to the individual and (i) that identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

§2.    Use and Disclosure; Rights.  Luxottica Retail agrees that it shall not use or disclose PHI except as permitted under this Agreement and HIPAA.  Luxottica Retail may use or disclose the PHI received or created by it, (a) to perform its obligations under this Agreement including without limitation, the Franchise Agreement or any other agreement pertaining to the Pearle Vision franchise by and between Luxottica Retail and Covered Entity, (b) in order to properly manage and administer its business, (c) to carry out its legal responsibilities if the disclosure is required by law, or (d) for data aggregation functions, as defined by HIPAA.  If pursuant to subsections (a), (b), (c)

or (d) above, Luxottica Retail discloses PHI to others, Luxottica Retail must obtain reasonable assurances from the person to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it is disclosed to the person and the person notifies Luxottica Retail of any instances of which it is aware that the confidentiality of the information has been breached.

§3.   Safeguards; Location.  Luxottica Retail agrees to implement, document, and use administrative, physical, and technical safeguards that prevent any use or disclosure of PHI other than as permitted or required by this Agreement, and that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains, or transmits on behalf of Covered Entity.  Without limiting the foregoing, on or before February 17, 2010, Luxottica Retail shall comply, and shall cause its agents and subcontractors to comply, with the Security Standards for the Protection of Electronic Protected Health Information (and Implementation Specifications therein) promulgated by the U. S. Department of Health and Human Services ("DHHS") in §§ 164.308, 164.310, 164.312, and 164.316 of title 45, Code of Federal Regulations (the "Security Standards") with respect to all electronic PHI it creates, receives, maintains or transmits on behalf of Covered Entity.  Luxottica Retail shall, and shall require any agent or subcontractor of Luxottica Retail to:  (a) implement the aforementioned administrative, physical and technical safeguards, and all record-keeping and documentation, required by the Security Standards, including those addressable Standards which are applicable to Luxottica Retail, in a manner that is compatible with Covered Entity's implementation of such safeguards, and that complies with Covered Entity's  HIPAA Security Policies and Procedures, and (b) notify Covered Entity of any security incident (as defined under HIPAA) of which Luxottica Retail becomes aware.

§4.   Minimum Necessary.  Luxottica Retail will limit any use, disclosure, or request for use or disclosure to the minimum amount necessary to accomplish the intended purpose of the use, disclosure, or request in accordance with the requirements of HIPAA.  Luxottica Retail covenants that in all uses, disclosures, and requests it will include only the minimum amount of PHI necessary to accomplish the permitted or required use or disclosure as set forth by the agreement and in accordance with the requirements of HIPAA.  Covered Entity may, pursuant to HIPAA, reasonably rely on any requested disclosure as the minimum necessary for the stated purpose when Luxottica Retail requests the information.  Luxottica Retail acknowledges that if Luxottica Retail is also a covered entity, as defined by HIPAA, Luxottica Retail is required, independent of Luxottica Retail's obligations under this Agreement, to comply with the HIPAA minimum necessary requirements when making any request for PHI from Covered Entity.

§5.   Records; Covered Entity Access.  Luxottica Retail shall maintain such records of PHI received from, or created or received on behalf of, Covered Entity and shall document subsequent uses and disclosures, other than as for treatment, payment, or healthcare operations, pursuant to a valid authorization, or otherwise excepted from the accounting requirement under HIPAA, made by Luxottica Retail as may be deemed necessary and appropriate in the sole discretion of Covered Entity.  Notwithstanding any other provision of this Agreement, Luxottica Retail shall document all uses and disclosures of electronic PHI for purposes of the accounting requirement under 45 C.F.R. § 164.528.  Luxottica Retail shall provide Covered Entity with

reasonable access to examine and copy such records and documents of Luxottica Retail during normal business hours.

§6.   DHHS Access to Books, Records, and Other Information.  Luxottica Retail shall make available to DHHS its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Luxottica Retail on behalf of Covered Entity for purposes of determining Luxottica Retail's or Covered Entity's compliance with HIPAA. Luxottica Retail agrees to fully cooperate in good faith with and to assist Covered Entity in complying with the requirements of HIPAA and any investigation of Covered Entity regarding compliance with HIPAA conducted by DHHS, Office for Civil Rights, or any other administrative or judicial body with jurisdiction, including, but not limited to, disclosing, providing access to or an accounting of any PHI as Covered Entity may request.

§7.   Designated Record Set; Individual Access.  Luxottica Retail shall maintain a designated record set, as defined by HIPAA, for each individual patient for which it has PHI.  In accordance with an individual's right to access to their own PHI under HIPAA and the individual's right to copy or append such records, Luxottica Retail shall make available all PHI in that designated record set to Covered Entity, or at the direction of Covered Entity, the individual to whom that information pertains or such individual's representative.

§8.   Accounting.  Luxottica Retail shall promptly make available to Covered Entity any PHI or any other information required to prepare, or assist in preparing, an accounting of disclosures in accordance with HIPAA.  Luxottica Retail agrees to document disclosures of PHI in the same manner as would be required for Covered Entity to respond to a request for an accounting of disclosures.  With respect to written PHI, Luxottica Retail must have this information and documentation available for the six (6) years preceding any request by Covered Entity.  With respect to electronic PHI, Luxottica Retail must have this information and documentation available for the three (3) years preceding any request by Covered Entity, and the exceptions under 45 C.F.R. § 164.528(a)(1)(i) shall not apply.

§9.   Notification of Breach of Unsecured PHI.  Pursuant to regulations promulgated in subpart D of part 164 of title 45, Code of Federal Regulations, as enacted by Section 13402(j) of the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"):

(a) Luxottica Retail shall notify Covered Entity of any breach, or potential breach, of unsecured PHI.  Such notice shall be in writing and shall include the identification of each individual whose unsecured PHI has been, or is reasonably believed by Luxottica Retail to have been, accessed, acquired, or disclosed during such breach.  Such notice shall be made to Covered Entity without unreasonable delay, and in no case later than ten (10) business days after discovery of the breach.  A breach shall be treated as discovered by Luxottica Retail as of the first day on which such breach is known to Luxottica Retail (including any person, other than the individual committing the breach, that is an employee, officer, or other agent of Luxottica Retail), or should reasonably have been known to Luxottica Retail to have occurred.

(b)  The notice required in (a) above shall also include any other information that Covered Entity is required to include in notifications to the affected individuals required under 45 C.F.R.

§164.404(c), including, but not limited to, the nature of the violating use or disclosure, the PHI used or disclosed, the identity of the person suspected of making the violating use and/or who received the disclosure, and the corrective action Luxottica Retail has or will take to prevent further similar violations, including any mitigation, and any other information Covered Entity reasonably requests.

(c) For purposes of this Section, the term "breach" means the acquisition, access, use, or disclosure of PHI in a manner not permitted under the HIPAA regulations at subpart E, part 164, title 45 Code of Federal Regulations ("HIPAA privacy regulations"), which compromises the security or privacy of the PHI. The determination of whether any breach or potential breach compromises the security or privacy of the PHI shall be made jointly by Covered Entity and Luxottica Retail upon being notified by Luxottica Retail of the breach or potential breach. The term "breach" does not include:

(i) any unintentional acquisition, access, or use of PHI by a workforce member or person acting under the authority of Covered Entity or Luxottica Retail if such acquisition, access, or use: (1) was made in good faith and within the course and scope of the employment or authority of such person, and (2) does not result in further use or disclosure in a manner not permitted under the HIPAA privacy regulations; or

(ii) any inadvertent disclosure by a person who is authorized to access PHI at Covered Entity or Luxottica Retail, to another person authorized to access PHI at Luxottica Retail or Covered Entity, or an organized health care arrangement in which Luxottica Retail participates, and the information received as a result of such disclosure is not further used or disclosed in a manner not permitted under the HIPAA privacy regulations; or

(iii) a disclosure of PHI where Covered Entity has determined or has a good faith belief, upon being notified by Luxottica Retail of the potential breach, that an unauthorized person to whom the disclosure was made would not reasonably have been able to retain such information.

(d) For purposes of this Section, the term "unsecured PHI" means any PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary of DHHS in guidance issued under Section 13402(h)(2) of the HITECH Act.

(e) Luxottica Retail shall fully cooperate in good faith with Covered Entity's investigation of any potential breach of PHI, and in any notifications to individuals undertaken by Covered Entity. The parties acknowledge that the ultimate determination of whether a potential breach has compromised the privacy or security of an individual's PHI, and authority for notifying individuals of such breach, lies with Covered Entity.

§10.   Amendment of and Access to PHI; Notification. Luxottica Retail shall make available PHI for amendment and, as is practical, shall incorporate any amendments to PHI in accordance with HIPAA, as directed by Covered Entity. Luxottica Retail shall make reasonable efforts to notify persons, organizations, or other entities, including, but not limited to, other

business associates, known by Luxottica Retail to have received erroneous or incomplete PHI and who may have relied, or could foreseeably rely, on such PHI to the detriment of the individual. Luxottica Retail must update this information as requested by Covered Entity.

§11.　Individual Authorizations; Restrictions.　Covered Entity will notify Luxottica Retail of any restriction to the use or disclosure of PHI to which Covered Entity is required to comply, or has agreed to, with an individual, or of any changes in or revocation of an authorization or other permission by an individual, to the extent that such restriction, change, or revocation may affect Luxottica Retail's use or disclosure of PHI.

§12.　Termination Rights; Mitigation.　Luxottica Retail acknowledges and agrees that Covered Entity shall have the right to terminate this Agreement in accordance with this §12 and §13 in the event Luxottica Retail breaches or fails to comply with the requirements set forth in this Agreement.　In addition, Covered Entity may immediately terminate the Agreement, if Covered Entity determines in its reasonable discretion, that Luxottica Retail has failed to comply with a material term of the Agreement required by HIPAA or is substantially not in compliance with the requirements of HIPAA.　In addition to its obligations under Sections 9 and Section 10 of this agreement, Luxottica Retail shall take any other reasonable actions available to it to mitigate any detrimental effects of such violation or failure to comply.

§13.　Breach; Knowledge.　Pursuant to 45 C.F.R. 164.504(e)(1)(ii), if either party to this Agreement knows or becomes aware of a pattern of activity or practice of the other party that constitutes a breach or violation of the other party's obligations under this Agreement, such party shall notify the other party in writing, and both parties shall, for a period of sixty (60) days following receipt of such written notice and an explanation of the breach from the notifying party, cooperate in good faith to take steps reasonably necessary to cure such breach; provided, however, that if such steps are unsuccessful, the non-breaching party may, in addition to any other remedy: (a) terminate this Agreement, if feasible, or (b) if cure and termination are not feasible, discontinue use or disclosure of PHI to the extent feasible and report the breach to the Secretary of DHHS.

§14.　Electronic Standards and Code Sets Regulations.　If Luxottica Retail or any of its subcontractors or agents conducts in whole, or in part, electronic transactions on behalf of covered entity of the type covered by HIPAA and any regulations promulgated pursuant thereto, including Standards for Electronic Transactions and Electronic Code Sets, Luxottica Retail will, and will require any of its subcontractors or agents to comply with each applicable requirement of such regulations.

§15.　Return of PHI.　Luxottica Retail agrees that upon termination of this Agreement, and if feasible, Luxottica Retail shall, at its expense, return or destroy all PHI received from, or created or received by Luxottica Retail or any of Luxottica Retail's subcontractors or agents on behalf of, Covered Entity that Luxottica Retail or its subcontractors or agents maintain or control in any form or manner and retain no copies of such information. If, however, Luxottica Retail claims that such return or destruction is not feasible, Luxottica Retail shall immediately notify Covered Entity of the reasons return or destruction are not feasible. Furthermore, the protection afforded to such PHI by this Agreement shall be extended indefinitely and Luxottica Retail shall

limit further uses and disclosures to those purposes that make the return or destruction of the PHI not feasible.

§16.   Notices.  All notices and other communications in connection with this Agreement to any Party shall be in writing and shall be deemed given when delivered personally, mailed by certified mail (return receipt requested) to that Party at the address for that Party set forth at the end of this Agreement (or at such other address for such Party as such Party shall have specified in a prior written notice to the other Parties), or delivered to Federal Express, United Parcel Service, or any similar express delivery service for delivery to that Party at that address.

§17.   Non-Waiver.  The failure by any Party to insist upon strict compliance with any term or provision of this Agreement, to exercise any option, to enforce any right, or to seek any remedy upon any default of any other Party shall not affect, or constitute a waiver of, any Party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default.  No custom or practice of the Parties at variance with any provision of this Agreement shall affect or constitute a waiver of, any Party's right to demand strict compliance with all provisions of this Agreement.

§18.   Gender and Numbers; Headings.  Where permitted by the context, each pronoun used in this Agreement includes the same pronoun in other genders and numbers, and each noun used in this Agreement includes the same noun in other numbers.  The headings of the various sections of this Agreement are not part of the context of this Agreement, are merely labels to assist in locating such sections, and shall be ignored in construing this Agreement.

§19.   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement.

§20.   Entire Agreement; Amendment.  This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter of this Agreement.  This Agreement may be amended from time to time by the written agreement of the Parties or unilaterally by Covered Entity only to the extent necessary for Covered Entity to comply with HIPAA.

§21.   Binding Effect.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the Parties and their respective heirs, personal representatives, parents, successors, and assigns.

§22.   Severability; Governing Law.  With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be unenforceable, such court shall have jurisdiction to reform such provision so that it is enforceable to the maximum extent permitted by applicable law, and the Parties shall abide by such court's determination.  In the event that any provision of this Agreement cannot be reformed, such provision shall be deemed to be severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.  This Agreement shall be governed by and construed in accordance with the laws of the

State of Ohio.  Any ambiguity in this Agreement shall be resolved in a manner that will permit Covered Entity to comply with HIPAA.

§23.    Survival.  All representations, covenants, and agreements in or under this Agreement or any other documents executed in connection with the transactions contemplated by this Agreement, shall survive the execution, delivery, and performance of this Agreement and such other documents.  The respective rights and obligations of Luxottica Retail under Section 15 of this Agreement shall survive termination or expiration of this Agreement.

§24.    Further Assurances.  Each Party shall in good faith execute, acknowledge or verify, and deliver any and all documents which may from time to time be reasonably requested by the other Party to carry out the purpose and intent of this Agreement.

Acknowledged and agreed to by:

**FRANCHISEE:**

Gutman Vision, Inc.

By: _____
Milana Gutman

Title: Secretary

Date: 11/23/2011

By: _____
Alex Gutman

Title: Pres.

Date: 11/23/11

Address: Preston Park Shopping Center
1713 Preston Road, Suite A
Plano, Texas    75093

**FRANCHISOR:**

Luxottica Retail North America Inc.,
franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title: CARLO PRIVITERA
CHIEF OPERATING OFFICER

Date: 12/23/2011

By: _____

Title: JAMES NEITZKE
SVP, Finance & Accounting

Date: 12/22/2011

Address: 4000 Luxottica Place
Mason, Ohio 45040

BA Std 2009 SL

## ROYALTY REBATE ADDENDUM

This ROYALTY REBATE ADDENDUM is made and entered into this **23rd day of November 2011** ("*Royalty Rebate Addendum*") by and between Luxottica Retail North America Inc., an Ohio corporation and franchisor of Pearle Vision® ("*Pearle Vision*"), having an office at 4000 Luxottica Place, Mason, OH 45040, and **Gutman Vision, Inc.** (hereinafter individually and collectively referred to as "*Franchisee*").  Pearle Vision and Franchisee are collectively referred to herein as the "Parties".

### RECITALS

WHEREAS, Pearle Vision and Franchisee entered into a Franchise Agreement dated **10/14/2011** (the "*Franchise Agreement*") for Pearle Vision Store #8655 ("*Store #8655*") located at **Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093** ("*Location*"); and

WHEREAS, Pearle Vision and Franchisee entered into a STARS Consignment Agreement dated (the "*STARS Consignment Agreement*") for the Location in order to participate in the STARS program, which is a program designed to consign frames to Pearle Vision franchisees (the "*STARS program*"); and

WHEREAS, because Franchisee is participating in the STARS program, Pearle Vision and Franchisee wish to amend the Franchise Agreement to incorporate a Royalty Rebate Program as outlined below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this hereby covenant and agree as set forth below:

    1.  **Defined Terms**.

| | |
|---|---|
| "*Audit*" | means a review of Franchisee's financial records, business records, Frame Capacity and/or Required Inventory Level as performed by Pearle Vision or its designee in accordance with this Royalty Rebate Addendum. |
| "*Consolidated Statement*" | means the statement of payment due for product purchases, telephone charges and miscellaneous charges as defined in the Franchise Agreement. |
| "*Frame Capacity*" | means the Frame Capacity as defined in the STARS Consignment Agreement. |

| | |
|---|---|
| "*Monthly Franchise Report*" | means the report provided by the Franchisee to Pearle Vision each month as defined in the Franchise Agreement. |
| "*POS System*" | means the current Pearle Vision POS system designated in writing by Pearle Vision as permitted under the Franchise Agreement. |
| "*Rebate Credit Period*" | means each three month period (the "*Quarter*") commencing after the date of this Royalty Rebate Amendment. |
| "*Required Inventory*" | means the Core Inventory as defined in the STARS Consignment Agreement. |
| "*Required Inventory Level*" | means the Required Inventory Level as defined in the STARS Consignment Agreement. |
| "*Royalty Rebate*" | means one and one-half percent (1.5%) of Franchisee's net dispensing sales as provided by Franchisee in the Monthly Franchise Report during the Rebate Credit Period. |

2.  **POS System**.  Franchisee shall purchase, use and maintain, from the date of this Royalty Rebate Amendment through the expiration date of the Franchise Agreement, POS System as required by Pearle Vision.

3.  **Required Inventory and Required Inventory Levels**.  Franchisee shall purchase the Required Inventory at the Required Inventory Levels as required by the STARS Consignment Agreement .

4.  **Auditing**.  Pearle Vision or its designee shall perform, at any time upon reasonable notice to Franchisee, periodic Audits, not less than once per quarter and preceding the Royalty Rebate, to determine Franchisee's compliance with the terms of this Royalty Rebate Addendum.  Pearle Vision reserves the right, in its sole discretion, to require a physical inventory, either by Pearle Vision or a third party, to determine Franchisee's compliance with the terms of this Royalty Rebate Addendum, and Franchisee acknowledges and agrees that the cost of any physical inventory shall be borne solely by Franchisee.

5.  **Reporting**.  The results of the Audit shall be provided to Franchisee upon its reasonable request.

6.  **Returns**.  Franchisee agrees and acknowledges that its return of any or all of the Required Inventory shall not exceed fifteen percent (15%) of Franchisee's total inventory purchases, either by number of frame units purchased or total purchase amount.

