## ASSIGNMENT AND ASSUMPTION OF LICENSE AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Agreement") is entered into as of June 28, 2016, by Gutman Vision, Inc. (the "Assignor"), Brave Optical, Inc. (the "Assignee") and Luxottica Retail North America Inc., an Ohio corporation, Licensor of Pearle Vision ("Licensor").

### RECITALS:

**WHEREAS,** in May of 2013, Licensor changed the terminology associated with its franchise system, and the terminology changes shall be reflected in this Amendment as follows: (i) "Franchisor" shall be referred to as "Licensor"; (ii) "Franchisee" shall be referred to as "Licensed Operator"; (iii) "Franchise Agreement" shall hereinafter be referred to as "License Agreement"; and (iv) "Store" shall hereinafter be referred to as the "EyeCare Center"; and

**WHEREAS,** Assignor operates the Licensed Business as defined in Section 1.c. below pursuant to the terms of a License Agreement with an effective date of March 20, 2013 ("License Agreement") between Assignor and Licensor; and

**WHEREAS,** Pursuant to the License Agreement, Assignor and Licensor entered into other ancillary agreements (referred to collectively in this Agreement as the "Ancillary Agreements") for the Licensed Business; and

**WHEREAS,** Assignor desires to assign Assignor's interest in the Licensed Business, License Agreement, and the Ancillary Agreements to Assignee, and Assignee desires to obtain the same from Assignor, all subject to the terms and conditions in this Agreement.

**NOW, THEREFORE, FOR AND IN CONSIDERATION** of the premises, the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are expressly acknowledged, Assignor and Assignee, each intending to be legally bound, do hereby mutually agree as follows:

1. **Definitions**.

   a. Upon completion of the transactions contemplated in this Agreement, Assignee, which is a Texas

   ☒ corporation   ☐ partnership   ☐ LLC   ☐ limited partnership   ☐ other

shall have owners holding the following ownership interests:

| OWNER(S) | OWNERSHIP % |
|---|---|
| Dawn Gray | 50% |
| Jeffrey Gray | 50% |

Assignee represents that these interests are owned free and clear of any and all liens, claims and security interest of every type, kind or nature, except that held by Licensed Operator and the financial agreement executed by Assignee in favor of Assignor, if any.

   b. The Designated Operator for Assignee is Dawn Gray.

   c. The licensed business is Pearle Vision Store **#8683** licensed to Assignor under the terms and conditions of the License Agreement and located at Village at Collin Creek, 601 W. Plano Pkwy, Suite 141B, Plano, Texas 75075 (the "Licensed Business").

   d. The closing date will be July 12, 2016 (the "Closing Date") and, on that date, the Assignment (as defined in Section 2.a.) shall be effective.

1

**CONFIDENTIAL**

2. **Assignment and Assumption**.

a. <u>Assignment and Assumption</u>.  On the Closing Date, Assignor assigns to Assignee all of Assignor's right, title and interest in and to the License Agreement and Ancillary Agreements for the Licensed Business and Assignee irrevocably and absolutely assumes each and every duty and obligation of Assignor which, in whole or in part, relates to the operation of the Licensed Business (the "Assignment").  Without limiting the foregoing, Assignee hereby becomes obligated upon all promissory notes of Assignor, if any, to Licensor, and hereby also becomes the debtor under any Security Agreement, and in furtherance thereof, grants to Licensor a security interest in the Collateral (as defined in the License Agreement), all as if Assignee had been the original debtor under the Security Agreement.

b. <u>Consent to Assignment</u>.  Licensor consents to the Assignment subject to the terms and conditions stated in this Agreement.  Licensor's consent to the Assignment is expressly conditioned upon the following:

i.  Successful completion of any training required by Licensor;

ii.  By no later than the Closing Date, Licensor's receipt of any or all of the following, as required by Licensor:

(a)  the Confidentiality/Covenant Not to Compete Agreement attached hereto as Exhibit A;

(b)  the Guaranty and Assumption of Licensed Operator's Obligations attached hereto as Exhibit B;

(c)  the General Release attached hereto as Exhibit C;

(d)  the SBA Addendum attached hereto as Exhibit D; and

(e)  a copy of the executed lease assignment or consent from the landlord to be attached hereto as Exhibit E.

iii.  Execution of this Agreement and compliance with each and every condition, requirement and undertaking in this Agreement.

4. **Transfer Fee**.  Licensor has agreed to waive the Transfer Fee.

5. **Representations and Warranties**.  Assignor and Assignee represent and warrant to Licensor that the respective statements in this Section 5 are correct and complete as of the Closing Date and understand that Licensor will rely upon these statements:

a.  Assignor and Assignee each have the power and authority to execute and deliver this Agreement and perform their respective obligations hereunder and that such performance will not result in breach, or constitute a default under, any agreement to which Assignor or Assignee is a party or has an obligation.

b.  The Assignment is subject to the consent of Licensor and any third party (including any landlords) needed to make the Assignment effective and enforceable.

c.  The Asset Purchase Agreement, or any such similar document, between Assignor and Assignee does not convey or in any way encumber any of Licensor's intellectual property (including the Pearle Vision Marks or System as those terms are defined in the License Agreement).

d.  If Assignee has granted Assignor or any other party lending money to Assignee a security interest in any of the assets being conveyed (a "Secured Party"), Assignee affirms that the security interest conforms to the following: (i) the security interest is subordinate to and ranks junior in all respects to any interest in favor of Licensor; (ii) the Secured Party has no right to foreclose any security interest or otherwise exercise its rights without Licensor's prior written

2

**CONFIDENTIAL**

consent; and (iii) the security interest does not extend directly or as proceeds to the accounts receivable of the Licensed Business.

    e.   All amounts which are due and payable to Licensor from Assignor have been paid current.

    f.   Assignor has provided a copy of the License Agreement, and any Ancillary Agreements, along with all amendments and schedules thereto, to Assignee prior to the Closing. Assignor represents that the License Agreement, and Ancillary Agreements are valid, binding and in full force and effect, that no breach or default has occurred or will occur after Closing, nor are those agreements subject to any liens, encumbrances, reservations or limitations (except as disclosed to Assignee) that would have a material adverse effect on the Assignment. Assignee represents that Assignee is familiar with all obligations being assumed under the License Agreement and Ancillary Agreements.