7.  **Royalty Rebate**. If Franchisee is in compliance with the terms and conditions of this Royalty Rebate Addendum and the STARS Consignment Agreement, Pearle Vision shall credit Franchisee the Royalty Rebate against the Consolidated Statement due the second month following the Rebate Credit Period

8.  **Default**. Franchisee shall be in default of this Royalty Rebate Addendum and thus ineligible to receive the Royalty Rebate upon the occurrence of any or all of the following:  (a) Failure to comply with the Required Inventory, Required Inventory Level or any term or condition of the STARS Consignment Agreement; (b) Failure to submit a Monthly Franchise Report as required by the Franchise Agreement;  (c) Failure to timely pay Pearle Vision (i) any accounts or notes receivable in an amount greater than Five Thousand Dollars ($5,000) or (ii) any invoice more than sixty (60) days past due; (d) Failure to comply with the terms and conditions of any agreement between Franchisee and Pearle Vision, its affiliates, successors or assigns; (e) Failure to comply with any term or provision of this Royalty Rebate Addendum, or failure to otherwise comply with any obligation hereunder; and (f) Termination of the Franchise Agreement or the STARS Consignment Agreement.

9.  **Termination**.  Franchisor shall have the right to terminate this Royalty Rebate Addendum upon Franchisee's receipt of notice, if any of the following events occur:  (a) Franchisee commits three defaults, as defined previously, within a twenty-four month period; (b) Franchisee commits a default, as defined previously, and fails to cure the default within 30 days or the time period required by law; or (c) the STARS Consignment Agreement is terminated. Franchisee shall have the right to terminate this Royalty Rebate Addendum upon Pearle Vision's receipt of notice ninety (90) days prior to termination and if Franchisee has terminated its STARS Consignment Agreement. Pearle Vision reserves the right to discontinue Royalty Rebates at any time in the future, without cause, for any reason, upon thirty (30) days notice to Franchisee.

10. **Assignment**.  Neither party may assign rights or obligations pursuant to this Royalty Rebate Addendum without the prior written consent of the other party, except that Pearle Vision may assign this Royalty Rebate Addendum without the need for Franchisee's consent to any successor entity, subsidiary, or parent company or other affiliate entity.

11. **Parties**.  This Royalty Rebate Addendum will be binding upon and will inure to the benefit of the respective parties and their successors and assigns.

12. **Acknowledgements/NoWarranties**. Pearle Vision SPECIFICALLY HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Franchisee also acknowledges and agrees that it shall comply with the policies and procedures established by Pearle Vision to determine eligibility for the Royalty Rebate that shall be incorporated by reference herein, and which may be updated from time to time by Pearle Vision in its sole discretion upon notice to Franchisee.

13. **Notices**.  Any notices that may be given under this Royalty Rebate Addendum will be provided as required by the Franchise Agreement.

14. **Choice of Law/Choice of Venue**.  This Royalty Rebate Amendment shall be governed by the laws of Ohio.  Any disputes regarding this Royalty Rebate Addendum shall resolved in the United States District Court for the Southern District of Ohio – Western Division in accordance with the terms and conditions of the Franchise Agreement.

15. **Counterparts**.  This Royalty Rebate Addendum may be executed in any number of counterparts, and each counterpart will be considered an original.

16. **Entire Agreement**.  This document sets forth the entire understanding of the Parties with respect to the Royalty Rebate and supersedes all prior understandings regarding the Royalty Rebate.

17. **No Change to Franchise Agreement**.  Notwithstanding anything contained in this Royalty Rebate Addendum, nothing herein amends, alters or otherwise affects the terms of the Franchise Agreement signed between the Parties, which Franchise Agreement shall remain in full force and effect.  In the event of any conflict between this Royalty Rebate Addendum and the Franchise Agreement, the terms of the Franchise Agreement shall govern.

18. **Severability**.  In the event any provision of this Royalty Rebate Addendum is held invalid or unenforceable, the remainder of this Royalty Rebate Addendum shall remain in full force and effect.

19. **No Waiver**.  Any failure or alleged failure of Pearle Vision to take any action, perform any obligation or exercise any right of Pearle Vision, or demand any performance or obligation of Franchisee under this Royalty Rebate Addendum shall not be deemed a waiver by Pearle Vision of such action, right or obligation.

*Remainder of this page left intentionally blank*

LRNA FDD Amendment 11072011

   IN WITNESS WHEREOF, the Parties have executed this Royalty Rebate Addendum, or an exact counterpart hereof, effective as of the date first written at the head of this Royalty Rebate Addendum.

**FRANCHISEE:**                                    **FRANCHISOR:**

Gutman Vision, Inc.                                Luxottica Retail North America Inc.,
                                                   franchisor of Pearle Vision ("Pearle Vision")

By: _____                      By: _____
    Milana Gutman

Title: Secretary                                   Title: CARLO PRIVITERA
                                                          CHIEF OPERATING OFFICER
Date: 11/23/2011                                   Date: 12/23/2011

By: _____                      By: _____
    Alex Gutman

Title: Pres.                                       Title: JAMES NEITZKE
                                                          SVP, Finance & Accounting
Date: 11/23/11                                     Date: 12/23/2011

LRNA FDD Amendment 11072011

## TELEPHONE ADDENDUM

This Telephone Addendum is made effective as of **11/23/2011** ("**Telephone Addendum**"), between Luxottica Retail North America Inc., an Ohio corporation and franchisor of Pearle Vision® with its principal office at 4000 Luxottica Place, Mason, OH 45040 ("**Pearle Vision**") and **Gutman Vision, Inc.**, a Texas corporation with its principal office at **Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093** ("**Franchisee**").

## RECITALS

A.      Pearle Vision, as Franchisor, and Franchisee have entered into a franchise agreement dated **11/23/2011** ("**Franchise Agreement**") for the Pearle Vision store described in Attachment B of the Franchise Agreement.  The Franchise Agreement is incorporated into this Telephone Addendum by reference as if fully set forth in this Telephone Addendum. The Pearle Vision store is or will be located at **Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093** ("**Franchise Location**").

B.      Capitalized words not defined in this Telephone Addendum have the meanings ascribed to them in the Franchise Agreement.

In consideration of the foregoing recitals, the mutual promises in this Telephone Addendum, and for other good and valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree as follows:

## AGREEMENT

1.    **Definitions.**

A.      "**Telephone**" means any and all telephone lines, whether through utility lines, cables, fiber optic networks, or the Internet, which provide telephone service to the Franchise Location and all telephone numbers associated with that certain Telephone and the Telephone Agreement (as defined below), with the exception of any long-distance telephone service.

B.      "**Telephone Company**" means any communications company that provides Telephone, cable, DSL, or fiber optic service to the Franchise Location whether charged or uncharged.

C.      "**Telephone Agreement**" means that certain agreement(s) between the Telephone Company and Pearle Vision for the Telephone at the Franchise Location attached hereto as Exhibit A.

D.      "**Address**" means 4000 Luxottica Place, Mason, OH 45040, Attn: Nichole Groom.

2.    **Grant**.  Pearle Vision subleases the Telephone, and Franchisee subleases the Telephone from Pearle Vision, on the terms and conditions in this Telephone Addendum.

Franchisee has none of the following rights:  (a) any rights of first refusal, any options to purchase or pursue ownership of the Telephone, or any extensions or renewal rights of any terms of the Telephone Agreement; and (b) any right to use the Telephone in a manner contrary to the Franchise Agreement.

3. **Term**.  The term of this Telephone Addendum begins on the date this document is executed.

4. **Ownership**.  Franchisee agrees that Pearle Vision will be the sole and exclusive owner of the Telephone.

5. **Use.**  Franchisee must use the Telephone solely at the Franchise Location and only for the purpose of operating a Pearle Vision franchise. The Telephone will be the sole telephone number published or used in any and all Pearle Vision advertising or marketing materials used to advertise the Franchise Location.

6. **Telephone Lease Charges**.  Franchisee must pay all charges relating to the Telephone as detailed in the Telephone Agreement, including, but not limited to, any deposits, monthly charges, surcharges, late fees, taxes, FCC fees, any other fees associated with the Telephone (collectively, the "***Telephone Lease Charges***").

Pearle Vision shall bill to, and collect from, Franchisee the Telephone Lease Charges on Franchisee's Consolidated Statement as defined in the Franchise Agreement. All charges must be paid to Pearle Vision in advance without notice, demand, deduction, counterclaim, or setoff. Franchisee must pay all initial deposits for the Telephone within 30 days after the Telephone Agreement is executed.

7. **Duty.**  Upon execution of the Franchise Agreement, and before Franchisee opens for business at the Franchise Location, Franchisee shall execute any and all contracts for telephone service in the name of Pearle Vision using the Address. In the alternative, Franchisee shall provide Pearle Vision with any and all information regarding the setup of the Telephone at the Franchise Location so that Pearle Vision may execute any documents relative to the set up of the Telephone at the Franchise Location.

8. **Franchisee's Obligations**.  Franchisee is specifically bound and obligated to each and every term and condition of the Telephone Agreement.  The Telephone Agreement is incorporated into this Telephone Addendum by reference and made a part of this Telephone Addendum. Franchisee represents that it has read the Telephone Agreement and consents to the Telephone Agreement.  Franchisee must comply with all terms of the Telephone Agreement as directed by Pearle Vision. Franchisee will be responsible for any breach or default of the Telephone Addendum occurring as of the date of this Telephone Addendum.

9. **Default.**  Franchisee's failure to perform any obligation under this Telephone Addendum will be a default.  Pearle Vision may, in its sole discretion, cure any default of Franchisee without notice to Franchisee, and Pearle Vision's cost to cure the default will be added

to the next consolidated statement due to Pearle Vision. Pearle Vision has no obligation to cure any default and shall not bear any liability to Franchisee for failing to do so.

10.   **Immediate Termination With Notice.**   Pearle Vision may terminate this Telephone Addendum immediately upon the occurrence of any of the following:  (a) Expiration of the Franchise Agreement; or (b) Franchisee defaults under this Telephone Addendum, the Telephone Agreement, the Franchise Agreement, or any agreement between Franchisee (or any of Franchisee's shareholders or guarantors) and Pearle Vision (or any of Pearle Vision's affiliates).

11.   **Notices.**  All notices in this Telephone Addendum must be sent in accordance with the Franchise Agreement.

12.   **Franchisee and Telephone Company.**  Franchisee has no authority to contract with or make any agreement with Telephone Company regarding the Telephone or the Telephone Agreement.

13.   **Maintenance and Repairs.**  At Franchisee's sole cost and expense, Franchisee must maintain the Telephone in good, safe, and customary condition and as further required under the Telephone Agreement.  At Pearle Vision's reasonable request, Franchisee must cooperate with the Telephone Company if any repairs or maintenance to the telephone is required. Upon expiration or termination of this Telephone Addendum for any reason, Franchisee must quit all use of the Telephone.

14.   **Binding Effect.**  This Telephone Addendum binds the successors and assigns of each party. Notwithstanding the forgoing, Franchisee has no right to assign or otherwise transfer its interest in the Telephone Addendum, nor any right to sublet the Telephone or any part thereof, without the prior written consent of Pearle Vision.

15.   **Legal Compliance.**   In addition to any requirements under the Telephone Agreement, Franchisee must comply with all present and future laws, ordinances, orders, rules, codes, regulations and requirements (collectively, "*Laws*") of any governmental body (federal, state, or local) relating to Sublesee's use, care, alterations, and occupancy of the Telephone.

16.   **Amendments in Writing.**  This Telephone Addendum can be changed only by a written agreement signed by all of the parties.

17.   **Headings.**  Headings are for convenience only and will not affect this Telephone Addendum in any way, nor will they be used to interpret this Telephone Addendum. No waiver of any party's obligations or rights will be effective unless it is in writing. No such waiver will be deemed a waiver of any other obligation or right in this Telephone Addendum.  A corporate officer signing this Telephone Addendum on behalf of a corporate party warrants and represents that he or she has full power and authority to sign this Telephone Addendum. If any provision of this Telephone Addendum (or the application thereof) to any person or circumstance is held invalid or unenforceable, then the remainder of this Telephone Addendum (or the application of such provision to persons or circumstances other than those as to which it is held invalid or

unenforceable) will remain in full force and effect. Each provision of this Telephone Addendum is severable and will be enforceable to the fullest extent permitted by law.

Pearle Vision and Franchisee have executed this Telephone Addendum as of the date and year first written above.

**FRANCHISEE:**

Gutman Vision, Inc.

By: _____
    Milana Gutman

Title: _Secretary_

Date: _11/23/2011_

By: _____
    Alex Gutman

Title: _Pres._

Date: _11/23/11_

**FRANCHISOR:**

Luxottica Retail North America Inc.,
Franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title: CARLO PRIVITERA
    CHIEF OPERATING OFFICER

Date: _12/23/2011_

By: _____

Title: JAMES NEITZKE
    SVP, Finance & Accounting

Date: _12/23/2011_

LRNA FDD Amendment 11072011

## EXHIBIT A TO TELEPHONE ADDENDUM

STORE ACCOUNT
AT&T SWBELL Account 9729315775001 - $230 - $250 each month for past 6 months
VERIZON (MCI) – Long Distance Service - $20 - $22 each month for past 6 months

DOCTOR ACCOUNT
AT&T SWBELL Account 9722503937534 – Local Phone Lines and DSL Service - $130- $140 each month
for past 6 months
VERIZON (MCI) – Long Distance Service - $6.00 - $7.00 each month for past 6 months

LRNA FDD Amendment 11072011

## BANK AUTHORIZATION FORM ("BAF")

## FRANCHISE ELECTRONIC CASH CONCENTRATION
## OR DISBURSEMENT POLICIES AND PROCEDURES

**OVERVIEW**

Cash concentration or disbursement (CCD entry) means a credit or debit entry initiated by an organization to consolidate funds of that organization from its branches, franchisees, or agents, or from other organizations, or to fund the accounts of the same.  The ACH payment plan is being offered as a convenient method of payment versus payment by check.  These policies and procedures have been developed in accordance wit the National Automated Clearing House Association (NACHA) rules and are provided to clarify the following:

- How to get started on the program
- Due dates
- Dispute resolution
- Insufficient funds

**GETTING STARTED**

Two items are needed to begin electronic payments:

1.  Franchisee must complete and sign the Franchisee Electronic Cash Concentration or Disbursement Payment Authorization From.

2.  Send the Authorization form, along with a voided check to:

   Luxottica Retail North America Inc.
   4000 Luxottica Place
   Mason, OH  45040
   Attention:  Regulatory Services

Franchisee will receive written confirmation from Luxottica Retail North America Inc., franchisor of Pearle Vision ("Pearle Vision") that the authorization form is complete and accurate.  Also, Franchisee will be notified as to when the first ACH transaction will occur.  The first ACH transaction will typically be three (3) to six (6) weeks after the ACH form is received.

**DUE DATES**

Signing up for the electronic payment option will not alter in any way the due dates of the various obligations. In summary, due dates are as follows (refer to the Franchise Agreement for specific guidelines as to due dates and obligations covered):

| | | |
|---|---|---|
| Note Obligations | - | 1st day of the month |
| Base Rent | - | 8th day of the month |
| Royalties | - | 15th day of the month |
| Merchandise Billings and | | |
| Consolidated Statement Items | - | 25th day of the month |

Should the due date fall on a weekend or on a bank holiday, the ACH transfer will be initiated on the first business day following the due date.

## DISPUTE RESOLUTION

It is Franchisee's responsibility to initiate resolution to disputed charges before the ACH transfer occurs. Pearle Vision will take all reasonable steps to resolve disputes in a timely manner. However, any disputed item(s) which are unresolved by the due date will be submitted for the original payment amount to be transferred on the due date. Subsequent resolution of unresolved disputes will be credited back to Franchisee's account (if it is resolved in Franchisee's favor) on the next due date for that particular obligation (e.g., disputed merchandise billing amounts resolved in January will be credited on the 25th day of February).

Specific Considerations

*Royalties and Advertising Contribution*

The certified Monthly Franchise Report ("MFR") must be received by Pearle Vision on a timely basis in order for the proper funds to be withdrawn. If the MFR is not received by the 10th of each month, Pearle Vision will, in accordance with the Franchise Agreement, "initiate payment from the Franchisee's business account. . . based on the highest monthly amount of Gross Revenues reported by the Franchisee during the preceding twelve (12) month period. If Franchisee's MFR reflects that more funds were withdrawn from Franchisee's business account that were due for the month, Pearle Vision will credit the excess against Franchisee's royalty obligations under Franchisee's MFR due for the following month." Note that MFRs which are not certified as accurate by Franchisee when received will also be subject to the above-stated royalty calculation. Late fees may also be assessed where applicable.

*Merchandise Billings*

It is expected that some credits for return of product will not be processed before the monthly consolidated statement is mailed out. Pearle Vision will take all reasonable steps to ensure timely credits are processed. However, any credits given after the billing date, but before the ACH transfer occurs, will **NOT** reduce the ACH transfer amount. Rather, these credits will be applied against future billings.

## INSUFFICIENT FUNDS

Pearle Vision will notify Franchisee, by telephone, of any ACH item that has been returned due to "insufficient funds" within two (2) business days after Pearle Vision has been notified of the occurrence and assess any applicable penalties. Please note that your financial institution may also charge a fee for ACH returns and/or insufficient fund occurrences. In additional to any penalties it may assess, Pearle Vision may also assess late charges at one and one-half percent (1.5 %) per month (not to exceed the highest rate allowed by law) of the outstanding balance, beginning with the second notification of insufficient funds. These outstanding amounts will (a) be billed to the monthly consolidated statement; (b) remain currently due; and (c) be resubmitted for payment continuously until paid.

LRNA FDD Amendment 11072011

## FRANCHISEE ELECTRONIC CASH CONCENTRATION
## OR DISBURSEMENT PAYMENT
## NOTIFICATION OF CHANGE FORM

I (we) authorize Luxottica Retail North America Inc., franchisor of Pearle Vision ("Pearle Vision") and its affiliates and the financial institution listed below to begin electronic debits and/or credit entries to my (our) account listed below.

**FRANCHISEE INFORMATION**

Franchisee Name: **Gutman Vision, Inc.**

Address: **Preston Park Shopping Center, 1713 Preston Road, Suite A**

City: **Plano**   State:   **Texas**   ZIP:   **75093**

Location Number: **8655**  (the "Franchise Location")

Daytime Phone: _____   Fax Number: _____   Email address: _____

**BANK INFORMATION**
Name on Account   _Gutman Vision Inc._

Name of Financing Institution   _Bank of America_

Address of Financial Institution _____

Account No.   _488025486700_

Transit/ABA No.   _111000025_                    *Attach Voided Check*

Terms of Agreement:  I (we) have an account(s) at the financial institution named and for all debit entries have funds sufficient to pay such entries.  Electronic debit or credit entries shall be initialed by Pearle Vision to pay obligations due and other charges for the above-listed Franchise Agreement.  No payment to Pearle Vision shall be deemed to have been made unless and until Pearle Vision receives actual credit.  I also understand that if corrections of the entry are necessary, it may involve an adjustment to my account.  I understand my direct electronic payment of the obligations due will be debited from the above-stated account on or after the due date of the stated obligation(s) indicated within the Franchise Agreement for the above referenced Franchise Location.