    6.    **Further Execution**. Assignor, Assignee and shareholders of Licensed Operator shall take such actions and execute such additional documents as may be necessary in Licensor's opinion to give effect to the Assignment.

    7.    **Governing Law**. This Agreement shall be construed and enforced in accordance with the laws of the state of Ohio.

    8.    **Conflict**. In the event that any conflict arises between this Agreement and any document or instrument executed to give effect to the Assignment, the terms of this Agreement shall prevail.

    9.    **Entire Agreement**. This Agreement and all documents executed in conjunction herewith set forth the full and complete understanding between the parties hereto with respect to the terms and conditions under which Licensor will consent to the Assignment. The terms and provisions of this Agreement may not be amended or modified except by written instrument executed by the parties hereto.

    10.   **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provisions of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

    11.   **Counterparts**. This Agreement may be executed in several counterparts and by facsimile transmission, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**CONFIDENTIAL**

**ASSIGNOR:**

**Gutman Vision, Inc.**

By: _____
    Alex Gutman

Title: _president_

By: _____
    Milana Gutman

Title: _Secretary_

**ASSIGNEE:**

**Brave Optical, Inc.**

By: _____
    Dawn Gray

Title: _Treasurer_

By: _____
    Jeffrey Gray

Title: _President_

**LICENSOR:**

**Luxottica Retail North America Inc., Licensor of Pearle Vision**

By: _David L Reuter Jr._

Title: _TVP_

4

**CONFIDENTIAL**

## EXHIBIT A

## CONFIDENTIALITY/COVENANT NOT TO COMPETE AGREEMENT

[See attached]

**CONFIDENTIAL**

## CONFIDENTIALITY/COVENANT NOT TO COMPETE AGREEMENT

**TO BE EXECUTED BY:**
**LICENSED OPERATOR'S OFFICERS, DIRECTORS AND OPERATORS**

**NAME:**                        Dawn Gray

**LICENSED OPERATOR:**  Brave Optical, Inc.

**LICENSED LOCATION:**  Village at Collin Creek
                                           601 W. Plano Pkwy, Suite 141B
                                           Plano, Texas 75075

**LOCATION NUMBER:**    8683

**HOME ADDRESS:**          6579 Mountain Sky Road
                                           Frisco, Texas 75034

**HOME TELEPHONE:**      (214) 395-6665

**CLASSIFICATION:**          Designated Operator

Capitalized words not defined in this Confidentiality Agreement ("*Agreement*") have the meanings ascribed to them in the License Agreement between the Licensed Operator and Pearle Vision ("*License Agreement*"). Confidential Information includes any information, knowledge, know-how, techniques and information which Pearle Vision designates as confidential, except information which I can demonstrate came to my attention prior to disclosure or which had become or becomes a part of the public domain through publication or communication by others but in no event by or through any act of mine.

During the term of the License Agreement, or at any time thereafter, I will not (1) (a) communicate, divulge or use for the benefit of any other person, persons, partnership, proprietorship, association, corporation or entity any Confidential Information; or (b) at any time copy, duplicate, record or otherwise reproduce any of the foregoing Confidential Information, in whole or in part store same in a computer retrieval or data base, nor otherwise make the same available to any unauthorized person; and (2) divert any business to competitors of Licensed Operator and/or Pearle Vision. If my position or employment with Licensed Operator ends for any reason, I must return to Pearle Vision or, at Pearle Vision's direction to Licensed Operator all Confidential Information that is in my possession.

I further agree that I will not, either directly or indirectly, engage or participate in a Competing Business, either: (i) while I am an owner, employee or otherwise associated with Licensed Operator; or (ii) for a period of one year after my ownership or employment ends for any reason and within a three (3) mile radius of the Licensed Location, except as otherwise provided in the License Agreement. I am prohibited from engaging in any such Competing Business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant thereof. This prohibition includes not only direct competition but also forms of indirect competition, such as consultation for competitive businesses, service as an independent contractor for such competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever which would be of any material assistance to a competitor.

I acknowledge that any conduct prohibited to me in this Agreement also applies to my spouse or other member of my immediate family (more specifically, spouses, parents, children, and the spouse of any immediate family member).

I acknowledge that violation of the covenants not to compete contained herein would result in immediate and irreparable injury to Pearle Vision and Licensed Operator for which no adequate remedy at law will be available. Accordingly, I hereby consent to the entry of an injunction procured by Pearle Vision or Licensed Operator prohibiting

6

**CONFIDENTIAL**

any conduct by me in violation of the terms of this Agreement.  I agree to pay all costs and expenses, including reasonable attorneys' and experts' fees, incurred by Pearle Vision and Licensed Operator in connection with the enforcement of this Agreement.