NOTE:  Pearle Vision reserves the right to refuse or terminate electronic payment services.  This agreement is to remain in effect until Pearle terminates it.  Notification of changes should be directed to *Luxottica Retail North America Inc, 4000 Luxottica Place, Mason, OH  45040; Attention Accounts Receivable.*

Joint accounts require the signature of all persons having authority over the account.  Checking account holder(s), please sign here:

Name   _Milana Gutman_                     Date   _11/23/2011_

Name   _____   Date   _____

*PLEASE INCLUDE A VOIDED CHECK OR A COPY OF A CANCELED CHECK FROM THE BANK ACCOUNT LISTED ABOVE.*



LRNA FDD Amendment 11072011

## PERSONAL GUARANTY

This Personal Guaranty made **11/23/2011** ("*Personal Guaranty*"), is between Milana Gutman and Alex Gutman ("*Guarantor*," whether one or more) and Luxottica Retail North America Inc., an Ohio corporation and the franchisor of Pearle Vision® ("*Pearle Vision*").

A.     Guarantor is an Equity Owner of that certain Franchisee under that certain Franchise Agreement made **11/23/2011** between **Gutman Vision, Inc.**, as Franchisee, and Pearle Vision ("*Franchise Agreement*").

B.     Franchisee has entered into the following agreements with Pearle Vision:

Lease/Sublease dated: _____*May 19, 2006*_____

Promissory Note dated: _____N/A_____

Security Agreement dated: _____11/23/2011_____

(referred to collectively in this Personal Guaranty as the "*Ancillary Agreements*").

C.     The Franchise Agreement and the Ancillary Agreements will directly benefit Guarantor as an Equity Owner of Franchisee.

Guarantor and Pearle Vision have agreed that in order to induce Pearle Vision to execute the Franchise Agreement and the Ancillary Agreements, Guarantor will be obligated by the following conditions. Pearle Vision and Guarantor also agree that the Franchise Agreement and Ancillary Agreements are incorporated in this Personal Guaranty by reference as though they were completely contained in this Personal Guaranty:

1.     Financial Obligations. Guarantor (jointly and severally, if more than one Guarantor) unconditionally, absolutely and irrevocably guarantees the full and prompt payment of Franchisee's obligations and liabilities to Pearle Vision under any agreement however created and regardless of origin. Guarantor agrees to pay all reasonable costs and expenses incurred by Pearle Vision in enforcing the provisions of this Personal Guaranty, the Franchise Agreement or the Ancillary Agreements, or in prosecuting any action to collect any collateral securing Franchisee's obligations to Pearle Vision, including reasonable attorneys' fees. (All amounts of payment obligations and liabilities now or hereafter owed by Franchisee to Pearle Vision described in this Paragraph 1, including any increases or modifications to them, together with any and all costs and expenses, described in this Paragraph 1 are later in this Personal Guaranty sometimes referred to as the "Indebtedness.")

2.     Performance of Obligations.  Guarantor also guarantees the full, prompt and unconditional performance of all obligations and agreements of every kind owed or hereafter to be owed by Franchisee to Pearle Vision as if Guarantor were a Franchisee,

LRNA FDD Amendment 11072011

including without limitations, any and all obligations of Franchisee under the Franchise Agreement and other Ancillary Agreements relating to non-competition both during and after the termination, expiration, transfer or assignment of the Franchise Agreement. Every provision for the benefit of <u>Pearle Vision</u> contained in this Personal Guaranty shall apply to the guaranty of performance given in Paragraphs 1 and 2 hereof.

3.    <u>Absolute and Unconditional</u>. Guarantor agrees that Guarantor's obligations under this Personal Guaranty are absolute and unconditional, irrespective of: (i) the validity, enforceability, loss or destruction of any instrument or document evidencing Franchisee's Indebtedness to <u>Pearle Vision</u>; or (ii) the absence of any attempt to collect the Indebtedness from Franchisee or any other Guarantor, or other action to enforce performance of the Indebtedness.

4.    <u>Waivers</u>. (a) Guarantor waives diligence in preserving liability of any person, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of any other Guarantor, notice of extensions, renewals, increases or modifications of the Franchise Agreement or any of the Ancillary Agreements or of any Indebtedness or other obligations evidenced or secured by them, protest or notice with respect Franchisee's liabilities or obligations to <u>Pearle Vision</u> and all demands, notices of release or substitution of collateral, and promises that this Personal Guaranty will not be discharged except by complete performance of the Indebtedness and other obligations contained in it. On the occurrence of Franchisee's default in the performance of its Indebtedness or other obligations under any Agreement with <u>Pearle Vision</u>, and so long as the default continues, <u>Pearle Vision</u> may, in its sole discretion, proceed directly, against Guarantor (or any one of them if more than one) to collect and recover the amount of Franchisee's Indebtedness or other obligations to <u>Pearle Vision</u>, without first proceeding against any other Guarantor. <u>Pearle Vision</u> will have the exclusive right to determine the application of payments and credits, if any, from the Guarantor on account of the Indebtedness. No payment by a Guarantor will entitle the Guarantor, by subrogation or otherwise, to any rights against Franchisee or any other Guarantor prior to payment in full of all Indebtedness and other obligations owing to <u>Pearle Vision</u>.

(b)    Guarantor's obligations under this Personal Guaranty will not be affected by any of the following, all of which Guarantor by this Personal Guaranty waives: (i) any failure to perfect or continue the perfection of any security interest in or other lien on any collateral securing payment of any Indebtedness or Guarantor's obligations under this Personal Guaranty; (ii) the invalidity, unenforceability, propriety or manner of enforcement of or loss or change in priority of, any such security interest or other lien; (iii) any failure to protect, preserve or insure any such collateral; (iv) failure of Guarantor to receive notice of any intended disposition of such collateral; (v) any defense arising by reason of the cessation from any cause whatsoever of liability of the Franchisee, including, without limitation, any failure, negligence or omission by <u>Pearle Vision</u> in enforcing its claims against the Franchisee; (vi) any release, settlement or compromise of any obligation of Franchisee; or (vii) the invalidity or unenforceability of any of the Indebtedness. It is especially and expressly agreed that if any or all of the Indebtedness of

LRNA FDD Amendment 11072011

the Franchisee now or at any time hereafter exceeds the amount permitted by law or if Franchisee's obligation to pay interest, attorneys' fees, costs or expenses or any other sums ceases to exist by operation of law, or if Franchisee is not liable because the act of creating the obligation is ultra vires, or the officers creating the obligation acted without authority, and for these reasons the Indebtedness which Guarantor agrees to pay cannot be enforced against the Franchisee, that fact will in no manner affect Guarantor's liability under this Personal Guaranty, notwithstanding the fact that Franchisee is not liable for the Indebtedness, but Guarantor will be liable under this Personal Guaranty to the same extent as Guarantor would have been if the Indebtedness had been fully enforceable against Franchisee.

5.      Continuing Guaranty.  (a) This is a continuing Guaranty. Guarantor's liability under this Personal Guaranty will not be impaired by Pearle Vision's actions from time to time, without notice or demand.  By way of explanation and not limitation, Pearle Vision is authorized to take the following described actions without impairing this Personal Guaranty:  (i) extend credit or advance loans to Franchisee or Guarantor; (ii) renew, extend, accelerate or otherwise change the terms of the Ancillary Agreements, the Franchise Agreement or any other agreements between Franchisee and/or Guarantor and Pearle Vision, or any Indebtedness evidenced or secured thereby; (iii) accept partial payments on the Indebtedness or other obligations to Pearle Vision; (iv) take and hold security or collateral for the payment of this Personal Guaranty or any other guarantees of the Indebtedness, the security or collateral; or (v) apply the security or collateral and direct the order or manner of the sale of it as Pearle Vision in its discretion may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the Indebtedness and any security or collateral therefore, in any manner. Pearle Vision may, without notice, assign this Personal Guaranty in whole or in part.

(b)      If any default shall be made in the payment of any Indebtedness, Guarantor, by this Personal Guaranty, agrees to pay the same in full: (i) without deduction by reason of any setoff, defense or counterclaim of Franchisee; (ii) without requiring protest or notice of nonpayment or notice of default to Guarantor, to Franchisee or to any other person; (iii) without demand for payment or proof of such demand; (iv) without requiring Pearle Vision to resort first to Franchisee (this being a guaranty of payment and not of collection) or to any other guaranty or any collateral which Pearle Vision may hold; (v) without requiring notice of acceptance hereof or assent hereto by Pearle Vision; and (vi) without requiring notice that any Indebtedness has been incurred or of the reliance by Pearle Vision upon this Personal Guaranty; all of which Guarantor by this Personal Guaranty waives.

6.      Marshalling of Assets; Invalidated Payment.  Guarantor agrees that Pearle Vision is under no obligation to marshal any assets in Guarantors favor against or in payment of Franchisee's liabilities or obligations to Pearle Vision or to preserve any rights of any prior party. Guarantor further agrees that to the extent that Guarantor makes a payment or payments to Pearle Vision, if any part of the payment or payments is subsequently invalidated, declared to be preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any applicable law or equitable cause, then to the extent

the obligation was to be satisfied by the payment it will be revived and continued in full force and effect as if the payment had not been made.

7.  Waiver; Modification. No waiver will be deemed to be made by Pearle Vision of any of its rights under this Personal Guaranty unless the waiver is in writing signed by Pearle Vision, and each waiver, if any, will be a waiver only with respect to the specific instance involved and will in no way impair Pearle Vision's rights or Guarantor's obligations to Pearle Vision in any other respect at any other time.  This Personal Guaranty may not be altered or amended except by an agreement in writing signed by the Guarantor and Pearle Vision.

8.  Successors and Assigns.  This Personal Guaranty and all rights of Pearle Vision under this Personal Guaranty will inure to the benefit of Pearle Vision, its successors and assigns, including without limitation any successor or assignee of any or all of Pearle Vision's rights under any of the Indebtedness evidenced by any promissory notes or secured by the Security Agreement, or any modifications thereto or increases, extensions or renewals of any thereof.  To the extent that Pearle Vision has assigned, or at any time hereafter shall assign, any rights under any of the Indebtedness evidenced by any promissory notes or secured by the Security Agreement, or any modifications thereto or increases, extensions or renewals of any thereof, either Pearle Vision or such assignee, with respect to Indebtedness held by Pearle Vision or such secured party is permitted to take herein without impairing the Guaranty or affecting any remaining Indebtedness held by such secured party or any remaining Indebtedness held by the other secured party.

9.  Severability. Wherever possible each provision of this Personal Guaranty will be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Personal Guaranty is prohibited by or invalid under law, the provision will be ineffective to the extent of the prohibition or invalidity without invalidating the remainder of the provision or the remaining provisions of this Personal Guaranty.

10. Miscellaneous.  (a) Captions of the paragraphs of this Personal Guaranty are solely for the convenience of Pearle Vision and Guarantor, and are not an aid in the interpretations of this Personal Guaranty.

    (b)Guarantor by this Personal Guaranty waives any and all rights Guarantor may have under Chapter 1341 of Title X111 of the Ohio Revised Code, as amended, or any similar provisions under the statutes or common laws of any other state, and Guarantor agrees that the provisions of Chapter 1341 of Title XIII of the Ohio Revised Code, as amended, any similar provisions under the statutes or common laws of any other state, do not and will not apply to this Personal Guaranty.

11. Choice of Law/Choice of Venue. PAYMENTS OF ALL SUMS OF MONEY AND THE PERFORMANCE OF ALL OF THE COVENANTS AND AGREEMENTS UNDER THIS PERSONAL GUARANTY WILL BE PAYABLE AND DUE AT THE OFFICE OF PEARLE VISION IN MASON, OHIO.  THIS PERSONAL GUARANTY AND THE TRANSACTION EVIDENCED BY THIS PERSONAL GUARANTY WILL BE

LRNA FDD Amendment 11072011

CONSTRUED UNDER THE INTERNAL LAWS OF THE STATE OF OHIO.  ANY DISPUTES REGARDING THIS PERSONAL GUARANTY SHALL RESOLVED IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO – WESTERN DIVISION IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE FRANCHISE AGREEMENT.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

**[SIGNATURE PAGE FOLLOWS]**

LRNA FDD Amendment 11072011

**GUARANTOR:**

Milana Gutman, individually

Date: 4/23/2011

Alex Gutman, individually

Date: 4/23/11

Address: Preston Park Shopping Center
1713 Preston Road, Suite A
Plano, Texas 75093

**FRANCHISOR:**

Luxottica Retail North America Inc.,
Franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title: _____
CARLO PRIVITERA
CHIEF OPERATING OFFICER

Date: 12/23/2011

By: _____

Title: _____
JAMES NEITZKE
SVP, Finance & Accounting

Date: 12/23/2011

Address: 4000 Luxottica Place
Mason, Ohio 45040

LRNA FDD Amendment 11072011

**CONFIDENTIALITY/COVENANT NOT TO COMPETE AGREEMENT**

**TO BE EXECUTED BY:**
**FRANCHISEE'S OFFICERS, DIRECTORS AND OPERATORS**

**NAME:**          **Milana Gutman**

**FRANCHISEE:**          **Gutman Vision, Inc.**

**FRANCHISE LOCATION:**  **Preston Park Shopping Center**
                        **1713 Preston Road, Suite A**
                        **Plano, Texas 75093**

**LOCATION NUMBER:  8655**

**HOME ADDRESS:**        1004 Sahallee dr
                        Frisco TX 75033

**HOME TELEPHONE:**      972-335-0444

**CLASSIFICATION:**      Designated Operator
**(Designated Operator, Designated Developer, Officer, Director)**

I, **Milana Gutman**, do hereby agree that during the term of my franchise agreement with Luxottica Retail North America Inc., franchisor of Pearle Vision® ("*Pearle Vision*"), or at any time thereafter, Franchisee shall not communicate, divulge or use for the benefit of any other person, persons, partnership, proprietorship, association, corporation or entity any knowledge, trade secrets or know-how concerning the systems of operation, programs, services, products, customers or practices of Franchisee and/or of Pearle Vision and/or pertaining to the Pearle Vision System which may be communicated to me (the "*Confidential Information*"), nor shall I divert any business to competitors of Franchisee and/or Pearle Vision.

Any and all information, knowledge, know-how, techniques and information which the aforementioned entities or their officers designate as confidential shall be deemed Confidential Information for the purposes of this Agreement, except information which I can demonstrate came to my attention prior to disclosure thereof or which had become or becomes a part of the public domain through publication or communication by others but in no event by or through any act of mine.

I specifically understand that, without limitation, the following have been deemed to constitute Confidential Information of Pearle Vision:  (1) all optical products, professional services, equipment, technologies and procedures relating to the Pearle Vision System; all systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications and criteria which now comprise or in the future may comprise a part of the Pearle Vision System; (2) the Pearle Vision Franchise Manual; (3) the Pearle Vision Marketing

LRNA FDD Amendment 11072011

Manuals; (4) Supplements and/or amendments to any of the foregoing Manuals; (5) Pearle Vision master store directories; (6) mailing lists and customer lists; (7) all other components, specifications, standards, requirements and duties imposed by Pearle Vision or its Affiliates; and (8) any information designated as confidential by Pearle Vision or its Affiliates.

I shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing Confidential Information, in whole or in part, store same in a computer retrieval or data base, nor otherwise make the same available to any unauthorized person. Upon the expiration or other termination for any reason of my employment, association, service or ownership participation, I shall return to Pearle Vision or Franchisee (as applicable) the Confidential Information that is in my possession.

I further agree that during the term of my employment/service/association, and within a three (3) mile radius of the Franchisee's Location and for a period of one year immediately following the expiration or termination thereof (for any reason whatsoever), except as otherwise provided in the Franchise Agreement, I will not, either directly or indirectly, engage or participate in any other business which offers or sells retail optical products and professional services; which offers or sells any products or service related thereto; which engages in any of the activities which the Franchise Agreement contemplates will be engaged in by Franchisee; or, which offers or sells any other product or service which comprises or may in the future comprise a part of the Pearle Vision System (or any product or service confusingly similar thereto). I am prohibited from engaging in any such competitive business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant thereof. This prohibition includes not only direct competition but also forms of indirect competition, such as consultation for competitive businesses, service as an independent contractor for such competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever which would be of any material assistance to a competitor. Nothing herein shall prevent me from owning, for investment purposes, up to an aggregate of five percent (5%) of the capital stock for any competitive business, provided that said business is a publicly held corporation whose stock is listed and traded on a national or regional stock exchange, or through the National Association of Securities Dealers Automated Quotation System (NASDAQ), and provided that Franchisee does not control any such company.

I acknowledge that violation of the covenants not to compete contained herein would result in immediate and irreparable injury to Pearle Vision (and, if I am an officer or director of Franchisee, to Franchisee) for which no adequate remedy at law will be available.  Accordingly, I hereby consent to the entry of an injunction procured by Pearle Vision (or, if I am an officer or director of Franchisee, by Franchisee, or by both Pearle Vision and Franchisee) prohibiting any conduct by me in violation of the terms of the covenants not to compete and/or restrictions on the use of Confidential Information set forth herein. I expressly agree that it may conclusively be presumed in any legal action that any violation of the terms of said covenants not to compete was accomplished by and through my unlawful utilization of Pearle Vision's Confidential Information, know-how, methods and procedures. Further, I expressly agree that the existence of any claims I may have against Pearle Vision (or, if I am an officer or director of Franchisee, against Franchisee) shall not constitute a defense to the enforcement of the covenants not to compete set forth herein by Pearle Vision (or, if I am an officer or director of Franchisee, by

LRNA FDD Amendment 11072011

Franchisee). I further agree to pay all costs and expenses, including reasonable attorneys' and experts' fees, incurred in connection with the enforcement of the covenants not to compete set forth herein by Pearle Vision (and, if I am an officer or director of Franchisee, by Franchisee).

If all or any portion of this covenant not to use confidential information and not to compete is held unreasonable, void, vague or illegal by any court or agency having valid jurisdiction in an unappealed final decision to which Pearle Vision and/or Franchisee is a party, the court or agency shall be empowered to revise and/or construe said covenant so as to fall within permissible legal limits and shall not by necessity invalidate the entire covenant. I expressly agree to be bound by any lesser covenant subsumed within the terms of this Agreement as if the resulting covenant were separately stated in and made a part hereof.

If I am a Designated Operator or Designated Developer of Franchisee (and I am not also an officer or director of Franchisee), I understand and agree that the consideration for my execution of this Confidentiality/Covenant Not to Compete Agreement is my employment by Franchisee; my obligations under this Agreement shall run to Pearle Vision alone; and, I undertake no obligations to Franchisee hereunder by virtue of my execution of this Agreement. In addition, if I am a Designated Operator or Designated Developer of Franchisee (and I am not also an officer or director of Franchisee), then Pearle Vision shall have no obligation to Franchisee to enforce this Agreement; Pearle Vision alone - and not Franchisee - may determine to enforce, refuse to enforce and/or waive enforcement of this Agreement in its sole and exclusive discretion.