If all or any portion of this Agreement is held unreasonable, void, vague or illegal by any court or agency having valid jurisdiction in an unappealed final decision to which Pearle Vision and/or Licensed Operator is a party, the court or agency shall be empowered to revise and/or construe the remainder of the covenants so as to fall within permissible legal limits and shall not by necessity invalidate the entire Agreement. I expressly agree to be bound by any lesser covenant subsumed within the terms of this Agreement as if the resulting covenant were separately stated in and made a part hereof.

I acknowledge that the consideration for my execution of this Agreement is my employment by / ownership in Licensed Operator; my obligations under this Agreement shall run to Pearle Vision alone; and, I undertake no obligations to Licensed Operator hereunder by virtue of my execution of this Agreement.  In addition, if I am a Designated Operator or Designated Developer of Licensed Operator (and I am not also an officer or director of Licensed Operator), then Pearle Vision shall have no obligation to Licensed Operator to enforce this Agreement; Pearle Vision alone - and not Licensed Operator - may determine to enforce, refuse to enforce and/or waive enforcement of this Agreement in its sole and exclusive discretion.

Dawn Gray

Date:  10/21/10

7

**CONFIDENTIAL**

<u>**CONFIDENTIALITY/COVENANT NOT TO COMPETE AGREEMENT**</u>

**TO BE EXECUTED BY:**
**LICENSED OPERATOR'S OFFICERS, DIRECTORS AND OPERATORS**

**NAME:**                         Jeffrey Gray

**LICENSED OPERATOR:**  Brave Optical, Inc.

**LICENSED LOCATION:**  Village at Collin Creek
                                            601 W. Plano Pkwy, Suite 141B
                                            Plano, Texas 75075

**LOCATION NUMBER:**   8683

**HOME ADDRESS:**          6579 Mountain Sky Road
                                            Frisco, Texas 75034

**HOME TELEPHONE:**      (214) 402-4423

**CLASSIFICATION:**         Director

Capitalized words not defined in this Confidentiality Agreement ("*Agreement*") have the meanings ascribed to them in the License Agreement between the Licensed Operator and Pearle Vision ("*License Agreement*"). Confidential Information includes any information, knowledge, know-how, techniques and information which Pearle Vision designates as confidential, except information which I can demonstrate came to my attention prior to disclosure or which had become or becomes a part of the public domain through publication or communication by others but in no event by or through any act of mine.

During the term of the License Agreement, or at any time thereafter, I will not (1) (a) communicate, divulge or use for the benefit of any other person, persons, partnership, proprietorship, association, corporation or entity any Confidential Information; or (b) at any time copy, duplicate, record or otherwise reproduce any of the foregoing Confidential Information, in whole or in part store same in a computer retrieval or data base, nor otherwise make the same available to any unauthorized person; and (2) divert any business to competitors of Licensed Operator and/or Pearle Vision. If my position or employment with Licensed Operator ends for any reason, I must return to Pearle Vision or, at Pearle Vision's direction to Licensed Operator all Confidential Information that is in my possession.

I further agree that I will not, either directly or indirectly, engage or participate in a Competing Business, either: (i) while I am an owner, employee or otherwise associated with Licensed Operator; or (ii) for a period of one year after my ownership or employment ends for any reason and within a three (3) mile radius of the Licensed Location, except as otherwise provided in the License Agreement. I am prohibited from engaging in any such Competing Business as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant thereof. This prohibition includes not only direct competition but also forms of indirect competition, such as consultation for competitive businesses, service as an independent contractor for such competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever which would be of any material assistance to a competitor.

I acknowledge that any conduct prohibited to me in this Agreement also applies to my spouse or other member of my immediate family (more specifically, spouses, parents, children, and the spouse of any immediate family member).

I acknowledge that violation of the covenants not to compete contained herein would result in immediate and irreparable injury to Pearle Vision and Licensed Operator for which no adequate remedy at law will be available. Accordingly, I hereby consent to the entry of an injunction procured by Pearle Vision or Licensed Operator prohibiting

8

**CONFIDENTIAL**

any conduct by me in violation of the terms of this Agreement.  I agree to pay all costs and expenses, including reasonable attorneys' and experts' fees, incurred by Pearle Vision and Licensed Operator in connection with the enforcement of this Agreement.

If all or any portion of this Agreement is held unreasonable, void, vague or illegal by any court or agency having valid jurisdiction in an unappealed final decision to which Pearle Vision and/or Licensed Operator is a party, the court or agency shall be empowered to revise and/or construe the remainder of the covenants so as to fall within permissible legal limits and shall not by necessity invalidate the entire Agreement. I expressly agree to be bound by any lesser covenant subsumed within the terms of this Agreement as if the resulting covenant were separately stated in and made a part hereof.

I acknowledge that the consideration for my execution of this Agreement is my employment by / ownership in Licensed Operator; my obligations under this Agreement shall run to Pearle Vision alone; and, I undertake no obligations to Licensed Operator hereunder by virtue of my execution of this Agreement.  In addition, if I am a Designated Operator or Designated Developer of Licensed Operator (and I am not also an officer or director of Licensed Operator), then Pearle Vision shall have no obligation to Licensed Operator to enforce this Agreement; Pearle Vision alone - and not Licensed Operator - may determine to enforce, refuse to enforce and/or waive enforcement of this Agreement in its sole and exclusive discretion.