**Milana Gutman**

Date: 11/23/2011

LRNA FDD Amendment 11072011

## CONFIDENTIALITY/COVENANT NOT TO COMPETE AGREEMENT

**TO BE EXECUTED BY:**
**FRANCHISEE'S OFFICERS, DIRECTORS AND OPERATORS**

**NAME:**              **Alex Gutman**

**FRANCHISEE:**        **Gutman Vision, Inc.**

**FRANCHISE LOCATION:**  **Preston Park Shopping Center**
                        **1713 Preston Road, Suite A**
                        **Plano, Texas 75093**

**LOCATION NUMBER: 8655**

**HOME ADDRESS:**      _1004 Sahallee dr_
                      _Frisco, TX 75033_

**HOME TELEPHONE:**    _972-335-0444_

**CLASSIFICATION:**    _Director_
**(Designated Operator, Designated Developer, Officer, Director)**

I, **Alex Gutman**, do hereby agree that during the term of my franchise agreement with Luxottica Retail North America Inc., franchisor of Pearle Vision® ("***Pearle Vision***"), or at any time thereafter, Franchisee shall not communicate, divulge or use for the benefit of any other person, persons, partnership, proprietorship, association, corporation or entity any knowledge, trade secrets or know-how concerning the systems of operation, programs, services, products, customers or practices of Franchisee and/or of Pearle Vision and/or pertaining to the Pearle Vision System which may be communicated to me (the "***Confidential Information***"), nor shall I divert any business to competitors of Franchisee and/or Pearle Vision.

Any and all information, knowledge, know-how, techniques and information which the aforementioned entities or their officers designate as confidential shall be deemed Confidential Information for the purposes of this Agreement, except information which I can demonstrate came to my attention prior to disclosure thereof or which had become or becomes a part of the public domain through publication or communication by others but in no event by or through any act of mine.

I specifically understand that, without limitation, the following have been deemed to constitute Confidential Information of Pearle Vision:  (1) all optical products, professional services, equipment, technologies and procedures relating to the Pearle Vision System; all systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications and criteria which now comprise or in the future may comprise a part of the Pearle Vision System; (2) the Pearle Vision Franchise Manual; (3) the Pearle Vision Marketing

Manuals; (4) Supplements and/or amendments to any of the foregoing Manuals; (5) Pearle Vision master store directories; (6) mailing lists and customer lists; (7) all other components, specifications, standards, requirements and duties imposed by Pearle Vision or its Affiliates; and (8) any information designated as confidential by Pearle Vision or its Affiliates.

I shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing Confidential Information, in whole or in part, store same in a computer retrieval or data base, nor otherwise make the same available to any unauthorized person. Upon the expiration or other termination for any reason of my employment, association, service or ownership participation, I shall return to Pearle Vision or Franchisee (as applicable) the Confidential Information that is in my possession.

I further agree that during the term of my employment/service/association, and within a three (3) mile radius of the Franchisee's Location and for a period of one year immediately following the expiration or termination thereof (for any reason whatsoever), except as otherwise provided in the Franchise Agreement, I will not, either directly or indirectly, engage or participate in any other business which offers or sells retail optical products and professional services; which offers or sells any products or service related thereto; which engages in any of the activities which the Franchise Agreement contemplates will be engaged in by Franchisee; or, which offers or sells any other product or service which comprises or may in the future comprise a part of the Pearle Vision System (or any product or service confusingly similar thereto). I am prohibited from engaging in any such competitive business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant thereof. This prohibition includes not only direct competition but also forms of indirect competition, such as consultation for competitive businesses, service as an independent contractor for such competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever which would be of any material assistance to a competitor. Nothing herein shall prevent me from owning, for investment purposes, up to an aggregate of five percent (5%) of the capital stock for any competitive business, provided that said business is a publicly held corporation whose stock is listed and traded on a national or regional stock exchange, or through the National Association of Securities Dealers Automated Quotation System (NASDAQ), and provided that Franchisee does not control any such company.

I acknowledge that violation of the covenants not to compete contained herein would result in immediate and irreparable injury to Pearle Vision (and, if I am an officer or director of Franchisee, to Franchisee) for which no adequate remedy at law will be available. Accordingly, I hereby consent to the entry of an injunction procured by Pearle Vision (or, if I am an officer or director of Franchisee, by Franchisee, or by both Pearle Vision and Franchisee) prohibiting any conduct by me in violation of the terms of the covenants not to compete and/or restrictions on the use of Confidential Information set forth herein. I expressly agree that it may conclusively be presumed in any legal action that any violation of the terms of said covenants not to compete was accomplished by and through my unlawful utilization of Pearle Vision's Confidential Information, know-how, methods and procedures. Further, I expressly agree that the existence of any claims I may have against Pearle Vision (or, if I am an officer or director of Franchisee, against Franchisee) shall not constitute a defense to the enforcement of the covenants not to compete set forth herein by Pearle Vision (or, if I am an officer or director of Franchisee, by

Franchisee). I further agree to pay all costs and expenses, including reasonable attorneys' and experts' fees, incurred in connection with the enforcement of the covenants not to compete set forth herein by Pearle Vision (and, if I am an officer or director of Franchisee, by Franchisee).

If all or any portion of this covenant not to use confidential information and not to compete is held unreasonable, void, vague or illegal by any court or agency having valid jurisdiction in an unappealed final decision to which Pearle Vision and/or Franchisee is a party, the court or agency shall be empowered to revise and/or construe said covenant so as to fall within permissible legal limits and shall not by necessity invalidate the entire covenant. I expressly agree to be bound by any lesser covenant subsumed within the terms of this Agreement as if the resulting covenant were separately stated in and made a part hereof.

If I am a Designated Operator or Designated Developer of Franchisee (and I am not also an officer or director of Franchisee), I understand and agree that the consideration for my execution of this Confidentiality/Covenant Not to Compete Agreement is my employment by Franchisee; my obligations under this Agreement shall run to Pearle Vision alone; and, I undertake no obligations to Franchisee hereunder by virtue of my execution of this Agreement. In addition, if I am a Designated Operator or Designated Developer of Franchisee (and I am not also an officer or director of Franchisee), then Pearle Vision shall have no obligation to Franchisee to enforce this Agreement; Pearle Vision alone - and not Franchisee - may determine to enforce, refuse to enforce and/or waive enforcement of this Agreement in its sole and exclusive discretion.


_Alex Gutman_

**Alex Gutman**

Date: _11/23/11_

## OD PROFESSIONAL LICENSE AND MAINTENANCE AGREEMENT

This OD PROFESSIONAL LICENSE AND MAINTENANCE AGREEMENT (this "*OD Professional Agreement*"), is effective as of the date signed below (the "Effective Date"), is by and between Luxottica Retail North America Inc., the franchisor of Pearle Vision®, with a principal place of business at 4000 Luxottica Place, Mason, OH 45040 (hereinafter "*Pearle Vision*") and the undersigned with its principal place of business at the address shown on the last page of this Agreement (hereinafter "*Franchisee*").

WHEREAS, EMRLogic Systems, Inc. ("*EMR Logic*") is the owner of that certain OD Professional™ software (the "*Software*");

WHEREAS, EMR Logic and Pearle Vision have entered into an agreement to license the Software (the "*Software License Agreement*");

WHEREAS, Pearle Vision and Franchisee entered into a franchise agreement (the "*Franchise Agreement*") which grants Franchisee the right to operate a Pearle Vision franchise at the address or addresses shown on the last page of this OD Professional Agreement (collectively, the "*Store*") using the Pearle Vision System as defined therein; and

WHEREAS, pursuant to the Franchise Agreement and this OD Professional Agreement, Pearle Vision wishes to sublicense the Software to Franchisee as the new point of sale system required by the Franchise Agreement; and Franchisee desires to acquire such sublicense to the Software.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are acknowledged by the parties, Pearle Vision and Franchisee agree as follows;

1.      SUBLICENSE

1.1.    Subject to the terms of this **OD Professional Agreement** and the Software License Agreement, Pearle Vision grants Franchisee a non-exclusive, non-transferable, non-assignable and terminable license to use the Software and related documentation in connection with its point of sale system located at the Store during the Term (as defined herein), and to make copies solely for backup and archival purposes. Pearle Vision (or EMR Logic as the case may be) reserves all rights not expressly granted to Franchisee hereunder.

1.2.    Pearle Vision may, in its sole discretion, provide to Franchisee, any updates or enhancements to the Software that Pearle Vision may receive from EMR Logic.  Franchisee agrees and acknowledges that Pearle Vision may require Franchisee, at its sole expense, to upgrade its then-current version of the Software to incorporate any such updates or enhancements that Pearle Vision may provide.

1.3.    In addition to the Software and any potential updates or enhancements thereto, Pearle Vision may, in its sole discretion, develop or have developed on its behalf, other computer modules and/or software which may provide additional and/or new functionality to Franchisee.

If such other computer modules are developed and made available to Franchisee under license from Pearle Vision, such computer modules may be governed by, and incorporated into this OD Professional Agreement by notice, addendum or schedule, and Pearle Vision reserves the right to charge Franchisee additional license and/or support fees for any such additional modules and/or software.

1.4.     Franchisee may not: (a) use the Software and related documentation in any unauthorized manner or commit any act that would jeopardize EMR Logic's or Pearle Vision's rights in the Software and related documentation; (b) decompile, disassemble, reverse engineer or copy (except for archival purposes) the Software; (c) disclose to others this OD Professional Agreement, the Software or any data or information relating to the Software; (d) use the Software, or any component thereof, in any manner contrary to applicable laws or government regulations; (e) use the Software in any application service provider or other service bureau type application for any third parties; (f) sublicense the software to any third parties; or (g) otherwise effect, attempt or enable the unauthorized use of the Software.

2.     SUPPORT

2.1.     Pearle Vision will provide basic, limited support for the Software and associated Hardware (as defined in Section 3 below) via a telephonic "Help Desk" support line provided by Pearle Vision's Store support team, available during regular business hours at Pearle Vision's offices in Mason, Ohio.  Any business critical issues affecting the Software (as determined in Pearle Vision's sole discretion) will be escalated to EMR Logic, at Pearle Vision's sole discretion and direction.  Pearle Vision has no obligation or  liability for any support beyond what is described herein, and Pearle Vision has no liability whatsoever for any actions, inactions, errors or omissions of EMR Logic, as it relates to support, or otherwise.  Franchisee agrees and acknowledges that it shall not direct any Software or other issues or questions directly to EMR Logic, but rather, must direct all inquiries to Pearle Vision via the Help Desk support line.

2.2.     Except as may be otherwise set forth in this OD Professional Agreement, Franchisee understands and acknowledges that it is responsible for all backup of data on Franchisee's systems and/or the Software.  Franchisee shall perform all backup and archival functions relative to its data and use of the Software, and agrees that Pearle Vision shall have no responsibility or liability whatsoever for any backup or archival functions relative to the Software, or otherwise.

3.     HARDWARE

3.1.     Franchisee acknowledges and agrees that it must purchase from and contract directly with Pomeroy IT Solutions, or such other party designated by Pearle Vision, for all hardware necessary for use of the Software (the "*Hardware*") and the related implementation and installation services.  The attached Exhibit A lists the Hardware necessary for use of the Software, along with the pricing for such Hardware and related services that Pearle Vision has negotiated for Franchisee's benefit.  Exhibit A may be updated from time to time, any such updates shall be effective upon notice to Franchisee.

3.2.     As part of the Support Fee (as defined in Section 4.2), Pearle Vision will provide limited telephone support for Franchisee's use of such Hardware relative to the Software.

However, Franchisee agrees that Pearle Vision has no warranty or other obligations of any kind with respect to any such Hardware.  Notwithstanding the foregoing, Pearle Vision agrees to provide additional limited Hardware support by faciliting through Pomeroy IT Solutions, or such other party designated by Pearle Vision, imaging services and repair or replacement of Hardware failing to meet the manufacturer's warranty.  Franchisee is required to return any and all failed Hardware to the supplier within five business days of receiving replacement Hardware.

3.3.   Except as it relates to Pearle Vision's limited Hardware support as referenced herein, Franchisee agrees and acknowledges that any warranties, payment obligations and/or any other issues relative to the Hardware purchased by Franchisee are solely between Franchisee and Pomeroy IT Solutions or any other organization or individual selling the Hardware to Franchisee.  Franchisee further acknowledges and agrees that Pearle Vision shall have no further responsibility, obligation or liability of any kind relative to the Hardware.

4.     FEES

4.1.   In exchange for the licenses granted hereunder, Franchisee will pay Pearle Vision a license fee of Five Thousand Dollars ($5,000.00) (the "*Sublicense Fee*") upon execution of this OD Professional Agreement.

4.2.   In exchange for the support provided pursuant to Section 2, Franchisee agrees to pay Pearle Vision a support fee of One Hundred Dollars ($100.00) per month during the Term (the "*Support Fee*") which shall be due on the 25th of each month as shown on Franchisee's Consolidated Statement (as defined in the Franchise Agreement).   Franchisee agrees and acknowledges that Pearle Vision may increase this monthly Support Fee in its sole discretion upon notice to Franchisee within thirty (30) days of the anniversary of the Effective Date of this OD Professional Agreement.  Any such increase will be in correlation to any increase in costs, fees or expenses that Pearle Vision may incur from EMR Logic, Pomeroy IT Solutions, and/or any other third party vendor providing hardware or software to Pearle Vision and/or Franchisee relative to this OD Professional Agreement.

5.     TERM AND TERMINATION

5.1.   The term of this OD Professional Agreement (the "*Term*") will commence on the Effective Date and shall remain in full force and effect for the earliest of (a) termination or expiration of the Franchise Agreement, or (b) termination or expiration of the Software License Agreement; provided, that, Pearle Vision, in its sole and absolute discretion, may terminate this OD Professional Agreement immediately, upon notice to Franchisee for any reason, including, but not limited to, Franchisee's breach of any obligations under this OD Professional Agreement or the Franchise Agreement, Franchisee's bankruptcy or insolvency, or in the event Franchisee sells all or substantially all of its assets or consolidates or merges with another entity or person.

5.2.   Franchisee understands and acknowledges that the sublicense granted herein can be revoked at any time by Pearle Vision, in Pearle Vision's sole discretion, upon Franchisee's receipt of notice.  Franchisee further understands and acknowledges that it shall be liable for any and all costs arising out of or from, revocation of the sublicense.

5.3.    Upon expiration or termination of this OD Professional Agreement for any reason, Franchisee shall cease using the Software and related documentation.

6.    OWNERSHIP OF INTELLECTUAL PROPERTY.  EMR Logic shall retain all title, copyright, and other proprietary rights in the Software. Franchisee acknowledges that it does not acquire any rights, express or implied, in the Software, other than those of a licensee and only as specified in this OD Professional Agreement. Franchisee will not contest EMR Logic's intellectual property rights and other proprietary rights in and to the Software, nor will Franchisee challenge Pearle Vision's rights or license to the Software.

7.    WARRANTY DISCLAIMER; LIMITATION OF LIABILITY

7.1.    THE SOFTWARE IS PROVIDED "AS IS" AND "AS AVAILABLE" AND FRANCHISEE'S USE OF THE SOFTWARE IS AT ITS OWN RISK. LUXOTTICA DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM THE COURSE OF DEALING, USAGE, OR TRADE PRACTICE.  LUXOTTICA DOES NOT WARRANT THAT THE SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. THE PARTIES UNDERSTAND THAT FRANCHISEE MAY USE CERTAIN THIRD PARTY SOFTWARE (INCLUDING WEB BROWSERS) OR HARDWARE IN CONNECTION WITH ACCESSING THE SOFTWARE.  LUXOTTICA MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO THE QUALITY, CAPABILITIES, OPERATIONS, PERFORMANCE OR SUITABILITY OF SUCH THIRD PARTY SOFTWARE OR HARDWARE.

7.2.    LUXOTTICA (AND EMR LOGIC AS IT RELATES TO FRANCHISEE) SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR SAVINGS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR RELATED TO THIS AGREEMENT OR USE OF THE SOFTWARE, WHETHER OR NOT LUXOTTICA HAS BEEN ADVISED OF OR KNEW OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF THE NATURE OF THE CAUSE OF ACTION OR THEORY ASSERTED. THE MAXIMUM AGGREGATE LIABILITY OF LUXOTTICA UNDER THIS AGREEMENT SHALL BE FOR DIRECT DAMAGES ONLY, AND CAPPED AT A SUM EQUAL TO THE AGGREGATE SUBLICENSE FEE,  OR SUPPORT FEE (AS MAY BE APPLICABLE) PAYMENTS MADE BY FRANCHISEE TO LUXOTTICA WITHIN THE PRECEDING TWELVE (12) MONTH PERIOD, PURSUANT TO THIS AGREEMENT.

8.    REPRESENTATIONS AND WARRANTIES.  Franchisee hereby represents and warrants to Pearle Vision that it has full power and authority to enter into, and to perform its obligations under, this OD Professional Agreement.

9.   INDEMNITY

9.1.   Franchisee, at its sole expense, shall defend, indemnify, and hold harmless Pearle Vision and its affiliated entities, EMR Logic, and each of their respective officers, employees, and agents, from and against any and all claims, demands, allegations, suits, proceedings, damages, costs and expenses (including reasonable attorneys' fees) (collectively "*Claims*"), arising from or related to Franchisee's breach of any of its obligations, representations and/or warranties under this OD Professional Agreement, Franchisee's performance and activities under this OD Professional Agreement, and/or any acts, errors or omissions of Franchisee, whenever and however asserted and established.

9.2.   Without in any way limiting the foregoing 9.1, Franchisee agrees, at its sole expense, to further defend, indemnify and hold Pearle Vision, its affiliated entities, and their respective officers, employees and agents from and against any Claims arising from or relating to any issues relative to Franchisee's use of the Software, including, but not limited to Claims against Pearle Vision by EMR Logic, Pomeroy IT Solutions, or any third party regarding Franchisee's use or misuse of the Software or Hardware, or for any nonpayment or any other obligations of Franchisee.

10.   MISCELLANEOUS

10.1.   This OD Professional Agreement contains the entire understanding between Pearle Vision and Franchisee relative to the subject matter set forth herein, and supersedes all other agreements between Pearle Vision and Franchisee pertaining to the Software, related documentation, Hardware and support.  For the avoidance of doubt, to the extent Pearle Vision and Franchisee entered into a previous agreement in connection with the Software, the terms of this OD Professional Agreement shall supersede such agreement such that these terms shall be deemed effective as of the effective date of such previous agreement.  Except as may be expressly set forth herein, nothing in this OD Professional Agreement supersedes, amends or otherwise affects the obligations of Pearle Vision and Franchisee as set forth in the Franchise Agreement.

10.2.   Except as provided herein, this OD Professional Agreement may be amended, modified, or supplemented, and provisions hereof waived, only by a written agreement of the parties hereto.

10.3.   The terms of this OD Professional Agreement are severable, and if any term or condition of this OD Professional Agreement is held invalid, such invalidity shall not affect any other provision in this OD Professional Agreement.  No failure or delay by Pearle Vision in exercising any right or remedy under this OD Professional Agreement shall not be deemed a waiver of any breach by Franchisee.