Jeffrey Gray

Date: 6 / 21 / 16

9

**CONFIDENTIAL**

**EXHIBIT B**

**GUARANTY AND ASSUMPTION OF LICENSED OPERATOR'S OBLIGATIONS**

[See attached]

10

**CONFIDENTIAL**

## GUARANTY AND ASSUMPTION OF LICENSED OPERATOR'S OBLIGATIONS

Luxottica Retail North America Inc. (*"Pearle Vision"*) and Brave Optical, Inc. (*"Licensed Operator"*) entered into a License Agreement dated as of March 20, 2013 (*"License Agreement"*) along with certain additional agreements such as lease or sublease agreement, promissory notes and security agreements (collectively, the *"Ancillary Agreements"*).  The License Agreement and the Ancillary Agreements, if any, are collectively referred to as the "Agreements" in this Guaranty.  In consideration of, and as an inducement to Pearle Vision's execution of the Agreements, the undersigned (*"Guarantors"*), each of whom is an Equity Owner in Licensed Operator, personally and unconditionally agree as follows:

1.      Payment and Performance Obligations.  Guarantor unconditionally, absolutely and irrevocably guarantees the full and prompt payment of Licensed Operator's obligations and liabilities to Pearle Vision under any Agreement.  Guarantor agrees to be personally bound by and liable for the full, prompt and unconditional performance of all obligations under any Agreement now owed or hereafter to be owed by Licensed Operator to Pearle Vision, including without limitation, any obligations of Licensed Operator under the Agreements relating to transfer, indemnification, and non-competition.

2.      General Terms and Conditions.  Each Guarantor waive:  (1) acceptance and notice of acceptance by Pearle Vision of the undertakings under Section 1; (2) notice that Pearle Vision and Licensed Operator have entered into any additioanl agreements or have amended, extended, renewed, altered or otherwise modified the terms, rights or obligations of any Agreement; (3) notice of demand for payment of any indebtedness or nonperformance of any obligations guaranteed; (4) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed; (5) any right he/she may have to require that an action be brought against Licensed Operator, any other gauarantor or any other person as a condition of Guarantor's liability; (6) all rights to payments and claims for reimbursement or subrogation which Guarantor may have against Licensed Operator or any other guarantors arising as a result of the execution of and performance under this Guarantee by Guarnator; (7) any law or statute which requires that Pearle Vision make demand upon, assert claims against or collect from Licensed Operator, any other guarantors or any others, foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Licensed Operator, any other guarantors or any others prior to making any demand upon, collecting from or taking any action against Guarantor; (8) any and all other notices and legal or equitable defenses to which Guarantor may be entitled; and (9) any and all right to have any legal action under this Guaranty decided by a jury.

Each Gurantor agrees that:  (a) his/her direct and immediate liability under this Guarantee shall be joint and several; (b) he/she shall render any payment or performance required under the Agreements upon demand if Licensed Operator fails or refuses punctually to do so; (c) such liability shall not be contingent or conditioned upon pursuit by Pearle Vision of any remedies against Licensed Operator, any other guarantor or any other person; (d) such liability shall not be diminished, relieved or otherwise affected by any amendment, renewal, extension, alteration or other modification of the Agreements or any rights or obligations of Licensed Operator thereunder, any extension of time, credit or other indulgence which Pearle Vision may from time to time grant to Licensed Operator, any other guarantor, or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the term of each Agreement and for so long thereafter as there are monies or obligations owing to Pearle Vision its affiliates under any Agreement, and thereafter as provided in each Agreement or at law or in equity; and (e) monies received from any source by Pearle Vision for application toward amounts due may be applied in any manner or order deemed appropriate by Pearle Vision.
This Guaranty remains in force and effect unless Pearle Vision in its sole discretion, in writing, releases Guarantor from his/her obligations under this Guarantee.  A release by Pearle Vision of Guarantor shall not affect the obligations of any other guarantor.

3.      Default.  If any of the following events occur, a default (*"Default"*) under this Guaranty shall exist: (1) Guarantor's failure to timely pay or perform any obligation under this Guaranty; (2) Guarantor's breach of any agreement or representation contained or referred to in this Guarantee; (3) appointment of a receiver for, assignment for the benefit of creditors of, or the commencement of any insolvency or bankruptcy proceeding by or against, Guarantor; (4) the entry of any monetary judgment or the assessment against, the filing of any tax lien against, or the issuance of any

11

CONFIDENTIAL

writ of garnishment or attachment against any property of or debts due Guarantor; and/or (5) Guarantor fails to sign any written documentation provided by Pearle Vision under which Guarantor reaffirms the obligations under this Guarantee. If a Default occurs, Guarantor's obligations shall be due immediately and payable without notice. Any Default of this Guarantee shall be considered a default of the Agreements. Upon Gaurantor's death, the estate shall be bound by this Guarantee for all obligations existing at the time of death. The obligations of any surviving guarantors shall continue in full force and effect.

4.     <u>Construction</u>. This Guaranty inures to the benefit of Pearle Vision, its successors and assigns. Guarantor has no right to assign this Guaranty. Wherever possible each provision of this Guaranty will be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Guaranty is prohibited by or invalid under law, the provision will be ineffective to the extent of the prohibition or invalidity without invalidating the remainder of the provision or the remaining provisions of this Guaranty. Captions are solely for the convenience and are not an aid in the interpretation of this Guaranty. This is a continuing Guaranty. Guarantor agrees that the obligations arising under this Guaranty are open and continuing and may not be revoked by Guarantor without written consent from Pearle Vision.