10.4.   The parties acknowledge and agree that this OD Professional Agreement is deemed entered into in Mason, Ohio, and is governed by Ohio law, and that the U.S. District Court for the Southern District of Ohio-Western Division, or if such court lacks jurisdiction, the Court of Common Pleas for Warren County, Ohio (or its successor) shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this OD Professional Agreement.

10.5.    Notices are received and delivered in person, sent by overnight courier, or mailed by certified mail to the addresses set forth above.

10.6.    Franchisee may not assign this OD Professional Agreement, or sublicense the Software without the prior written consent of Pearle Vision, which consent may be withheld in Pearle Vision's sole and absolute discretion.  This OD Professional Agreement and the sublicense granted herein to Franchisee shall not succeed to any successor entity of Franchisee by operation of law or otherwise.

10.7.    This OD Professional Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.8.    This OD Professional Agreement may be executed in duplicate counterparts by the parties' duly authorized representatives.

10.9.    This OD Professional Agreement is subject to all of the terms and conditions of the Software License Agreement.

Each of the undersigned represents that he/she is authorized to bind his/her company to the terms of this OD Professional Agreement.

**FRANCHISOR:**

Luxottica Retail North America Inc., Franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title:    **CARLO PRIVITERA**
          **CHIEF OPERATING OFFICER**

Date: _____12/23/2011_____

By: _____

Title:    **JAMES NEITZKE**
          **SVP, Finance & Accounting**

Date: _____12/23/2011_____

Address: 4000 Luxottica Place
          Mason, Ohio 45040

**FRANCHISEE:**

Gutman Vision, Inc.

By: _____
    Milana Gutman

Title: ____Secretary____

Date: ____11/23/2011____

By: ____Alex Gutman____
    Alex Gutman

Title: ____Pres.____

Date: ____11/23/11____

Store #:   8655
Address:  Preston Park Shopping Center
          1713 Preston Road, Suite A
          Plano, Texas 75093

**Exhibit A to OD Professional Agreement**
**Hardware and Installation Pricing**

| Hardware Pricing | Quantity | Price | Extended Price |
|---|---|---|---|
| DELL -workstation | ☐ | $ 598.00 | $ |
| DELL Server (required – back office) | 1 | $ 598.00 | $598.00 |
| 17" DELL LCD Monitor (1 needed for each workstation and 1 for the server) | ☐ | $ 96.00 | |
| Microsoft Server 2008 Web (required for server) | 1 | $ 390.00 | $390.00 |
| Trend Micro Anti Virus (1 per workstation required) | ☐ | $ 15.00 | |
| Trend Micro Server Anti Virus (required for server) | 1 | $ 29.00 | $29.00 |
| Additional Toner Cartridge | ☐ | $ 45.00 | |
| External Back up Drive (250 GB) | 1 | $ 80.00 | $80.00 |
| Data Switch (required) | 1 | $ 60.00 | $60.00 |
| Back up -UPS (for server) | 1 | $ 118.00 | $118.00 |
| Cash Drawer | ☐ | $ 135.00 | |
| Patch Cords (5 per store + 2 per workstation) | ☐ | $ 5.00 | |
| Firewall (required) | 1 | $ 155.00 | $155.00 |
| Freight (M-F Ground) | 1 | $ 235.00 | $235.00 |
| Printer Options (Select One; Printer is required; additional printers may also be ordered) | Quantity | Price | Extended Price |
| Lexmark E360DN Printer (see FAQ for details) | ☐ | $ 389.00 | |
| Brother Printer (see FAQ for details) | ☐ | $ 145.00 | |
| 2- Day Onsite Installation | 1 | $ 2,000.00 | $2,000.00 |
| 1-Day Installation credit (up to 8 hour) Will be applied at final invoicing if applicable | N/A | $ 250.00 | Credit Applied at Final Invoice |
| Site Revisit Fee after sign-off complete & Out of Scope Letter | N/A | $175 per site revisit & $75.00 Time and Material | Change Order Required |
| Cancellation fee | N/A | $250.00 | Change Order Required |
| Cabling Material (If Needed) | Quantity | Price | Extended Price |
| Cat 5 Cable  $0.17ft | N/A | $ 0.17 | Change Order Required |
| Cat 5 Termination Jacks | N/A | $ 5.00 | Change Order Required |
| Out-of-scope Materials | N/A | price of the materials | Change Order Required |
| TOTAL (sales tax and duty tax- if applicable, is not included) | | | |

LRNA FDD Amendment 11072011

## Schedule 4.1

### List of Workstations

**[Completed when workstations are ordered]**

LRNA FDD Amendment 11072011

**Exhibit A to Software License and Maintenance Agreement**
**OD Professional Election Form**

**[Completed when workstations are ordered]**

## SECURITY AGREEMENT

This Security Agreement ("Agreement"), made **11/23/2011**, is between **Luxottica Retail North America Inc.,** its successors, assigns and transferees ("*Secured Party*"), with its principal office at 4000 Luxottica Place, Mason, Ohio 45044 and **Gutman Vision, Inc.,** a Texas corporation located at Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093 (referred to herein as the "*Debtor*").

## ARTICLE I
## Collateral; General Terms of Pledge

**Section 1.01 Security Interest.** Debtor by this Agreement grants to Secured Party a continuing general security interest in the Debtors following property and interest in property, whether now owned or existing, acquired or arising in the future, or in which Debtor in the future has any rights, at the locations described in Section 3.01:  (A) furniture; (B) fixtures; (C) inventory; (D) equipment; (E) accounts; (F) general intangibles; (G) leases and leasehold interests covering any Location described in Section 3.01 below to the extent granted by any landlord other than Secured Party ("*Third Party Leases*"); (H) all monies, residues and property of any kind, at any time possessed or controlled by Secured Party or a bailee of Secured Party; (I) all pertinent books and records, (including without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records); (J) goods, machinery, chattel paper, contract rights, instruments, documents, notes, tax refunds, any balances in any deposit accounts, returned and repossessed goods and all other personal property and interests in personal property; (K) all accessions, substitutions, replacements, products and proceeds of the above, including without limitation, proceeds of insurance policies insuring the Collateral; and (L) all other forms of collateral described in Attachment A to this Agreement which is incorporated herein by reference.

Debtor's interests in the property and assets described in Subsections (A) through (L) above and any of Debtors other property and interests in property and assets which Secured Party may require, will secure the Indebtedness, as defined below, and are referred to collectively as "*Collateral*". Collateral will also include proceeds of Collateral, but Secured Party does not consent to any sale of the Collateral outside of the normal course of business.  All terms contained in this Agreement that are used or defined in Articles One through Nine of the Uniform Commercial Code of the state identified in Section 7.09 hereof (the "*UCC*"), will have the same meanings as they are given in the UCC, unless the context of their usage in this Agreement clearly requires otherwise.

**Section 1.02 Indebtedness Secured.**  This security interest is given to secure:  (1) Payment of a promissory note of even date herewith, executed and delivered by Debtor to Secured Party in the principal sum of  N/A payable as to principal and interest as stated in the Note, and any amendments, renewals or extensions of the Note (collectively, the "*Note*"); (2) all liabilities of Debtor to Secured Party as evidenced by a Franchise Agreement of even date herewith; (3) future advances made at Secured Party's option to Debtor under the Note or by additional promissory notes; (4) all costs incurred by Secured Party related to the collection and

enforcement of the Note or other promissory notes and any other indebtedness owed by Debtor or to the protection or maintenance of the Collateral; and (5) all liabilities of Debtor to Secured Party at any time.

**Section 1.03 <u>Duration of Pledge</u>.**  This Agreement will remain in full force and effect until Debtor's Indebtedness to Secured Party, however and whenever originated, has been paid in full.

**ARTICLE II**
**<u>Conditions Precedent</u>**

**Section 2.01 <u>Conditions of Initial Loan</u>.**  Secured Party's obligation to make any loan under the Note or other agreements between the parties is subject to the prior satisfaction of the following conditions:

**(A)**      **<u>Lease Estoppel</u>.**  If any Location (as defined in Section 3.01 hereof) is held by Debtor under a third party lease ("***Third Party Lease***"), Secured Party will have received estoppel and subordination agreements, in recordable form, executed and acknowledged by the landlord and Debtor, stating that (i) the Third Party Lease is in full force and effect and Debtor is not in default (nor has any potential default occurred) under the lease, (ii) so long as Debtors obligations are performed under all documents executed by Debtor concerning the Third Party Lease, then Debtor's bankruptcy or insolvency will not constitute a default under that instrument, in spite of any terms in the lease to the contrary, and (iii) the landlord will give notice of any default by Debtor and grant Secured Party a period of 30 days from the date of the notice (or a reasonable period if the default cannot be cured in 30 days) to cure the default; and (iv) consenting (if consent is necessary to Secured Party's lien covering the Third Party Lease and subordinating any liens for the landlord under the Third Party Lease to the Secured Party's lien, and agreeing to recognize Debtor as landlord or tenant, as the case may be, or any other purchaser at foreclosure as landlord or tenant, as the case may be, at the time of any foreclosure of Secured Party's lien; and

**(B)**      **<u>Other Documents</u>.**  Secured Party will have received all other agreements, documents, instruments, opinions, certificates, and information as Secured Party may reasonably request.

**ARTICLE III**
**<u>Locations</u>**

**Section 3.01 <u>Locations</u>.**  The collateral described in Section 1.01 above is sited at the locations listed below ("***Location***"):

Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093.

**Section 3.02 <u>Limitation on Additional Debt</u>.**  Until all Indebtedness has been paid in full, Debtor will obtain Secured Party's prior written consent to borrow additional funds in excess of an aggregate amount of Ten Thousand and No/100 Dollars ($10,000.00) from any source whatsoever without first obtaining Secured Party's written consent to do so until all Indebtedness to Secured Party under this Agreement shall have been paid in full. However, Debtor may

borrow additional funds from third parties without Secured Party's prior permission if all of the following conditions are met:

(a)      Such additional indebtedness is secured or unsecured and does not result in any lien, claim or encumbrance against any of the Collateral;

(b)      Debtor's consolidated current assets (determined in accordance with generally accepted accounting principles, consistently applied ["*GAAP*"]) at all times during any fiscal year must be at least twice the amount of Debtor's consolidated current liabilities (determined in accordance with GAAP) at such time (after giving effect to the additional amount of current liabilities that would exist if such additional indebtedness is incurred) in such fiscal year;

(c)      Debtor's projected annual cash flow may not, after giving effect to the proposed additional indebtedness, drop below 125% of the current amount of Debtor's payments on indebtedness, lease payments, advertising contributions and royalties to Secured Party.  The term, "Debtors projected annual cash flow," is the difference between (i) the annual profit or loss of Debtor as disclosed by the audited year end statement for Debtor's prior year, plus the depreciation for the Debtor's prior year, minus (ii) the sum of (x) the annual amount (or estimate, if the amount cannot be ascertained) of all principal and interest payments to be made to Secured Party, during the current year, (y) the annual amount (or estimate, if the amount cannot be ascertained) of all other scheduled payments made or to be made to Secured Party and any landlord during the year, and (z) the annual amount (or estimate, if the amount cannot be ascertained) of all principal and interest payments to be made to the proposed lender during the current year.  Any annual amount for any of the factors in the preceding sentence that is computed based on a partial year must be annualized as if computed for a full year.  The phrase, "current amount', means the amount of all the payments due during the twelve month period beginning with any date of reference.

**Section 3.03 Minimum Inventory Levels.**  Debtor will maintain a minimum of $N/A merchandise inventory level at the Locations until all Indebtedness has been paid in full.

**Section 3.04 Secured Party's Right to Audit.**  Secured Party will have the right, as provided under the Franchise Agreement, to audit, examine and make copies of Debtor's books, accounts, records and returns for the purpose of verifying Debtor's compliance with Debtors promises and agreements described in this Agreement.

**ARTICLE IV**
**Interest Charges**

**Section 4.01 Annual Rates Will Not Exceed Maximum Legal Rate.**  If the interest amount on the Indebtedness computed by the Annual Rate defined in the Note or other agreements, together with all other amounts regarded to be interest under applicable law, (collectively, "*Interest*"), ever exceeds the maximum rate of Interest permitted by law (the "*Maximum Legal Rate*") then the Interest will be reduced to the extent necessary to avoid exceeding the Maximum Legal Rate at any time.

**Section 4.02  Return of Excess Charges.**  Nothing will entitle Secured Party to collect Interest exceeding the Maximum Legal Rate at any time and Debtor will not be obligated to pay Interest exceeding the Maximum Legal Rate at anytime. If any agreement or circumstance should obligate Debtor to pay Interest that exceeds the Maximum Legal Rate at any time, the portion of the agreement that provides for payments of Interest in excess of the Maximum Legal Rate will automatically be deemed to limit the Interest contracted for the extent necessary to avoid exceeding the Maximum Legal Rate. If any Interest is charged or received in excess of the Maximum Legal Rate (the charged or received amount being called the "*Excess*"), Debtor understands and agrees that any charge or receipt would be the result of an error.  Any Excess will be, first, applied to reduce the unpaid principal; second, applied to reduce the Indebtedness; and third, returned to Debtor. It is the intention of the parties to this Agreement not to enter into a usurious or otherwise illegal relationship. Debtor recognizes that, with fluctuations in the Annual Rate and the Maximum Legal Rate, an unintentional result could occur. Debtor agrees to accept the credit or return of any Excess.  To determine whether or not any Excess has been contracted for, charged or received by Secured Party, all Interest at any time contracted for, charged or received by Secured Party in connection with this Agreement or the Indebtedness will be amortized, prorated, allocated and spread in equal or unequal parts during the entire term of the Indebtedness.

**Section 4.03  Incorporation of Usury Savings Clause Into All Documents.**  The terms of Article VIII this Agreement are considered incorporated into every document or communication relating to Debtor's Indebtedness to Secured Party, whether or not it is referred to in the document or communication.

**Section 4.04  Changes in Maximum Legal Rate.**  If any applicable law is amended in the future allowing Secured Party to charge a greater interest rate, or if the Maximum Legal Rate increases under existing law, then the Maximum Legal rate will be increased to that greater rate.  The increase will be automatic and effective under this Agreement on the effective date of the amendment in applicable law or the increase in Maximum Legal Rate.

**ARTICLE V**
**Debtor's Representations, Promises and Agreements**

Debtor represents promises and agrees as follows:

**Section 5.01  Loan Purpose.**  Debtor will use any proceeds of any advances made by Secured Party to Debtor for the purposes of Debtor's working capital needs, as well as other uses permitted under this Agreement, the Franchise Agreement and all applicable laws and statutes. None of the Indebtedness is a consumer loan and Debtor will not use any of the proceeds for consumer purposes.

**Section 5.02  Ownership Free of Encumbrances.**  Except for the security interest granted by this Agreement, Debtor will use the proceeds to become the owner of the Collateral free from any prior lien. Debtor will not grant any lien or security interest in any of the Collateral, except in favor of Secured Party. Debtor will not permit any lien, security interest, claim or

encumbrance to exist in or against any of the Collateral, without Secured Party's written consent. Debtor will defend the Collateral against all liens, security interests, claims and encumbrances.

**Section 5.03 Financing Statements.**  No financing statement related to any of the Collateral or proceeds is on file in any public office and Debtor will join with Secured Party in executing one or more financing statements satisfactory to Secured Party. Secured Party may file any standard or nonstandard financing statement or statements, including without limitation any original or photocopy of this Agreement, as a financing statement, in Secured Party's sole discretion.

**Section 5.04 Insurance.**  Debtor will insure the Collateral in a manner acceptable to Secured Party.  All insurance policies will be written for the benefit of Debtor and Secured Party as their interests may appear.  The policies or certificates evidencing the coverage will be furnished to Secured Party.  The policies will provide at least 30 days' (or the maximum allowed by law, whichever is less) prior written notice to Secured Party of cancellation or modification.

**Section 5.05 Maintenance.**  Debtor will keep the Collateral in good condition and will promptly pay all taxes and assessments on the Collateral. Debtor will not use the Collateral illegally or encumber it and will not permit it to be affixed to real or personal property without Secured Party's prior written consent. Secured Party may examine the Collateral at any reasonable time, wherever located.

**Section 5.06 Compliance With Laws.**  Debtor will comply with all requirements of law. If Debtor fails to comply, the failure must not, in the aggregate, have a material adverse effect on the business, operations, property (including, without limitation, the Collateral) or Debtors financial condition and must not materially adversely affect Debtors ability to perform its obligations under this Agreement, the Note and the other agreements.

**Section 5.07 Assumed Names.**  Debtor has not been known as or used any other assumed, fictitious or corporate name, except for: Pearle Vision Center or Pearle Express.

**Section 5.08 Financial Statements.**  The financial statements (and related schedules and notes) required under the Franchise Agreement (the "*Financials*") fairly present the assets, Indebtedness, financial condition and results of Debtor's operations.  The Financials have been prepared under GAAP, and contain no omissions or other facts or circumstances that could be considered material.  There has been no material and adverse change in the assets, indebtedness or Debtor's financial condition since the date of Debtors most recently furnished Financials. There is no equity or long-term investment in or outstanding advance to any person not reflected in the Financials.  There are no actions or proceedings that are pending or, to the best of Debtors knowledge, threatened against Debtor or any other person that might result in any material adverse change in Debtor's financial condition (except for trade payables arising at ordinary levels in the ordinary course of Debtors business) or its operations, assets or the Collateral. Debtor has not guaranteed the obligations of any other person.

**Section 5.09 Litigation.**  To Debtor's knowledge, there is no litigation, investigation, or arbitration proceeding pending or threatened against Debtor or its respective properties or revenues:  (a) with respect to this Agreement, the Note, or other agreements; or (b) which, if

adversely determined, would have a material adverse effect on Debtors business, operations, property (including, without limitation, the Collateral), or financial condition taken as a whole.

**Section 5.10 No Defaults.**  Debtor is not in default of any note, loan agreement, mortgage, lease, deed or other similar agreement to which Debtor is bound.

**Section 5.11 Change of Location of Collateral.**  Debtor will not permit the Collateral to be removed from the Locations specified in this Agreement without the prior written consent of Secured Party unless sold in the ordinary course of business.

**Section 5.12 Further Assurances.**  Debtor will make, execute and deliver to Secured Party without additional consideration, any document necessary to carry out and effectuate the purpose of this Agreement. Notwithstanding the execution of any other documents, Secured Party may retain the original Note or other original promissory notes until all Indebtedness to Secured Party has been paid in full.

**Section 5.13 Guaranties.**  Any guarantee given by Debtor or its shareholders, partners or affiliates, will be additional security.  The guaranty will not impair any other security or instruments of security that Secured Party may hold concerning the Indebtedness.

**Section 5.14. Power and Authority.**  Debtor has full power and authority to execute this Agreement, and to perform all obligations under this Agreement.