5.     <u>Enforcement.</u>

      (a)     PAYMENTS OF ALL SUMS OF MONEY AND THE PERFORMANCE OF ALL OF THE COVENANTS AND AGREEMENTS UNDER THIS GUARANTY WILL BE PAYABLE AND DUE AT THE OFFICE OF PEARLE VISION IN MASON, OHIO.   THIS GUARANTY AND THE TRANSACTION EVIDENCED BY THIS GUARANTY WILL BE CONSTRUED UNDER THE INTERNAL LAWS OF THE STATE OF OHIO. Any disputes regarding this Guaranty shall resolved in the United States District Court for the Southern District of Ohio – Western Division in accordance with the terms and conditions of the License Agreement.

      (b)     Guarantor shall pay all reasonable costs and expenses incurred by Pearle Vision in enforcing the provisions of this Guaranty, including reasonable attorneys' fees.

      (c)     Guarantor by this Guaranty waives any and all rights Guarantor may have under Chapter 1341 of Title X111 of the Ohio Revised Code, as amended, or any similar provisions under the statutes or common laws of any other state, and Guarantor agrees that the provisions of Chapter 1341 of Title XIII of the Ohio Revised Code, as amended, any similar provisions under the statutes or common laws of any other state, do not and will not apply to this Guaranty.

      (d)     No waiver will be deemed to be made by Pearle Vision of any of its rights under this Guaranty unless the waiver is in writing signed by Pearle Vision.

**CONFIDENTIAL**

**GUARANTOR:**

Dawn Gray

Jeffrey Gray

LOCATION: #8683

Village at Collin Creek
601 W. Plano Pkwy, Suite 141B
Plano, Texas 75075

13

**CONFIDENTIAL**

**EXHIBIT C**

**<u>MUTUAL RELEASE</u>**

[See attached]

14

## MUTUAL RELEASE

**THIS MUTUAL RELEASE** ("Release") is made this 28th day of June, 2016, by and between  Gutman Vision, Inc., a Texas corporation, and Alex Gutman and Milana Gutman, each an individual (individually and collectively herein referred to as "Releasors") and Luxottica Retail North America Inc., Licensed Operator of Pearle Vision, ("Pearle Vision").  Releasors and Pearle Vision are parties to an Assignment and Assumption Agreement effective July 12, 2016, (the "Assignment") for the Pearle Vision EyeCare Center located at Village at Collin Creek, 601 W. Plano Pkwy, Suite 141B, Plano, Texas 75075 (the "Licensed Business") whereby Releasors transferred one hundred percent (100%) of Releasors' right, title and interest in the Licensed Business, the License Agreement effective March 20, 2013 and all other agreements which are related to the franchise to Brave Optical, Inc.

Now, therefore, in consideration of the mutual covenants, promises and conditions contained in the Assignment and for other good and valuable consideration, the receipt of which the parties have acknowledged, Releasor states as follows:

1.      **General Release**.  Releasors, for themselves and itself, their heirs, its successors and assigns, hereby release, acquit and forever discharge Pearle Vision and its successors and assigns and officers, directors, agents, representatives, parent, subsidiary and affiliated companies from all obligations, liabilities, claims, demands, actions and rights of action of any type, kind or nature which they may now have or hereafter have against the parties which arise, or have arisen, out of the License Agreement, Ancillary Agreements, the Assignment on July 12, 2016, ("Transfer Date"), other agreements or contractual relations between them, the operation of the Licensed Location, or the actions of Pearle Vision and its respective employees, agents or servants in conjunction therewith, except as to any violation of the franchise law related to disclosure required by the state where the Licensed Location is located, any ongoing financial obligations to Pearle Vision, and any post-termination or post-expiration obligations outlined in the License Agreement.

2.      Except as otherwise provided in the Guaranty and Assumption of Licensed Operator's Obligations of the Assignment and Assumption Agreement of even date herewith, Pearle Vision, together with its present and future principals, representatives, directors, officers, agents, shareholders, corporations and successors and assigns, does hereby release and forever discharge Releasors and their agents, employees, and attorneys, from any and all claims both known and unknown arising out of or relating to the License Agreement, any guaranty of the License Agreement executed by Releasors.

3.      This Release may be executed in several counterparts and by facsimile transmission, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

15

**CONFIDENTIAL**

**RELEASORS:**
**Gutman Vision, Inc.**

By: _____
      Alex Gutman

Title: _president_____

Date: _6/21/16_____

_____
Alex Gutman, individually

By: _____
      Milana Gutman,

Title: _secretary_____

Date: _6/21/16_____

_____
Milana Gutman, individually

**Luxottica Retail North America Inc.,**
**Licensor of PearleVision**

By: _David L Greater Jr._____

Title: _IVP_____

Date: _June 30, 2016_____

16

**CONFIDENTIAL**

**EXHIBIT D**

**SBA ADDENDUM**

[See attached]

17

**CONFIDENTIAL**

## SBA ADDENDUM RELATING TO LUXOTTICA RETAIL NORTH AMERICA INC. LICENSE AGREEMENT

THIS ADDENDUM (Addendum) is made and entered into on  6 / 2 8 , 20 1 6 , by Luxottica Retail North America Inc., located at 4000 Luxottica Place, Mason, Ohio 45040 (Licensor), and  Brave Optical, Inc.  , located at  601 W Plano Pkwy, Ste 141B, Plano, TX 75075 (Licensed Operator).

### Recitals

Licensor and Licensed Operator entered into a License Agreement effective as of March 20 , 20 13 (License Agreement). Licensed Operator agreed among other things to operate and maintain a franchise located at  601 W Plano Pkwy, Ste 141B, Plano, TX 75075 designated by Licensor as Unit # 8683  (Licensed Business).