## ARTICLE VI
## Default and Remedies

**Section 6.01 Events of Default.**  Debtor will be in default under this Agreement upon the occurrence of any of the following events or conditions (each of which will be considered an "***Event of Default***"):

**(A)**      **Payments; Failure to Perform.**  Debtors failure to pay or perform any obligation, promise or liability contained in this Agreement, the Note, any other agreement evidencing or securing any of the Indebtedness, any lease with Secured Party or any Third Party Lease;

**(B)**      **Misrepresentations.**  Debtors making any representation or statement to Secured Party that is untrue, incorrect or misleading when given;

**(C)**      **Acceleration of Indebtedness.**  The occurrence of any event that results in the acceleration of the maturity of any indebtedness of Debtor to others;

**(D)**      **Destruction of Collateral.**  The occurrence of any loss, theft, substantial damage, destruction, sale or encumbrance of the Collateral or the making of any levy, lien or encumbrance against the Collateral;

**(E)**      **Cross Default.**  Debtor's default under the Note, the Franchise Agreement, or any other agreement between Debtor and Secured Party;

**(F)**     **Insecurity**.  Secured Party's reasonable belief that the prospect of payment of any Indebtedness or the performance of Debtor's obligations under this Agreement is impaired; or

**(G)**     **Cease to Conduct Business**.  Debtor's death (if Debtor is an individual), dissolution, termination of existence, insolvency or business failure, or the appointment of a receiver for the Collateral, assignment for the benefit of Debtor's creditors or the commencement of proceedings under any bankruptcy or insolvency law by or against Debtor or guarantor or surety for Debtor.

**(H)**     **Transfer of Business**.  Debtor's disposition of the Collateral, or the business related to it, except:  (i) sale of inventory in the ordinary course of Debtor's business and for fair consideration; or (ii) if Debtor is an individual, pursuant to a transfer of the business to Debtor's spouse or to a corporation wholly owned by Debtor, on terms approved in writing by Secured Party.

**(I)**     **Other Liens**.  The existence of liens or security interests in any of the Collateral except as created by this Agreement or in favor of Secured Party.

**(J)**     **Consolidation, Merger or Transfer of an Interest in Debtor**.  Either (i) Debtor's consolidation or merger with another entity, unless Debtor is the surviving corporation or owns 100% of the surviving entity's outstanding shares, or (ii) any other transfer of Debtor's capital shares or other ownership interest, except on terms approved in writing by Secured Party.

**Section 6.02 Remedies**.  On the occurrence of any Event of Default and at any time after the occurrence of any Event of Default, Secured Party may declare any or all of the Indebtedness immediately due and payable, without demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, or protest, which are expressly waived and will have and may exercise any and all of the following rights:

**(A)**     **Rights and Remedies Under UCC**.  Secured Party will have all of the rights and remedies of a Secured Party under the UCC, or under other applicable laws, all of which rights and remedies will be cumulative, and none of which will be exclusive, to the extent permitted by law, in addition to any other rights and remedies possessed by Secured Party;

**(B)**     **Assembling Collateral**.  Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at any place designated by Secured Party which is reasonably convenient to both parties; and

**(C)**     **Foreclosure**.  Secured Party may foreclose its security interest in the Collateral in any way permitted by law.  To the extent permitted by law, Secured Party may enter Debtor's premises, whether the premises are leased or owned by Debtor, without legal process and without incurring liability to Debtor. Secured Party may, in its discretion, without notice or demand, take the Collateral subject to its security interest and remove it, or require Debtor to make the Collateral available to it at a convenient place. Unless the Collateral is perishable or threatens to decline speedily in value or is customarily sold on a recognized market, Secured Party will give Debtor reasonable notice as to the time and place of public sale, or the time after

which any private sale or any other intended disposition of it is to be made.  The requirements of reasonable notice will be met if the notice is mailed, postage prepaid, to the Debtor's address provided in this Agreement, at least five days before the sale or disposition.  Any expenses related to the foreclosure will be borne by Debtor and will include Secured Party's reasonable attorneys' fees and legal expenses.

**Section 6.03 <u>Collections; Secured Party's Right to Notify Account Debtors and to Endorse Debtor's Name</u>.**  Debtor by this Agreement authorizes Secured Party to:  (i) open Debtors mail and collect amounts due to Debtor from any person who is obligated to Debtor under an account (collectively, "*Account Debtors*"); (ii) direct the Debtor to notify, or Secured Party may directly notify, Account Debtors that the accounts have been assigned to Secured Party; (iii) cause Debtor to direct, or Secured Party may directly direct, the Account Debtors to make all payments due from them to Debtor, directly to Secured Party or to a depository account designated by Secured Party. Secured Party will promptly furnish Debtor with a copy of the notice sent and Debtor agrees that the notice, in Secured Party's sole discretion, may be sent on Debtor's stationery on which Debtor will co-sign the notice with Secured Party.

**Section 6.04 <u>Reimbursement for Expenses</u>.**  At its option, Secured Party may discharge taxes, liens, security interests or other encumbrances on the Collateral. In addition, Secured Party at its option may pay for repair of damage to the Collateral, maintenance and preservation of the Collateral, and insurance for the Collateral. Debtor agrees to reimburse Secured Party on demand for these payments. If Debtor does not reimburse these payments within ten days of Secured Party's request, interest on such payment, at 1-1/2% per month (or the Maximum Legal Rate, whichever is less) from the date of the payment until reimbursement, will be added to Debtors Indebtedness and will be secured by this Security Agreement.

**ARTICLE VII**
**<u>Miscellaneous</u>**

**Section 7.01 <u>Assignment</u>.**  Debtor's promises, undertakings and agreements contained in this Agreement will be binding on Debtors heirs, personal representatives, successors and assigns; except that this Agreement will not be assignable by Debtor without the prior written consent of Secured Party. Secured Party and Debtor as used in this Agreement will include the successors or assigns of those parties.  The rights and benefits of Secured Party under this Agreement will, if Secured Party directs, apply to any party acquiring any part of or interest in the Indebtedness. If any of Secured Party's rights under this Agreement are construed to be a power of attorney, this power of attorney will not be affected by the subsequent death, disability or incompetence of Debtor.

**Section 7.02 <u>Counterpart</u>.**  This Agreement may be executed in any number of counterparts, and each counterpart will be considered an original.

**Section 7.03 <u>Notices</u>.**  Any notices that may be given under this Agreement will be considered delivered and received on delivery, if delivered by personal service, or sent by a recognized courier or express mail, or by United States certified or registered mail, with postage prepaid personally to the Debtor or any one of them if there be more than one, or to an executive officer

of Secured Party, or on deposit in the United States mail, if given by certified or registered mail, and addressed as follows:

Debtor:       Gutman Vision, Inc.
               Preston Park Shopping Center
               1713 Preston Road, Suite A
               Plano, Texas 75093

Secured Party:  Luxottica Retail North America Inc.
               Attn: Legal Department
               4000 Luxottica Place
               Mason, OH  45044

or at any other address as each party may designate by written notification to the other as described above.

**Section 7.04 Expenses and Attorneys' Fees**. If, at any time, Secured Party employs counsel for any reason to assist Secured Party concerning this Agreement; then, the attorneys' fees incurred by Secured Party will be payable on demand by Debtor to Secured Party and will be additional Indebtedness under this Agreement secured by the Collateral.

**Section 7.05 Section Titles.**  The captions and section titles contained in this Agreement are without substantive meaning or content and are not a part of the Agreement between the parties.

**Section 7.06 Severability.**  Wherever possible, each term of this Agreement will be interpreted in a manner as to be effective and valid under applicable law. If applicable law prohibits any term of this Agreement, that term will be ineffective only to the extent of the prohibition without invalidating the remainder of this Agreement.

**Section 7.07 No Waivers**.  Secured Party's failure or delay to exercise any right, power or privilege under this Agreement will not operate as a waiver of them. Secured Party's waiver of any Event of Default will not operate as a waiver of any other Event of Default.

**Section 7.08 Governing law; Jurisdiction; Venue.**  This Agreement is to be governed and construed in accordance with the laws of the State of Ohio.

**Section 7.09 Waiver of Jury Trial. Secured Party and Debtor agree that in any litigation, suit, action, counterclaim, or proceeding, whether at law or in equity, which arises out of, concerns, or relates to this Agreement, any and all transactions contemplated hereunder, the performance of this Agreement, or otherwise, trial shall be to a court of competent jurisdiction and not to a jury.  Secured Party and Debtor hereby irrevocably waive any right either party may have to a trial by jury.  Either Secured Party or Debtor may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of Secured Party or Debtor of the waiver of their right to trial by jury.**

**THIS AGREEMENT AND ALL OTHER INSTRUMENTS, DOCUMENTS AND AGREEMENTS EXECUTED AND DELIVERED BY DEBTOR IN CONNECTION WITH THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT EMBODY THE FINAL, ENTIRE AGREEMENT OF DEBTOR AND PAYEE WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF DEBTOR AND SECURED PARTY. THERE ARE NO ORAL AGREEMENTS BETWEEN DEBTOR AND SECURED PARTY.**

Signed and delivered as of the day and year first above written but effective for all purposes as of **11/23/2011**.

DEBTOR:                                          SECURED PARTY:

Gutman Vision, Inc.                              Luxottica Retail North America Inc.,
                                                 Franchisor of Pearle Vision ("Pearle Vision")

By: _____                    By: _____
    Milana Gutman

Title: _Secretary_____                   Title: _____
                                                        CARLO PRIVITERA
                                                        CHIEF OPERATING OFFICER
Date: _11/23/2011_____                     Date: _12/23/2011_____


By: _Alex Gutman_____                     By: _____
    Alex Gutman

Title: _Pres._____                    Title: _____
                                                        JAMES NEITZKE
                                                        SVP, Finance & Accounting
Date: _11/23/11_____                     Date: _12/23/2011_____

**Attachment A**
**to**
**Security Agreement**

Other Collateral securing the Indebtedness includes:

(i)  "*Accounts Receivable*," which means (in addition to the definition contained in the Uniform Commercial Code) all accounts and any and all obligations of any kind at any time due and/or owing to the Debtor and all rights of the Debtor to receive payment or any other consideration including without limitation, invoices, contract rights, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments and all other debts, obligations and liabilities in whatever form owing to Debtor from any person, firm, governmental authority, corporation or any other entity, all security therefor, and all of the Debtor's rights to goods sold (whether delivered, undelivered, in transit or returned) which may be represented thereby, all of which whether now existing or hereafter arising, together with all proceeds, products and insurance as to any and all of the foregoing.

(ii)  "*Inventory*," which means, (in addition to the definition contained in the Uniform Commercial Code), all goods, merchandise or other personal property held by the Debtor for sale or lease or to be furnished under labels and other devices, names or marks affixed thereto, all raw materials, work or goods in process or materials and supplies of every nature used, consumed or to be consumed in the Debtor's business, all packing and shipping materials, all of which now owned or hereafter acquired by the Debtor, and wherever located, and all proceeds, products and insurance as to any or all of the foregoing.

(iii)  "*Equipment*," which means, (in addition to the definition contained in the Uniform Commercial Code), all equipment, machinery, furniture, fixtures, and all other tangible assets, and all replacements, repairs, modifications, alterations, additions, controls and operating accessories therefor, all accessions and additions thereto, all of which now owned or hereafter acquired by the Debtor and all proceeds, products, and insurance as to the foregoing.

(iv)  All monies, securities, drafts, notes, instruments (including, without limitation, negotiable instruments and non-negotiable instruments), chattel paper, items, contract rights, leases, licenses, customer lists, general intangibles (including, without limitation, income tax refunds, copyrights, licenses, rights, patents, patent rights, franchise rights, distributorship rights, trademarks, service marks, trademark rights, formulae, customer lists and goodwill) and documents of title, (including, without limitation, bills of lading, dock warrants, dock receipts and warehouse receipts), of the Debtor, whether now owned or existing or hereafter arising or acquired:

(v)  All claims of the Debtor against third parties for loss or damage to, or destruction of, any and all of the foregoing, all guarantees, security and liens for payment of any Accounts Receivable and documents of title, policies, certificates of insurance, insurance proceeds, securities, chattel paper, and other documents and instruments evidencing or pertaining thereto, and all files, correspondence, computer programs, tapes, discs and related data processing

software owned or used by the Debtor or in which Debtor has an interest which contains information identifying any one or more of the items referred to in (i) through (iv) above.

(vi)    As to all of the foregoing (i) through (v) inclusive, cash proceeds, noncash proceeds and products thereof, additions and accessions thereto, replacements and substitutions therefor.

LRNA FDD Amendment 11072011

## STARS CONSIGNMENT AGREEMENT

## PEARLE VISION STORE #8655

This STARS Consignment Agreement (the "***STARS Consignment Agreement***") is dated **11/23/2011**, ("***Effective Date***") and is by and between Luxottica Retail North America Inc., an Ohio corporation and Franchisor of Pearle Vision® ("***Pearle Vision***") having an office at 4000 Luxotttica Place, Mason, OH and   Gutman Vision, Inc. ("***Consignee***") (Pearle Vision and Consignee sometimes hereinafter together referred to as the "***Parties***").

## RECITALS

**WHEREAS**, Consignee is a franchisee of Pearle Vision Store #8655 (as defined below) pursuant to the terms and conditions of a franchise agreement (as defined below); and

**WHEREAS**, Pearle Vision has developed, and Consignee wishes to participate in, the STARS Program, and has elected to purchase those products on consignment (as defined below).

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this hereby covenant and agree as set forth below:

1. **Defined Terms**.

| | |
|---|---|
| a. | "***Audit***" means a review of Consignee's financial and business records performed by Pearle Vision's representatives as permitted under the Franchise Agreement. |
| b. | "***Consigned Property***" means the Core Inventory (as defined below), as well as the Supplemental Assortment (as defined below) if applicable, or any modifications, additions, or deletions thereto. Upon notice to Consignee in the form of a packing slip, invoice, or such other notice as Pearle Vision may deem appropriate in its sole discretion, Pearle Vision reserves the right to modify, add to, delete or substitute any of the Core Inventory at any time in the future in its sole discretion based on factors including, but not limited to, availability of product, customer demographics, and margin opportunity. |
| c. | "***Core Inventory***" means the Consigned Property determined by Pearle Vision and defined in the Franchise Operations Manual, which can be modified at any time thereafter as described in Paragraph 3 below. |
| d. | "***Effective Date***" means the date all duties and obligations of the Parties are effective, but for all intents and purposes as of the date. |
| e. | "***Frame Capacity***" means the total frames visible to customers on frame boards in the Pearle Vision Store (as defined below), as determined in a survey from Pearle Vision or its designee.  The Frame Capacity shall not include any frames stocked in the back room, stocked in a cabinet, not displayed on a frame board, or otherwise not visible to the customers.  The Frame Capacity, as of the date of this STARS Consignment Agreement, is **900**. Pearle Vision reserves the right to require |

| | |
|---|---|
| | an additional survey to be performed by Pearle Vision or its designee at any time in the future upon notice to Consignee to verify the Frame Capacity.  Pearle Vision further reserves the right, in its sole discretion, to modify the Frame Capacity, in accordance with the most recent survey, at any time in the future upon notice to  Consignee. |
| f. | "*Franchise Agreement*" means the agreement dated **11/23/2011**, by and between Consignee and Pearle Vision, which grants Consignee the right to operate Pearle Vision Store **#8655** . |
| g. | "*Free On Board*" or "FOB", means the risk of loss after delivery of the Consigned Product to Consignee at the Pearle Vision Store. |
| h. | "*Pearle Vision Approved POS System*" means the current point of sale system required by Pearle Vision. |
| i. | "*Pearle Vision Store*" means the Pearle Vision store located at **Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093.** |
| j. | "*Personal Guaranty*" means the form of personal guaranty attached hereto as Exhibit B. |
| k. | "*Physical Inventory*" means a count of the Consigned Property on hand in the store as of a date certain.  The physical inventory may be performed by RGIS or other representative of Pearle Vision as designated by Pearle Vision in its sole discretion. |
| l. | "*PMSA*" means the Purchase Money Security Agreement attached hereto as Exhibit C. |
| m. | "*Required Inventory Level*" means at least sixty-five percent (65%) of the Frame Capacity or  **N/A** frame units (which will be between 450 to 850 frame units depending on total Frame Capacity). |
| n. | "*STARS Consignment Program*" means the vendor managed inventory program developed by Pearle Vision to consign certain Luxottica frame products to Consignee. |
| o. | "*Sale Date*" means each date that the sale of Consigned Product to the retail consumer is reported to Pearle Vision, which shall be every Thursday in the manner provided in Paragraph 8 herein. |
| p. | "*Sale Price*" means the price of the Consigned Property on each Sale Date as charged to Consignee, including all expenses of handling, storage, and delivery to customers, and all taxes and other charges assessed and levied on the Consigned Property while in the possession of the Consignee, which are not included in the purchase price of the Consigned Property. |
| q. | "*Supplemental Assortment*" means approximately 150 additional frames or up to fifteen percent (15%) of the Frame Capacity which are consigned hereunder if Consignee elects to participate in the STARS Premier program by executing the election form attached hereto as Exhibit A. |
| q. | "*Initial Term*" means the period commencing with the Effective Date and expiring at the later of the December 31 of the current calendar year; unless one of the following events occurs:  (a) the end date of the STARS Consignment Program; (b)  the date Consignee opts-out of this STARS Consignment Agreement in accordance with Paragraph 13 herein; (c) the date Consignee does not renew this STARS Consignment Agreement; or (d) the such earlier date as the agreement may be terminated in accordance with Paragraph 13 herein. |

  **2.**  **Term.**  After the expiration of the Initial Term, this STARS Consignment Agreement will be automatically renewed for one calendar year commencing on January 1 and expiring on December 31 of the immediately subsequent calendar year after the Initial Term provided that: (a) Consignee is not in default of the STARS Consignment Agreement or another agreement between Consignee and Pearle Vision or its affiliates; (b) Consignee executes an annual enrollment form if Consignee wishes to change its Core Inventory or assortment; and (c) Consignee is a franchisee of Pearle Vision.  In addition, if any of the following events occur the subsequent term shall expire:  (a) Pearle Vision terminates the STARS Consignment Program;

LRNA FDD Amendment 11072011

(b) Consignee opts-out of this STARS Consignment Agreement in accordance with Paragraph 13 herein; (c) Consignee or Pearle Vision provide the other party 60 days notice that this STARS Consignment Agreement will not be extended; or (d) the such earlier date as this STARS Consignment Agreement is terminated in accordance with Paragraph 13 herein.

3.   **Consigned Property**.  Pearle Vision agrees to deliver on consignment the Core Inventory initially, and on an ongoing basis to replenish the Core Inventory up to the Required Inventory Level Consignee acknowledges and agrees that the Consigned Property is intended for use only in the Pearle Vision Store.  Consignee covenants and agrees not to remove the Consigned Property from the Pearle Vision Store except in connection with retail sales made to customers in the ordinary course of business, and shall not, under any circumstances, transfer, sell or store any of the Consigned Property to/with any other individual, business, entity, or other franchisee.

4.   **Delivery of Consigned Property**.  Pearle Vision shall deliver the Consigned Property to Consignee FOB, except as set forth in Paragraph 5, 8 and 9 of this STARS Consignment Agreement, at the Pearle Vision Store at such times and in such amounts as Pearle Vision and Consignee may from time to time agree.