Licensed Operator has obtained from  Affiliated Bank  (Lender) a loan (Loan) in which funding is provided with the assistance of the United States Small Business Administration (SBA). SBA requires the execution of this Addendum as a condition for obtaining the SBA-assisted financing.

NOW, THEREFORE, in consideration of the mutual promises below, and for good and valuable considerations in hand paid by each of the parties to the others, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1. The License Agreement is in full force and effect, and Licensor has not sent any written notice of default to Licensed Operator under the License Agreement that remains uncured on the date hereof.

2. If Licensor elects to operate the Licensed Business under Sections 5.11, 16.2.B or 19.4 of the License Agreement, Licensor will operate the Licensed Business for no more than a 120 day renewable term, renewable as necessary for a maximum period of one year and Licensor will periodically discuss the status with the Licensed Operator (or Licensed Operator's heirs, representatives, successors or assigns).

3. Notwithstanding anything to the contrary in Section 5.14 of the License Agreement, Licensed Operator shall have the discretion to set pricing for its products and services provided that, subject to applicable antitrust laws, such pricing: (1) is at or below any maximum price cap programs established by Licensor for its franchise system; or (2) is at or above any minimum price threshold programs established by Licensor for its franchise system; or (3) conforms to any bona fide promotional programs or national or regional accounts programs established from time to time by Licensor for its franchise system.

4. Notwithstanding anything to the contrary in Section 8.4.F of the License Agreement and any security agreement entered pursuant to that Section, Licensor approves Licensed Operator's granting a first lien security interest to Lender in the business assets used at the Licensed Business (collectively, the Collateral) to secure the Loan; provided, however, such approval of Licensor shall not be deemed to interfere with or otherwise pre-empt any lien rights of any landlord or sub-landlord leasing the premises to Licensed Operator, and if such premises are leased and if Licensor is the prime lease tenant, such consent is given only to the extent

1

**CONFIDENTIAL**

permitted by the corresponding prime lease(s) or as otherwise consented to by the lessor(s) under such prime lease(s), and provided further that this approval is not intended to, nor shall it be interpreted or construed as, granting Lender a license to conduct a public or private sale at any of the premises.  The Collateral shall not include any and all interest in the License Agreement, the intellectual property licensed to Licensed Operator pursuant to the License Agreement, and any inventory consigned by Licensor (or its affiliates) to Licensed Operator. In any document granting the security interest to Lender, Lender must and agrees that, notwithstanding execution and delivery of the security instrument in favor of Lender (a) Licensor is not assuming the Loans nor is Licensor incurring any liability whatsoever with respect to the payment or performance of the Loans; and (b) in accordance with UCC Section 9-408(d), Lender agrees that Lender's lien, as it may relate to the License Agreement (i) is not enforceable against Licensor; (ii) does not impose any duty or obligation on Licensor whatsoever; (iii) does not require Licensor to recognize the security interest, pay or render performance to Lender, or accept payment or performance from Lender; (iv) does not entitle Lender to use or assign Licensed Operator's rights under the License Agreement; and (v) does not entitle Lender to use, assign, possess, or have access to any trade secrets or confidential information of Licensor.

5.  If Licensed Operator owns the real estate upon which the Licensed Business is located, Licensor shall have the option to lease the premises for the remainder of the License Agreement's term (excluding additional renewals).

6.  This Addendum automatically terminates on the earliest to occur of the following: (i) a termination occurs under the License Agreement; (ii) the Loan is paid; or (iii) SBA no longer has any interest in the Loan.

7.  This Addendum may be executed in several counterparts and by facsimile transmission, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

   IN WITNESS WHEREOF, the parties hereto have duly signed and executed this Addendum as of the day and year first above written.

LICENSOR:                                    LICENSED OPERATOR:

LUXOTTICA RETAIL NORTH                       Brave Optical, Inc.
AMERICA INC.

By: David L. Reiter Jr.                      By: _____

Print Name: David Reiter                     Print Name: Jeffrey Gray

Title: AVP                                   Title: President

2

**CONFIDENTIAL**

**EXHIBIT E**

**LEASE ASSIGNMENT**

[See attached]

20

**CONFIDENTIAL**

## SECOND ASSIGNMENT AND MODIFICATION OF SHOPPING CENTER LEASE

THIS ASSIGNMENT AND MODIFICATION OF SHOPPING CENTER LEASE (the "Second Assignment"), is made to be effective the 28th day of June, 2016, by and between 700 ALMA INVESTMENTS, LLC (hereinafter referred to as the "Landlord"), for certain premises in the building known as 601 W. Plano Parkway, Suite 141B, City of Plano, Texas (hereinafter referred to as the "Demised Premises"), and between GUTMAN VISION, INC., a Texas corporation, dba PEARLE VISION (the "Assignor"), and BRAVE OPTICAL, INC., a Texas corporation, dba PEARLE VISION (the "Assignee") upon the following terms and conditions:

### WITNESSETH:

WHEREAS, Landlord and PEARLE VISION, INC d/b/a PEARLE VISION ("Original Tenant") executed and delivered a Shopping Center Lease dated on or about OCTOBER 30, 2007 (the "Shopping Center Lease") currently pertaining to approximately 2400 square feet of retail space located in the shopping center known as The Villages of Collin Creek, located at 601 West Plano Parkway, Plano, Texas 75075 (the "Shopping Center").

WHEREAS, Landlord, Original Tenant, and Assignor entered into an Assignment and Modification of Shopping Center Lease dated March 29, 2013, with respect to the Demised Premises, which substituted Assignor as Tenant under the Lease (the "First Assignment"). For purposes of this Second Assignment, the Lease, as modified by the First Assignment and this Second Assignment shall at all times remain the Lease referred to herein.