5.   **Risk of Loss.**  Pearle Vision shall bear the risk of loss of the Consigned Property until such Consigned Property is delivered to Consignee. Consignee shall bear the risk of loss upon delivery and thereafter until the Consigned Property is sold by Consignee or returned to Pearle Vision.

6.   **Retention of Title.**  All Consigned Property will be held by Consignee on behalf of Pearle Vision and will remain the property of Pearle Vision until sold by Consignee to its retail customers. Such property will be clearly identified with a Pearle Vision sku tag and be easily distinguishable from other inventory in the Pearle Vision Store, and Consignee agrees to take all steps necessary to ensure that the Consigned Property and the sales receipts and records relating thereto are kept distinct from the sales receipts and records relating to Consignee's regular inventory.  Consignee will not substitute any property for the Consigned Property and will not use the Consigned Property for any other purpose except in the retail sale of said Consigned Property.  Consignee will not mortgage, pledge or encumber the Consigned Property to any third parties, will keep such property free at all times from being affixed to real or personal property, or, free at all times from all claims, liens, taxes and other encumbrances (except those to Pearle Vision), during the term hereof, and will ensure that the Consigned Property is not included in any blanket security or UCC filings by Consignee or any creditor of Consignee other than Pearle Vision.  Consignee also will take all steps necessary to insure the safety and maintenance of the Consigned Property at all times.

7.   **Use of Consigned Property by Consignee.**  Consignee may withdraw Consigned Property from consignment at any time for retail sale, upon agreement by Consignee to pay Pearle Vision for such Consigned Property in accordance with Pearle Vision's standard sale and invoice arrangements with Consignee for purchase of Luxottica products, at which time the Consigned Property so withdrawn shall become the property of Consignee.  In consideration of

the consignment of Consignment Property by Pearle Vision, Consignee also agrees to maintain the Consigned Property in good condition and as otherwise specified by Pearle Vision.

8. **Maintenance of Consigned Property.**

a. <u>Inventory Levels</u>. Consignee shall receive the Core Inventory, which shall fulfill one hundred percent (100%) of Consignee's Frame Capacity frame units. Thereafter, Consignee shall receive frames to fulfill the Required Inventory Level.

b. <u>Physical Inventory</u> and Auditing. Consignee agrees that prior to delivery of any Consigned Property that Consignee shall participate in a Physical Inventory to establish a baseline of Consignee's inventory levels. Thereafter, Pearle Vision reserves the right to conduct a Physical Inventory of Consignee's Consigned Property or other inventory and Audit at any reasonable time for any reason, including, but not limited to, establishing whether the levels of Consigned Property are maintained, examining the condition and the manner in which the Consigned Property is stored, or ensuring compliance with all aspects of this STARS Consignment Agreement. The cost of all Physical Inventories, or any other inventory that Pearle Vision deems necessary shall be solely borne by the Consignee, and the cost of any Audit as outlined in the Franchise Agreement. If a variance in the quantity, type or condition of the Consigned Property is revealed by the Physical Inventory or Audit, Consignee shall pay Consignor the Sale Price of that Consigned Property as outlined in Paragraph 12 herein.

c. <u>Reporting</u>. During the term of this STARS Consignment Agreement, Pearle Vision shall have full access through the Pearle Vision Approved POS System to determine Consignee's compliance with the terms and conditions of this STARS Consignment Agreement. Such access will include, but not be limited to: sales of Consigned Property and the real-time quantity level of the Consigned Property. Additionally, if Pearle Vision cannot access such information through the Pearle Vision Approved POS System, Consignee shall provide  reports to Pearle Vision as follows:  (i) Sales of Consigned Property and any Consigned Property received by Consignee each week, no later than 10:00 AM Eastern Time every Thursday, or such other time as Pearle Vision may require; and (ii) The quantity on hand at the end of the preceding month no later than 10:00 AM Eastern Time, or such other time as Pearle Vision may require. All reports shall be provided to the Pearle Vision Merchandising department on Pearle Vision's Pearle Vision Web Portal or through any other means that Pearle Vision may subsequently designate. Pearle Vision reserves the right to require Consignee to report more frequently as Pearle Vision may deem necessary at any time upon notice to Consignee.

d. <u>Returns</u>. Consignee shall return all Consigned Property in unused condition (including any cases, certificates of authenticity, warranties or other items included with any of the Consigned Property when received by Consignee) upon the expiration or termination of this STARS Consignment Agreement for any reason.  Upon receipt of the Consigned Property, Pearle Vision shall inspect the Consigned Property and

LRNA FDD Amendment 11072011

notify Consignee of the acceptance or rejection of such Consigned Property.  For any shortage in the quantity of Consigned Property, or failure to return the Consigned Property in the condition described previously due to Pearle Vision's rejection or Consignee's failure, Consignee shall pay Pearle Vision the then current selling price as set by Pearle Vision from time to time for the Consigned Property.

e.  <u>Claims</u>.  Any claim by Consignee that Consigned Property is damaged, defective or not provided in accordance with shipping invoice list or other shipping or documentation concerning the initial delivery of Consigned Property to Consignee must be made no later than seven (7) business days after execution of this STARS Consignment Agreement, and five (5) business days after subsequent deliveries of Consigned Property.  The claim shall be made by returning the Consigned Property in accordance with Paragraph 8.d.

**9.  <u>Existing Franchisee Qualification</u>.**  If Consignee is an existing franchisee of Pearle Vision as of the date of this STARS Consignment Agreement, Consignee must fulfill all of the following criteria prior to and during the Term:  a) pay when due all amounts owed to Pearle Vision or its affiliates;  b) must have had no more than three (3) incidents of payments declined by Pearle Vision or its affiliates due to insufficient funds (as outlined in the Franchise Agreement) during any twelve-month period; and c) receive no defaults under the Franchise Agreement during any twelve-month (12) period.

If Consignee does not qualify for participation in the STARS Consignment Program for any of the foregoing reasons, you may be reconsidered after an additional six (6) months if you can demonstrate the following:  (a) cured any previous defaults; (b) are current on all amounts owed to Pearle Vision or its affiliates; and (c) have not had any payments to Pearle Vision or its affiliates declined due to insufficient funds within the most recent six (6) months.  You may be reconsidered for participation in the STARS Consignment Program no more than twice within any twelve-month (12) period.

**10.  <u>Insurance</u>**.  Consignee agrees to obtain, and maintain during the term of this STARS Consignment Agreement, insurance for the Consigned Property at Consignee's expense in the amount of at least Fifty Thousand Dollars ($50,000) or the replacement cost of the Consigned Property, whichever is greater, with loss payable to Luxottica Retail North America Inc., its affiliates, successors or assigns as a named insured.  Consignee shall provide Pearle Vision evidence of such insurance within five (5) business days of the Effective Date hereof.

**11.  <u>Taxes</u>**.  The Sale Price set forth herein is exclusive of all taxes.  The parties shall comply with all federal, state, and local tax laws applicable to the transaction occurring under this STARS Consignment Agreement.  Consignee shall not be responsible for sales taxes if Consignee has provided to Consignor a valid, properly executed, resale certificate or exemption form prior to receipt of any Consigned Property, if applicable.  If Consignee does not delivery a valid sales tax resale certificate, Consignor has the right to charge applicable sales tax on the transaction occurring under this agreement.  In no event shall Consignee be obligated to pay any tax based on the income of Consignor.

**12. Payment for Consigned Property.**  Pearle Vision will invoice Consignee the Sale Price through its Consolidated Statement, as defined in the Franchise Agreement, for that quantity of Consigned Property sold, lost, damaged or otherwise not eligible for return in accordance with Paragraph 8.d herein, during the preceding month.  Consignee shall pay the Sale Price for the Consigned Property as outlined herein at the same time and in the same manner as its Consolidated Statement obligations in accordance with the Franchise Agreement.

a.  Purchase of Consigned Property.  If Consignee or Pearle Vision wish to end consignment of the Consigned Property at any time during the term of this STARS Consignment Agreement, and before the retail sale of the Consigned Property, but Consignee wishes to keep the Consigned Property, Consignee may purchase the Consigned Property for the Sale Price currently being offered by Pearle Vision, which Consignee may pay in three (3) equal payments over a ninety (90) day period.  Under no circumstances shall payment terms be available to franchisees who are not in good standing, nor shall such payment terms extend for a period longer than one year.

b.  Personal Guaranty.  If Consignee is a corporation or other entity, Consignee agrees that each of its individual shareholders or member shall execute the Personal Guaranty or a personal guaranty in a form required by Pearle Vision.

c.  Additional Incentives.  Pearle Vision reserves the right to offer additional incentives to Consignee for products purchased by Consignee from Pearle Vision.  Those incentives may include additional discounts off of the sale price of contact lenses, lenses and accessories.  These incentives may not apply to products purchased by Consignee from an affiliate of Pearle Vision.  Pearle Vision reserves the right to modify or discontinue these incentives at any time without notice.

**13. Default and Termination.**

a.  Default.  Consignee shall be deemed to be in default of this agreement and shall have thirty (30) calendar days after receiving written notice in which to remedy any default hereunder.  Any uncured default shall be subject to Paragraph 13.b below.  Such defaults shall include, without limitation, the occurrence of any one of the following events:

(1)  Consignee shall commit an event of default under any franchise agreement, sublease, security agreement or other agreement with Pearle Vision or its affiliates;
(2)  Consignee fails to timely pay for any Consigned Property; or
(3)  Consignee fails to install, maintain, and use the Pearle Vision Approved POS System;
(4)  Consignee fails to adhere to any material term or provision of this STARS Consignment Agreement, or otherwise fails to perform any obligation hereunder.

b.  Termination.  Pearle Vision shall have the right to terminate this STARS Consignment Agreement immediately without notice, or reduce the quantity of Consigned Property, upon the occurrence of the following events:

LRNA FDD Amendment 11072011

(1)    Commencement of a bankruptcy proceeding, appointment of a receiver or other custodian of Consignee; levy of Consignee's assets by any governmental body or agency, sheriff, marshall or constable; all or a substantial part of Consignee's assets are assigned for the benefit of any creditor; Consignee generally admits its inability to pay its debts when due; or final judgment is entered against Consignee and remains unsatisfied for thirty (30) days.

(2)    Consignee's Franchise Agreement is terminated or expires.

(3)    Consignee has received notice of a default pursuant to Paragraph 13.a above and has failed to sure such default within thirty (30) days of such notice of default.

(4)    Consignee loses the right to possession of the premises where the Consigned Property is sold.

(5)    Pearle Vision's reasonable belief that the prospect of payment for the Consigned Property is impaired.

(6)    Consignee transfers or sells any of the Consigned Products to another Franchisee or location in violation of this STARS Consignment Agreement.

(7)    Consignee mortgages, pledges or encumbers any portion of the Consigned Property.

(8)    Consignee fails to maintain the Consigned Property in the specified types and quantities.

c.    <u>Termination by Consignee</u>. Consignee may terminate this Agreement no earlier than one hundred and eighty (180) days after the Effective Date for any reason after providing Pearle Vision with written notice ninety (90) days prior to termination.

d.    <u>Re-enrollment in STARS</u>. If this STARS Consignment Agreement is terminated, your election to re-enroll in STARS may be limited by a waiting period as outlined in the Manual. The waiting period is applied to each Franchised Store you own. We reserve the right to amend the waiting period in our sole discretion.

**14. <u>Security Interest</u>**. Pearle Vision and Consignee agree that Pearle Vision shall have a purchase money security interest in all Consigned Property, including the proceeds thereof, as evidenced by the PMSA or such other form of security agreement as Pearle Vision may require. Pearle Vision's security interest as evidenced by the PMSA shall take effect upon delivery of the Consigned Property to Consignee, without Pearle Vision filing a separate UCC-1.  If Consignee has granted a party other than Pearle Vision any security interest in inventory or proceeds, Prior to shipment of the Consigned Property, Consignee must provide to Pearle Vision written notice of the security interest that states the name and contact information of the lienholder. Pearle Vision will then send notice to the lienholder in accordance with Section 9-324(b) of the Uniform Commercial Code, or other applicable law.  Consignee will execute financing statements or other documents evidencing Pearle Vision's interest in, and title to, the Consigned Property in the form, at the times, and from time to time as required by Pearle Vision.  Pearle Vision will have the right to give notice of its interest in the Consigned Property to any person as

Pearle Vision deems proper or advisable. If Consignee does not wish to grant Pearle Vision a security interest in the Consigned Property, Consignee shall furnish a standby letter of credit or performance bond in an amount sufficient to pay for the Consigned Property, and name Pearle Vision as the beneficiary of such letter of credit or performance bond.

**15.  Assignment**.  Neither party may assign rights or obligations pursuant to this STARS Consignment Agreement without the prior written consent of the other party, except that Pearle Vision may assign this STARS Consignment Agreement without the need for Consignee's consent to any successor entity, subsidiary, or parent company or other affiliate entity.

**16.  Parties**.  This STARS Consignment Agreement will be binding upon and will inure to the benefit of the respective parties and their successors and assigns.

**17.  Confidentiality**.  The terms, conditions and existence of this STARS Consignment Agreement are private and are to be kept strictly confidential, and no party hereto shall reveal said terms and conditions to any third party, other than an affiliate, employee or agent with the need to know, without the express written consent of other party, except pursuant to a valid court order or directive from a governmental body.  Without in any way limiting the foregoing, Consignee expressly agrees and acknowledges that it is absolutely prohibited from disclosing the existence or terms of this STARS Consignment Agreement to any other Pearle Vision franchisees.

**18.  Acknowledgements/NoWarranties/Release**.  Consignee acknowledges and agrees that the consignment program described herein is only inventory program that may be discontinued at any time by Pearle Vision in its sole discretion.  Consignee further acknowledges and agrees that Pearle Vision MAKES NO WARRANTIES OF ANY KIND REGARDING THIS STARS CONSIGNMENT PROGRAM, AND SPECIFICALLY HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Consignee also acknowledges and agrees that it shall comply with the policies and procedures for the STARS Consignment Program that shall be incorporated by reference herein, and which may be updated from time to time by Pearle Vision in its sole discretion upon notice to Consignee.  Consignee further acknowledges and agrees that it shall release, acquit and forever fully discharge Pearle Vision, and each of its parents, subsidiaries, affiliates, successors and assigns of and from any and all liability, actions, causes of action, claims, demands, damages, costs, expenses and compensation of whatsoever nature or character, whether known or unknown, foreseen or unforeseen, direct or indirect, contingent or actual, liquidated or unliquidated, whether in contract or in tort, including without limitation, claims asserted on account of or in any way connected with or related to the STARS Consignment Program.  It is the express intention of the undersigned that this release be as broad as permitted by law.

**19.  Notices**.  Any notices that may be given under this STARS Consignment Agreement will be considered delivered and received on delivery, if delivered by personal service, or sent by a recognized courier or express mail, or by United States certified or registered mail, with postage prepaid personally to the Consignee, or by facsimile, or any one of them if there be more

than one, or to an executive officer of Secured Party, or on deposit in the United States mail, if given by certified or registered mail, and addressed as follows:

> Consignee:   Gutman Vision, Inc.
> Preston Park Shopping Center
> 1713 Preston Road, Suite A
> Plano, Texas 75093

> Pearle Vision: Luxottica Retail North America Inc.
> Attn: Legal Department
> 4000 Luxottica Place
> Mason, OH  45044
> (513) 492-4018

or at any other address as each party may designate by written notification to the other as described above.

**20. Choice of Law/Choice of Venue**.  This STARS Consignment Agreement shall be governed by the laws of Ohio.  Any disputes regarding this agreement shall be submitted to the United States District Court for the Southern District of Ohio – Western Division and resolved in accordance with the terms and conditions of the Franchise Agreements.

**21. Counterparts**.  This STARS Consignment Agreement may be executed in any number of counterparts, and each counterpart will be considered an original.

**22. Entire Agreement**.  This document, together with the Personal Guaranty and Purchase Money Security Agreement relating to the STARS Consignment Program, sets forth the entire understanding of the Parties with respect to the STARS Consignment Program. For the avoidance of doubt, to the extent Pearle Vision and Consignee entered into a previous agreement in connection with consignment, the terms of this STARS Consignment Agreement shall supersede such agreement such that these terms shall be deemed effective as of the effective date of such previous agreement.  Except as may be expressly set forth herein, nothing in this STARS Consignment Agreement supersedes, amends or otherwise affects the obligations of Pearle Vision and Consignee as set forth in the Franchise Agreement.

**23. No Change to Franchise Agreement**.  Notwithstanding anything contained in this STARS Consignment Agreement, nothing herein amends, alters or otherwise affects the terms of the Franchise Agreement signed between the Parties, which Franchise Agreement shall remain in full force and effect.  In the event of any conflict between this STARS Consignment Agreement and the Franchise Agreement, the terms of the Franchise Agreement shall govern.

**24. Severability**.  In the event any provision of this STARS Consignment Agreement is held invalid or unenforceable, the remainder of this STARS Consignment Agreement shall remain in full force and effect.

**25. No Waiver**.  Any failure or alleged failure of Pearle Vision to take any action, perform any obligation or exercise any right of Pearle Vision, or demand any performance or obligation of Consignee under this STARS Consignment Agreement shall not be deemed a waiver by Pearle Vision of such action, right or obligation.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this STARS Consignment Agreement, or an exact counterpart hereof, effective as of the date first written at the head of this STARS Consignment Agreement.

**CONSIGNEE:**

Gutman Vision, Inc.

By: _____
        Milana Gutman

Title: _____Secretary_____

Date: _____11/23/2011_____

By: _____
        Alex Gutman

Title: _____President_____

Date: _____11/23/11_____

**FRANCHISOR:**

Luxottica Retail North America Inc.,
franchisor of Pearle Vision ("Pearle Vision")

By: _____

Title: _____
        CARLO PRIVITERA
        CHIEF OPERATING OFFICER   11/23/2011

Date: _____

By: _____

Title: _____
        JAMES NEITZKE
        SVP, Finance & Accounting   11/23/2011

Date: _____

### EXHIBIT A TO STARS CONSIGNMENT AGREEMENT:
### STARS PREMIER ENROLLMENT FORM

I, the undersigned, agree and acknowledge that this form shall serve as an amendment to my STARS Consignment Agreement, and shall indicate my election to enroll in the STARS Premier Program. I understand and acknowledge that through STARS Premier, Pearle Vision will consign to me a supplemental assortment of up to 150 frames (or 15% of my Frame Capacity) in one of the categories described below (and in the Franchise Operations Manual), which may not be available for shipment until a date in the future:

| Assortment | Customer Types | Suggested Price Points | Frame Brands* |
|---|---|---|---|
| Suburban | Updated looks at a moderate price. Value is more important than Designer names. | $69 - $320 | BCBG, Burberry, DKNY, Ellen Tracy, Revolution, Columbia, Burberry, Republica, Versace, Persol, Coach, Ray Ban, Lucky, Marc Hunter, Daisy Fuentes |
| Urban | Focused on contemporary looks at all price points. Designer names are more prevalent here. | $69 - $550 | Bvlgari, John Varvatos, Columbia, Cazal, Marc Ecko, Prada, Daisy Fuentes, Penguin, Tiffany, Ogi, Persol, Prada, Republica, Thalia, Versace, Tiffany |
| Luxury | Focused on updated and contemporary looks at medium to high price points. | $69 - $550 | Bvlgari, Burberry, Columbia, Cazal, Bvlgari, Prada, Coach, John Varvatos, Tiffany, Ogi, Persol, Prada, Prada, Tiffany, Republica, Tory Burch, Versace |

*Pearle Vision reserves the right to modify, add to, delete or substitute any of the Supplemental Inventory at any time in the future in its sole discretion based on factors including, but not limited to, availability of product, customer demographics, and margin opportunity.