WHEREAS, Assignor desires to assign all its right title and interest in and to the Lease to Assignee and Assignee desires to accept the assignment, agree to the modifications and become liable for all the obligations under the Lease, as modified by the First Assignment and the Second Assignment; and

NOW, THEREFORE, in consideration of the mutual promises and benefits, obligations and conditions herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor hereby assigns the Lease to Assignee and the Assignee and Landlord hereby agree to amend the Lease as follows:

1.  The Term of the Lease, as modified by the First Assignment, currently extends to April 30, 2020, and Landlord and Assignee agree to extend the Lease for a one year and two month period, thereby making the new expiration date for the Lease, as amended hereby to be June 30, 2021.

2.  The Lease currently provides that Minimum Guaranteed Rental in the amount of $6,200.00 will be due as of April 1, 2016 until April 30, 2018. Notwithstanding anything contained in the Lease or the First Assignment to the contrary, Landlord and Assignee agree to modify the Minimum Guaranteed Rental due under the Lease to the rates set forth in paragraph 3 below for the periods indicated. Assignor will be responsible for the Minimum Guaranteed Rental and any other payments due under the Lease before July 1, 2016 and Assignee will be responsible for the Minimum Guaranteed Rental and any other payments due under the Lease after July 1, 2016.

3.  From the date of execution of the Second Assignment, the term of the Lease will be extended by one year and two months, with the new Lease Term ending June 30, 2021, and the Minimum Guaranteed Rental due under the Lease during the Lease Term shall be as set forth below:

    | | |
    |---|---|
    | 04-01-2016 to 12-31-2016 | $4,921.00 |
    | 01-01-2017 to 04-30-2017 | $5,500.00 |
    | 05-01-2017 to 04-30-2018 | $6,000.00 |
    | 05-01-2018 to 04-30-2019 | $6,200.00 |
    | 05-01-2019 to 04-30-2020 | $6,200.00 |
    | 05-01-2020 to 06-30-2021 | $6,200.00 |

4.  Assignee acknowledges and agrees that the termination option provided in Article 30.1 of the Lease has expired and is without further force or effect as of the date of either the First Assignment or this Second Assignment, and in addition, Assignee shall pay its pro-rata share of all Tenant's ancillary charges (Common Area Maintenance Expense, Real Estate Taxes and Insurance) during the new Lease Term as set forth above.

5.  Jeffrey Gray, the owner of Assignee has agreed to sign a guarantee of the Lease in the form attached hereto as Exhibit "A" as part of the consideration for this Second Assignment. Effective upon the execution of this Agreement and said Guarantee by Jeffrey Gray, Landlord will release Alex Gutman, the current guarantor of the Lease ("Gutman"), from all obligations and liabilities under that certain Guaranty of the Lease dated March 27, 2013, from Gutman in favor of Landlord (the "Gutman Guaranty"), and the original Gutman Guaranty shall be deemed to be null and void.

6.  Tenant is granted the option to extend the term of the Lease for one (1) term of five (5) years beyond the Current Lease Term (the "Option Term"), provided (a) Tenant is not in default at the time of exercise of the option, and (b) Tenant gives written notice of its exercise of the option no earlier than two hundred seventy (270) days and no later than one hundred eighty (180) days prior to the expiration of the original term or the expiration of the then existing term. The Option

**CONFIDENTIAL**

Term shall be upon the same terms, conditions and rentals, except (1) Tenant shall have no further right of renewal after the Option Term prescribed above, and (2) the monthly Minimum Guaranteed Rental will be equal to whatever monthly Minimum Guaranteed Rental Landlord is then quoting to prospective tenants for new leases of comparable space in the Shopping Center for a comparable term (as confirmed by written statement to Tenant by a representative of Landlord), or if no comparable space exists in the Shopping Center, then whatever is then being quoted to prospective tenants for new leases of reasonably comparable space in reasonably comparable shopping centers within the same general geographical area as the Shopping Center (also as confirmed by written statement to Tenant by a representative of Landlord) (the "Prevailing Rental Rate").  Notwithstanding the above provisions to the contrary in no event will the adjusted monthly Minimum Guaranteed Rental for any option period be lower than the monthly Minimum Guaranteed Rental for the immediately preceding period.  Within 30 days after receipt of Tenant's notice of intent to exercise the Option Term, Landlord shall deliver to Tenant written notice of the Prevailing Rental Rate and shall advise Tenant of the required adjustment to Minimum Guaranteed Rental based on the Prevailing Rental Rate.  Tenant shall, within ten (10) days after receipt of Landlord's notice, notify Landlord in writing whether Tenant accepts or rejects Landlord's determination of the Prevailing Rental Rate.  If Tenant timely notifies Landlord that Tenant accepts Landlord's determination of the Prevailing Rental Rate, then, on or before the commencement date of the Option Term, Landlord and Tenant shall execute an amendment to the Lease extending the term of the Lease for the Option Term on the same terms provided in the Lease, except as follows:

    a.  Tenant shall have no further renewal option unless expressly granted by Landlord in writing; and

    b.  Landlord shall lease to Tenant the Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements.

If Tenant rejects Landlord's determination of the Prevailing Rental Rate, or fails to timely notify Landlord in writing that Tenant accepts or rejects Landlord's determination of the Prevailing Rental Rate, time being of the essence with respect thereto, Tenant's rights under the Lease, as amended by this Second Assignment shall terminate and Tenant shall have no right to renew the Lease.