## EXHIBIT B TO CONSIGNMENT AGREEMENT:  PERSONAL GUARANTY

The undersigned hereby unconditionally, absolutely and irrevocably guarantees the full and prompt payment of Consignee's obligations and liabilities to Pearle Vision under Sections 8 and 11 of the STARS Consignment Agreement. Guarantor agrees to pay all reasonable costs and expenses incurred by Pearle Vision in enforcing the provisions of this Guaranty or the STARS Consignment Program Agreement, including, but not limited to, reasonable attorneys' fees.

_____
Milana Gutman, Individually


_____
Alex Gutman, Individually

LRNA FDD Amendment 11072011

## EXHIBIT C TO STARS CONSIGNMENT AGREEMENT:  PURCHASE MONEY SECURITY AGREEMENT

This Purchase Money Security Agreement ("*STARS Consignment PMSA*"), made 11/23/2011, is between Luxottica Retail North America Inc., the Franchisor of Pearle Vision®, with a principal place of business at 4000 Luxottica Place, Mason, OH 45040 (hereinafter "*Pearle Vision*") its successors, assigns and transferees ("*Secured Party*"), with its principal office at 4000 Luxottica Place, Mason, Ohio 45044, and Gutman Vision, Inc., located at Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093 (referred to herein as the "*Consignee*").

### RECITALS

WHEREAS, Consignee is a franchisee of Pearle Vision Store #8655 pursuant to the terms and conditions of a Franchise Agreement; and

WHEREAS, Consignee has entered into a STARS Consignment Agreement of even date herewith.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this hereby covenant and agree as set forth below:

### ARTICLE I
### Collateral; General Terms of Pledge

**Section 1.01 Security Interest.** Consignee by this STARS Consignment PMSA grants to Secured Party a continuing general security interest in the Consignee's following property and interest in property, whether now owned or existing, acquired or arising in the future, or in which Consignee in the future has any rights, and wherever located:  (A) Consigned Product; (B) accounts derived from the Consigned Product; (C) all accessions, substitutions, replacements, products and proceeds of the above, including without limitation, proceeds of insurance policies insuring the Collateral; and (D) all other forms of collateral described in Attachment A to this STARS Consignment PMSA which is incorporated herein by reference.

Consignee's interests in the property and assets described in Subsections (A) through (D) above will secure the Indebtedness, as defined below, and are referred to collectively as "*Collateral.*" Collateral will also include proceeds of Collateral, but Secured Party does not consent to any sale of the Collateral outside of the normal course of business.  All terms contained in this STARS Consignment PMSA that are used or defined in Articles One through Nine of the Uniform Commercial Code of the state identified in Section 3.01 hereof (the "*UCC*"), will have the same meanings as they are given in the UCC, unless the context of their usage in this STARS Consignment PMSA clearly requires otherwise.

LRNA FDD Amendment 11072011

**Section 1.02 Indebtedness Secured**.  This security interest is given to secure the Consigned Property as defined in the STARS Consignment Agreement of even date herewith; and (2) all costs incurred by Secured Party related to the collection and enforcement of the STARS Consignment Agreement or to the protection or maintenance of the Collateral.

**Section 1.03 Duration of Pledge**.  This STARS Consignment PMSA will remain in full force and effect until Consignee's Indebtedness to Secured Party, however and whenever originated, has been paid in full.

## ARTICLE II
## Conditions Precedent

**Section 2.01 Conditions of Consignment**.  Secured Party's obligation to consign goods as described in the STARS Consignment Agreement is subject to the prior satisfaction of the following conditions:

**(A)    Notice to Other Lienholders**.  If Consignee has granted a security interest, or any interest, in and to the Collateral to a lienholder other than Secured Party, Consignee shall not receive the Collateral from Secured Party unless and until Secured Party is able to deliver to the lienholder a notice that states the following:

> Luxottica Retail North America Inc. ("Pearle Vision") has taken a purchase money security interest in the Consigned Goods as defined in the attached upon (insert franchisee name), the Debtor, receiving possession of those Consigned Goods.  This notice is being sent to you as a prior lienholder that appears to have a conflicting security interest in the Consigned Goods, however, in accordance with Subsection 9-324(c) of the Uniform Commercial Code, and except as otherwise provided in subsection (g), Pearle Vision shall hold a prior security interest in the Consigned Goods.  This notice has also been sent to you within five years prior to the date the Debtor received possession of the Consigned Goods.  If you have any questions regarding this notice, please contact Legal Services Department, Luxottica Retail North America Inc., 4000 Luxottica Place, Mason, OH  45040.

**(B)    Other Documents**.  Secured Party will have received all other agreements, documents, instruments, opinions, certificates, and information as Secured Party may reasonably request.

## ARTICLE III
## Consignee's Representations, Promises and Agreements

Consignee represents promises and agrees as follows:

**Section 3.01 Consignment Purpose**.  Consignee will use the Consigned Property for all uses permitted under this STARS Consignment PMSA, the Franchise Agreement and all applicable laws and statutes.

**Section 3.02  Ownership Free of Encumbrances.**  Consignee will not grant any lien or security interest in any of the Collateral, except in favor of Secured Party. Consignee will not permit any lien, security interest, claim or encumbrance to exist in or against any of the Collateral, without Secured Party's written consent. Consignee will defend the Collateral against all liens, security interests, claims and encumbrances.

**Section 3.03  Financing Statements.**  No financing statement related to any of the Collateral or proceeds is on file in any public office and Consignee will join with Secured Party in executing one or more financing statements satisfactory to Secured Party. Secured Party may file any standard or nonstandard financing statement or statements, including without limitation any original or photocopy of this STARS Consignment PMSA, as a financing statement, in Secured Party's sole discretion.

**Section 3.04  Compliance with STARS Consignment Agreement.**  Consignee will comply with the terms set forth in the STARS Consignment Agreement.

**Section 3.05  Compliance With Laws.**  Consignee will comply with all requirements of law. If Consignee fails to comply, the failure must not, in the aggregate, have a material adverse effect on the business, operations, property (including, without limitation, the Collateral) or Consignees financial condition and must not materially adversely affect Consignees ability to perform its obligations under this STARS Consignment PMSA, the STARS Consignment Agreement and any other agreements.

**Section 3.06  Assumed Names.**  Consignee has not been known as or used any other assumed, fictitious or corporate name, except for [specify: Pearle Vision Center or Pearle Express].

**Section 3.07  Litigation.**  To Consignee's knowledge, there is no litigation, investigation, or arbitration proceeding pending or threatened against Consignee or its respective properties or revenues:  (a) with respect to this STARS Consignment PMSA, the STARS Consignment Agreement, the Franchise Agreement or other agreements; or (b) which, if adversely determined, would have a material adverse effect on Consignees business, operations, property (including, without limitation, the Collateral), or financial condition taken as a whole.

**Section 3.08  No Defaults.**  Consignee is not in default of any note, loan agreement, mortgage, lease, deed or other similar agreement to which Consignee is bound.

**Section 3.09  Change of Location of Collateral.**  Consignee will not permit the Collateral to be removed from the Location(s) specified in this STARS Consignment PMSA without the prior written consent of Secured Party unless sold in the ordinary course of business.

**Section 3.10  Further Assurances.**  Consignee will make, execute and deliver to Secured Party without additional consideration, any document necessary to carry out and effectuate the purpose of this STARS Consignment PMSA. Notwithstanding the execution of any other documents, Secured Party may retain the original STARS Consignment Agreement until the Sale Price of the Consigned Property has been paid in full.

**Section 3.11 <u>Guaranties</u>.**  Any guarantee given by Consignee or its shareholders, partners or affiliates, will be additional security.  The guaranty will not impair any other security or instruments of security that Secured Party may hold concerning the Indebtedness.

**Section 3.12 <u>Power and Authority</u>.**  Consignee has full power and authority to execute this STARS Consignment PMSA, and to perform all obligations under this STARS Consignment PMSA.

**ARTICLE IV**
**<u>Default and Remedies</u>**

**Section 4.01 <u>Events of Default</u>.**  Consignee will be in default under this STARS Consignment PMSA upon the occurrence of any of the following events or conditions (each of which will be considered an "Event of Default"):

**(A)**     **<u>Payments; Failure to Perform</u>.**  Consignee's failure to pay or perform any obligation, promise or liability contained in this STARS Consignment PMSA, the STARS Consignment Agreement, or any other agreement evidencing or securing any of the Indebtedness;

**(B)**     **<u>Misrepresentations</u>.**  Consignee's making any representation or statement to Secured Party that is untrue, incorrect or misleading when given;

**(C)**     **<u>Acceleration of Indebtedness</u>.**  The occurrence of any event that results in the acceleration of the maturity of any indebtedness of Consignee to others;

**(D)**     **<u>Destruction of Collateral</u>.**  The occurrence of any loss, theft, substantial damage, destruction, sale or encumbrance of the Collateral or the making of any levy, lien or encumbrance against the Collateral;

**(E)**     **<u>Cross Default</u>.**  Consignee's default under the STARS Consignment Agreement, the Franchise Agreement, Sublease or any other agreement between Consignee and Secured Party;

**(F)**     **<u>Termination of Franchise Agreement</u>.**  The termination or expiration of the Franchise Agreement, lease or sublease between Consignee and Secured Party except by mutual agreement of the Parties;

**(G)**     **<u>Insecurity</u>.**  Secured Party's reasonable belief that the prospect of payment of any Indebtedness or the performance of Consignee's obligations under this STARS Consignment PMSA is impaired; or

**(H)**     **<u>Other Liens</u>.**  The existence of liens or security interests in any of the Collateral except as created by this STARS Consignment PMSA or in favor of Secured Party.

**Section 4.02 <u>Remedies</u>.**  On the occurrence of any Event of Default and at any time after the occurrence of any Event of Default, Secured Party may declare any or all of the Indebtedness immediately due and payable, without demand, presentment, notice of dishonor, notice of

acceleration, notice of intent to accelerate, notice of intent to demand, or protest, which are expressly waived and will have and may exercise any and all of the following rights:

**(A)** **Rights and Remedies Under UCC.** Secured Party will have all of the rights and remedies of a Secured Party under the UCC, or under other applicable laws, all of which rights and remedies will be cumulative, and none of which will be exclusive, to the extent permitted by law, in addition to any other rights and remedies possessed by Secured Party;

**(B)** **Assembling Collateral.** Secured Party may require Consignee to assemble the Collateral and make it available to Secured Party at any place designated by Secured Party which is reasonably convenient to both parties; and

**(C)** **Foreclosure.** Secured Party may foreclose its security interest in the Collateral in any way permitted by law. To the extent permitted by law, Secured Party may enter Consignee's premises, whether the premises are leased or owned by Consignee, without legal process and without incurring liability to Consignee. Secured Party may, in its discretion, without notice or demand, take the Collateral subject to its security interest and remove it, or require Consignee to make the Collateral available to it at a convenient place. Unless the Collateral is perishable or threatens to decline speedily in value or is customarily sold on a recognized market, Secured Party will give Consignee reasonable notice as to the time and place of public sale, or the time after which any private sale or any other intended disposition of it is to be made. The requirements of reasonable notice will be met if the notice is mailed, postage prepaid, to the Consignee's address provided in this STARS Consignment PMSA, at least five (5) days before the sale or disposition. Any expenses related to the foreclosure will be borne by Consignee and will include Secured Party's reasonable attorneys' fees and legal expenses.

**Section 4.03 Reimbursement for Expenses.** At its option, Secured Party may discharge taxes, liens, security interests or other encumbrances on the Collateral. In addition, Secured Party at its option may pay for repair of damage to the Collateral, maintenance and preservation of the Collateral, and insurance for the Collateral. Consignee agrees to reimburse Secured Party on demand for these payments. If Consignee does not reimburse these payments within ten (10) days of Secured Party's request, interest on such payment, at 1-1/2% per month (or the Maximum Legal Rate, whichever is less) from the date of the payment until reimbursement, will be added to Consignees Indebtedness and will be secured by this STARS Consignment PMSA.

### ARTICLE V
### Miscellaneous

**Section 5.01 Assignment.** Consignee's promises, undertakings and agreements contained in this STARS Consignment PMSA will be binding on Consignees heirs, personal representatives, successors and assigns; except that this STARS Consignment PMSA will not be assignable by Consignee without the prior written consent of Secured Party. Secured Party and Consignee as used in this STARS Consignment PMSA will include the successors or assigns of those parties. The rights and benefits of Secured Party under this STARS Consignment PMSA will, if Secured Party directs, apply to any party acquiring any part of or interest in the Indebtedness. If any of Secured Party's rights under this STARS Consignment PMSA are construed to be a power of

LRNA FDD Amendment 11072011

attorney, this power of attorney will not be affected by the subsequent death, disability or incompetence of Consignee.

**Section 5.02 <u>Counterpart</u>**.  This STARS Consignment PMSA may be executed in any number of counterparts, and each counterpart will be considered an original.

**Section 5.03 <u>Notices</u>**.  Any notices that may be given under this STARS Consignment PMSA will be considered delivered and received on delivery, if delivered by personal service, or sent by a recognized courier or express mail, or by United States certified or registered mail, with postage prepaid personally to the Consignee, or by facsimile or any one of them if there be more than one, or to an executive officer of Secured Party, or on deposit in the United States mail, if given by certified or registered mail, and addressed as follows:

Consignee:     Gutman Vision, Inc.
               Preston Park Shopping Center
               1713 Preston Road, Suite A
               Plano, Texas 75093

Secured Party: Luxottica Retail North America Inc.
               Attn: General Counsel's Office
               4000 Luxottica Place
               Mason, OH  45044
               (513) 492-4018

or at any other address as each party may designate by written notification to the other as described above.

**Section 5.04 <u>Expenses and Attorneys' Fees</u>**.  If, at any time, Secured Party employs counsel to assist Secured Party to enforce this STARS Consignment PMSA or the STARS Consignment Agreement; then, the attorneys' fees incurred by Secured Party will be payable on demand by Consignee to Secured Party and will be additional Indebtedness under this STARS Consignment PMSA secured by the Collateral. Such attorney's fees shall not exceed the retail value of the Consigned Property.  Each party agrees to bear its own expenses and attorney's fees associated with entering into this STARS Consignment PMSA or the STARS Consignment Agreement.

**Section 5.05 <u>Section Titles</u>**.  The captions and section titles contained in this STARS Consignment PMSA are without substantive meaning or content and are not a part of the STARS Consignment PMSA between the parties.

**Section 5.06 <u>Severability</u>**.  Wherever possible, each term of this STARS Consignment PMSA will be interpreted in a manner as to be effective and valid under applicable law. If applicable law prohibits any term of this STARS Consignment PMSA, that term will be ineffective only to the extent of the prohibition without invalidating the remainder of this STARS Consignment PMSA.

LRNA FDD Amendment 11072011

**Section 5.07  No Waivers.**  Secured Party's failure or delay to exercise any right, power or privilege under this STARS Consignment PMSA will not operate as a waiver of them. Secured Party's waiver of any Event of Default will not operate as a waiver of any other Event of Default.

**Section 5.08  Governing law; Jurisdiction; Venue.**  The parties acknowledge and agree that this STARS Consignment PMSA is deemed entered into in Mason, Ohio, and is governed by Ohio law, and that the U.S. District Court for the Southern District of Ohio, or if such court lacks jurisdiction, the Court of Common Pleas for Warren County, Ohio (or its successor), shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this STARS Consignment PMSA.

**Section 5.09  Waiver of Jury Trial. Secured Party and Consignee agree that in any litigation, suit, action, counterclaim, or proceeding, whether at law or in equity, which arises out of, concerns, or relates to this STARS Consignment PMSA, any and all transactions contemplated hereunder, the performance of this STARS Consignment PMSA, or otherwise, trial shall be to a court of competent jurisdiction and not to a jury. Secured Party and Consignee hereby irrevocably waive any right either party may have to a trial by jury.  Either Secured Party or Consignee may file an original counterpart or a copy of this STARS Consignment PMSA with any court as written evidence of the consent of Secured Party or Consignee of the waiver of their right to trial by jury.**

**THIS AGREEMENT, TOGETHER WITH THE PERSONAL GUARANTY AND CONSIGNMENT AGREEMENT,AND ALL OTHER INSTRUMENTS, DOCUMENTS AND AGREEMENTS EXECUTED AND DELIVERED BY CONSIGNEE IN CONNECTION WITH THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT EMBODY THE FINAL, ENTIRE AGREEMENT OF CONSIGNEE AND PAYEE WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE INDEBTEDNESS EVIDENCED BY THIS AGREEMENT AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF CONSIGNEE AND SECURED PARTY.  THERE ARE NO ORAL AGREEMENTS BETWEEN CONSIGNEE AND SECURED PARTY.**

LRNA FDD Amendment 11072011

Signed and delivered as of the day and year first above written but effective for all purposes as of **11/23/2011**.

**CONSIGNEE:**

Gutman Vision, Inc.

By: _Milana Gutman_
Milana Gutman

Title: _Secretary_

Date: _11/25/2011_

By: _Alex Gutman_
Alex Gutman

Title: _Pasident_

Date: _11/23/11_

**FRANCHISOR:**

Luxottica Retail North America Inc.,
franchisor of Pearle Vision ("Pearle Vision")

By: _Carlo Privitera_

Title: _____
CARLO PRIVITERA
CHIEF OPERATING OFFICER_ 12/23/2011

Date: _____

By: _James Neitzke_

Title: _____
JAMES NEITZKE
SVP, Finance & Accounting_ 11/23/2011

Date: _____

LRNA FDD Amendment 11072011

## ATTACHMENT A TO STARS CONSIGNMENT AGREEMENT:  DESCRIPTION OF COLLATERAL FOR PURCHASE MONEY SECURITY AGREEMENT

All Consigned Goods as defined in the STARS Consignment Program and as described in Exhibit A, as well as such replacements or modifications thereto, that is on consignment to Consignee, all proceeds and products of sales of the Consigned Goods.

The security interest in those Consigned Goods shall be a Purchase Money Security Interest.

Consignee shall include but not be limited to all affiliated corporations, subsidiaries, companies, stores, DBAs wherever located, including stores and/or entities known as:

**Pearle Vision Store #8655 located at Preston Park Shopping Center, 1713 Preston Road, Suite A, Plano, Texas 75093.**