7.    Except as expressly modified by this Second Assignment, all other terms and conditions of the Lease will continue in full force and effect and Landlord and Tenant hereby ratify and confirm the terms, provisions and conditions of, and representations, covenants and agreements set forth in the Lease as amended by this Second Assignment, and Tenant (both Assignor and Assignee) specifically acknowledges the validity, binding effect and enforceability of the Lease as hereby amended.  This Second Assignment shall be binding upon the parties hereto and their respective successors and assigns.

8.    Assignee certifies to Landlord as to the accuracy, insofar as it pertains to Assignee, of the items discussed in Articles 28.1 and 28.2 of the Lease.

9.    Assignor and Assignee  each further acknowledges that, to the best of its knowledge as of the date of this Second Assignment, neither Assignor nor Assignee has any existing claims or defenses (personal or otherwise), whatsoever with respect to any defaults under the Lease and Assignor and Assignee each further acknowledges and represents that to the best of its knowledge no condition currently exists which would constitute a default by Landlord under the Lease, or this Second Assignment, either with or without notice or lapse of time, or both.

10.    Assignor and Assignee, their respective principals, employees, agents, representatives and attorneys agree to keep the terms of this Second Assignment strictly confidential and shall not disclose either directly or indirectly the terms of this Second Assignment to any person or entity without the prior written permission of Landlord; provided, however, that Landlord's permission shall not be required for disclosure compelled by applicable laws, rules and regulations and disclosures to Assignee's or Assignor's lenders, current or bona fide potential investors, accountants and members of Assignee's or Assignor's Board of Directors and Assignee's or Assignor's officers, agents, employees and professional representatives.

**CONFIDENTIAL**

EXECUTED and EFFECTIVE this __28th____ day of June, 2016.

GUTMAN VISION, INC.

ASSIGNOR:          By:
                   Its: _____
                        Alex Gutman   President

                   Date: _____6/21/16_____

BRAVE VISION, INC.

ASSIGNEE:          By _____
                      Jeffrey Gray   President
                   Its:

                   Date: _____6/21/16_____

LANDLORD:

700 ALMA INVESTMENTS, LLC

                   By: _____
                      Larry Vineyard, Authorized Signatory

                   Date: _____6/21/16_____

Page 3

**CONFIDENTIAL**

Exhibit "A"

Guaranty

In order to induce 700 Alma Investments, LLC. ("**Landlord**") to consent to the foregoing Second Assignment and Amendment of Lease Agreement (the "**Second Assignment**") between Gutman Vision, Inc ("**Assignor**") and Brave Vision, Inc. ("**Assignee**"), for certain Demised Premises in 601 W. Plano Parkway, Suite 141B, Plano, Collin County, Texas, the undersigned (whether one or more, "**Guarantor**") has guaranteed, and by this instrument does hereby guarantee, the payment and performance of all liabilities, obligations and duties (including but not limited to, payment of rent) imposed upon Tenant under the terms of this Lease, as if Guarantor executed this Lease as Tenant hereunder.

Guarantor hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Tenant under this Lease, and waives diligence, presentment and suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

Guarantor further agrees Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against Guarantor. Suit may be brought and maintained against Guarantor by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. The liability of Guarantor shall not be affected by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord end Tenant, and shall not be impaired, modified, changed, released or limited in any manner whatscever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Act, or any similar law or statute of the United States or any state thereof. Landlord and Tenant, without notice to or consent by Guarantor, may at any time or times enter into such extensions, renewals, amendments, assignments, subleases, or other covenants with respect to this Lease as they may deem appropriate, and Guarantor shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under this Lease as so extended, renewed, amended, assigned or otherwise modified.

It is understood that other agreements similar to this guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to this Lease. This Guaranty shall be cumulative of any such agreements and the liabilities and obligations of Guarantor hereunder shall in no event by affected or diminished by reason of such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this page or by obtaining additional guarantee agreements, or both, Guarantor agrees that Landlord, in Landlord's sole discretion, may (a) bring suit against all guarantors of this Lease jointly and severally or against any one or more of them, (b) compound or settle with any one or more of the guarantors for such consideration as Landlord may deem proper, and (c) release one or more of the guarantors from liability. Guarantor further agrees that no such action shall impair the rights of Landlord to enforce this Lease against any remaining guarantor or guarantors, including Guarantor.

If Guarantor is a corporation, the undersigned officer personally represents and warrants that the Board of Directors of such corporation, in a duly held meeting, has determined this Guaranty may reasonably be expected to benefit the corporation.

Guarantor agrees if Landlord shall employ an attorney to present, enforce or defend all of Landlord's rights or remedies hereunder, Guarantor shall pay any reasonable attorney's fees incurred by Landlord in such connection.

This Guaranty shall be binding upon Guarantor and the successors, heirs, executors and administrators of Guarantor, and shall inure to the benefit of Landlord and Landlord's heirs, executors, administrators and assigns.

Page 4

**CONFIDENTIAL**

EXECUTED as of 28 th day of April, 2016.

GUARANTORS:

JEFFERY GRAY

INDIVIDUAL
Type of Guarantor (individual)*

8579 Mountain Sky Rd
Frisco, TX 75034
Address (printed or typed)

454190845
Social Security/Taxpayer Identification Number

1395157
Drivers License Number

Drivers License Number

By: _____
              Signature
* If, and only if, the Guarantor is a corporation, trust
or other entity and Signatory is signing as the
officer of such Guarantor, specify the title of the
Signatory:

President

Page 5

**CONFIDENTIAL**