# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| LUXOTTICA OF AMERICA, INC., | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:22-CV-244 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| BRAVE OPTICAL, INC., et al., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff Luxottica of America, Inc.'s Motion for Preliminary Injunction (Dkt. #55). Having considered the motion, the relevant pleadings, and the applicable law, the Court finds that Plaintiff's motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case concerns a trademark dispute between Plaintiff Luxottica of America, Inc. ("Luxottica") and Defendants Jeffrey and Dawn Gray (the "Grays") and Brave Optical, Inc., (collectively, the "Brave Parties") regarding (1) the Brave Parties' use of Luxottica's trademarks and service marks at two vision stores they own and operate in Plano, Texas, and (2) the Grays' operation of a competing business in violation of the parties' non-compete agreements.

## I.      Luxottica's Pearle Vision Brand

Luxottica operates and franchises distinctive optical retail stores throughout the United States under the brand "Pearle Vision" (Dkt. #54 at p. 3).  As part of its branding, Luxottica advertises and publicizes "certain distinctive symbols as legally protected trademarks, trade dress and service marks" (collectively, the "Pearle Vision Marks") (Dkt. #55 at p. 12).  More specifically, Luxottica contends that its trade dress

consists of the distinctive design and layout of a retail store featuring a clean modern appearance, consisting of light-colored wood wall panels and desk furniture, light-colored wood shelving and accents, and beige seating and flooring.  The interior is marked by square décor panels above square multitiered shelving, incorporating distinctive department and header graphics and brand and storytelling fixtures

(the "Pearle Vision Trade Dress") (Dkt. #55 at p. 12).  And Luxottica's registered Pearle Vision

trademarks include:



(collectively, the "Pearle Vision Trademarks") (Dkt. #55 at pp. 12–13).

According to Luxottica, it has expended substantial resources in developing, advertising, and promoting the Pearle Vision Marks (Dkt. #55 at p. 14).  Now, Luxottica contends that Pearle Vision stores are "widely recognized and exclusively associated by consumers, the public, and the trade as being high quality stores with high quality products sourced from Luxottica" (Dkt. #55 at p. 14).  Thus, Luxottica argues that there is valuable goodwill associated with Pearle Vision stores, products, and services (Dkt. #55 at p. 14).

## II.    The 2016 Sale and the License Agreements

Pursuant to license agreements between Luxottica and its franchisees, Luxottica grants its franchisees a limited license and authority to use and display the Pearle Vision Marks, but only in such manner, and at such locations and times, as are expressly authorized by Luxottica (Dkt.

2

#55 at p. 5).  In 2016, the Grays purchased two optical retail stores from a former Pearle Vision franchisee, Gutman Vision, Inc. ("Gutman Vision") (Dkt. #55 at p. 5).  The stores are located in Plano, Texas: one store is located at 1713 Preston Rd., Ste. A, Plano, Texas 75093 ("Store 8655") and the other store is located at 601 W Plano Pkwy, Ste. 141 B, Plano, Texas 75075 ("Store 8683") (collectively, the "Stores") (Dkt. #55).  Gutman Vision entered into two franchising agreements with Luxottica for the Stores, which were substantively the same, and, as part of the sale, Pearle Vision, Gutman Vision, and the Brave Parties entered into an Assignment and Assumption of the License Agreement (individually, the "License Agreement"; collectively, the "License Agreements") for the Stores (Dkt. #54, Exhibits 1–4).  In the License Agreements, the Brave Parties took over all obligations and duties that had previously been the responsibility of Gutman Vision (Dkt. #54, Exhibits 3, 4).

The License Agreements granted the Brave Parties the right to use Pearle Vision Marks subject to the following:

> The Marks are the exclusive property of Pearle Vision, and nothing in this Agreement gives Franchisee any right, title or interest in or to any of the Marks except as a mere privilege and license during the term of this Agreement to display and use the Marks according to the limitations set forth in this Agreement. All uses of the Marks by Franchisee inure to the benefit of Pearle Vision. . . . During and after the term of this Agreement, Franchisee will neither (i) represent in any manner that Franchisee has acquired any ownership or equitable rights in any of the Marks by virtue of the limited license granted in this Agreement or of the Franchisee's use of the Marks, nor (ii) in any way dispute or impugn the validity of the Marks, the rights of Pearle Vision in the Marks, or the rights of Pearle Vision or other franchisees of Pearle Vision to use the Marks.

(Dkt. #55, Exhibit 1 at pp. 44–45).  Additionally, the License Agreements contains a provision stating that

> Franchisee explicitly affirms and recognizes the unique value and secondary meaning attached to the Pearle Vision System and the Marks.  Accordingly, Franchisee agrees that any non-compliance with the terms of this Agreement, or any unauthorized or improper use of the Pearle Vision Systems or the Marks will cause irreparable damage to Pearle Vision and other franchisees of Pearle Vision.

> If Franchisee engages in any non-compliance with the terms of this Agreement, or in any unauthorized and/or improper use of the Pearle Vision System or Marks, during or after the termination or expiration of this Agreement, Pearle Vision will be entitled to both temporary and permanent injunctive relief against Franchisee from any court of competent jurisdiction, in addition to all other remedies that Pearle Vision may have at law or in equity.  Franchisee consents to the entry of temporary and permanent injunctions of that type, and Franchisee waives the posting of any bond by Pearle Vision in connection with those injunctions.

(Dkt. #55, Exhibit 1 at p. 46).

Importantly, the License Agreement prohibits the Brave Parties' right to use the Pearle Vision Marks upon the expiration date or upon termination of the License Agreement (Dkt. #55, Exhibit 1 at p. 69).  By its terms, the License Agreement for Store 8655 was originally set to expire on November 22, 2021 (Dkt. #54 at p. 10).  However, on August 23, 2021, the parties agreed to extend the expiration date of the License Agreement to February 28, 2022 (Dkt. #55, Exhibit 1 at pp. 179–81).  On February 11, 2022, Luxottica sent a Notice of Non-Renewal to the Brave Parties, informing them that the License Agreement of Store 8655 would not be renewed upon its expiration and ordering them to cease all business operations and use of the Pearle Vision Trademark upon the License Agreement's expiration on February 28, 2022 (Dkt. #55, Exhibit 1 at pp. 182–84).

Further, on October 19, 2022, Luxottica sent the Brave Parties a Notice of Default for Store 8683, indicating that Luxottica believed the Brave Parties to be in default of the License Agreement for failure to pay royalties and advertising fees when due (Dkt. #54, Exhibit 8 at p. 2).  Luxottica gave the Brave Parties thirty days to cure the default (Dkt. #54, Exhibit 8 at p. 2).  On November 19, 2022, when the Brave Parties did not cure the default, Luxottica sent a letter to the Brave Parties that the License Agreement for Store 8683 was terminated.

The License Agreements also contain identical covenants not to compete (individually, the "Non-Compete Agreement"; collectively, the "Non-Compete Agreements"), whereby the

4

Grays agreed not to engage or participate in a competing business within a three-mile radius of the Stores, either directly or indirectly, for a period of one year after their ownership of the Stores ended (Dkt. #55, Exhibit 1 at pp. 157–60).  The Grays agreed that a violation of the Non-Compete Agreement would result in immediate and irreparable injury to Luxottica (Dkt. #55, Exhibit 1 at pp. 157, 159).  In addition, the Grays consented to entry of an injunction if they violated the Non-Compete Agreement  (Dkt. #55, Exhibit 1 at pp. 157–60).

### III.    The Ongoing State Court Action

In 2017, the Brave Parties filed suit against Gutman Vision and its principals for alleged fraudulent misrepresentation in connection with the 2016 sale of Store 8655 in the 101st Judicial District Court, Dallas County, Texas (the "State Action") (Dkt. #14 at p. 2).  In 2019, the Brave Parties added Luxottica to the State Action, alleging that Luxottica knowingly assisted the fraud by making affirmative misrepresentations and concealing material facts to induce the Brave Parties into the sales transactions (Dkt. #14 at p. 2).

On February 24, 2022, the Brave Parties filed an application for a temporary restraining order and injunctive relief against Luxottica in the State Action, which the state court granted the next day (Dkt. #14 at p. 3).  In the application, the Brave Parties explained that injunctive relief was necessary to maintain the status quo through the State Action's trial for several reasons— namely, because compliance with the demands in the Notice of Non-Renewal would cause the Brave Parties to default on their lease at Store 8655 and a small business administration loan (Dkt. #14 at p. 3).  On March 10, 2022, after holding a temporary injunction hearing, the state court entered a temporary injunction (the "State Injunction") (Dkt. #14, Exhibit 2).  As explained in the State Injunction, the state court found that "the last actual, peaceful, and non-contested status enjoyed by the parties was at the time that [the parties] were operating under the August

5

23, 2021, Status Quo Agreement" and accordingly that "that status should be maintained for the protection of all parties pending resolution of this lawsuit" (Dkt. #14, Exhibit 2 at p. 7).   In addition, in the State Injunction, the state court noted that "this Temporary Injunction shall continue until the completion of the trial of this cause on the merits herein and any succeeding appeals" (Dkt. #14, Exhibit 2, at p. 8).

On March 29, 2022, the state court issued an order clarifying the State Injunction (the "Clarification Order") (Dkt. #14, Exhibit 4).  The Clarification Order revised the State Injunction to: (i) remove EyeMed Vision Care LLC; (ii) remove all references to Store 8683; and (iii) "only extend until completion of the trial of this cause, which trial is set for May 3, 2022; The Temporary Injunction does not extend through 'any succeeding appeals'" (Dkt. #14, Exhibit 4). Notably, the Clarification Order further explained that (i) "[t]he term 'interfere' as used in the [State] Injunction is only intended to mean actions to force Plaintiffs to close down Store #8655[;]" (ii) the State Injunction "does not prohibit Luxottica of America Inc. from pursuing claims against Plaintiffs in federal court[;]" and (iii) the State Injunction "does not prohibit Luxottica of America Inc. from sending statements of account, franchise reports, or other franchise-related materials that are not for the purpose of closing Store #8655" to the Brave Parties (Dkt. #14, Exhibit 4).

The jury trial in the State Action was delayed and did not begin until September 12, 2022. The jury in the State Action returned a verdict on September 17, 2022 (Dkt. #58, Exhibit 1).  On December 30, 2022, the state court issued a Final Judgment, indicating, among other things, that the jury made findings of fraud, fraud by non-disclosure, and conspiracy to defraud relating to the License Agreements (Dkt. #58, Exhibit 1 at pp. 2–3).  Also, relevant here, in the Final Judgment, the state court noted that: "The Court finds that Defendant LUXOTTICA has

withdrawn its interim appeal from the Temporary Injunction entered by the Court on March 20, 2022, as modified on March 29, 2022.  Accordingly, the Temporary Injunction remains in effect according to its terms" (Dkt. #58, Exhibit 1 at p. 8).

### IV.     The Brave Parties Rebrand and De-Identify Store 8655

After the State Action trial, the Brave Parties hired a third-party vendor who began removing all Pearle Vision Marks and Trade Dress from the Stores (Dkt. #58 at p. 9).  By October 17, 2022, the Brave Parties argue that they had entirely removed all of the Pearle Vision Marks, trade dress, and the green color scheme—including posters, photos, and logos—from the Stores and claim that, as of that date, the Stores were fully rebranded as "Brave Optical" (Dkt. #58 at p. 9).  Now, the Stores have blue signs and accent walls, new light fixtures, updated external monuments, new business cards, and new branded floor mats (Dkt. #58 at p. 9). Additionally, the Brave Parties "updated their credit card machines to preclude any mention of Pearle Vision on customer receipts, changed their phone system to remove any mention of Pearle Vision in the voiceover and obtained a new tax license that reflected they were no longer operating as a Pearle Vision store" (Dkt. #58 at p. 9).  The Brave Parties did not, however, change the light-colored wood wall panels, desk furniture, shelving, or accents (Dkt. #58 at p. 9).

On December 1, 2022, after the Brave Parties de-identified and rebranded the Stores, a representative from Pearle Vision, Jon Womack ("Womack"), visited the Stores to review the Brave Parties' de-identification efforts (Dkt. #58 at p. 14).  Womack found no instances of continued use of the Pearle Vision Trademarks and specifically noted that all Pearle Vision signs had been removed (Dkt. #55 at p. 34).  However, Womack believes that the Brave Parties were still using the Pearle Vision Trade Dress (Dkt. #55 at p. 35).  According to the Brave Parties, when Womack was at the store, he identified several instances where the Brave Parties were still

using "'proprietary' fixtures . . . including generic gender and brand headers and labels (i.e., signs that identify the eyewear in a particular section as 'men' 'women' 'youth' or belonging to a particular fashion brand), square display stands, and a green-colored sign that said 'Doctor'" (Dkt. #58 at p. 14).  The Brave Parties contend that Womack told them the doctor sign had to come down because it was "Pearle Vision green" and the other signs had to come down because they originally came from Pearle Vision (Dkt. #58 at p. 14).  According to the Brave Parties, however, Womack did not mention the Brave Parties' use of light-colored wood panels, accents, or furniture (Dkt. #58 at p. 14).  After the visit from Womack, the Brave Parties removed the signage Womack identified as proprietary (Dkt. #58 at p. 14).  Since then, no other Pearle Vision representative has visited the Stores (Dkt. #58 at p. 14).

In addition to making physical changes to the Stores, the Brave Parties have also attempted to de-identify the Stores online, "including updating their social media pages and internet listings from 'Pearle Vision' to 'Brave Optical' and creating a new Google page for Brave Optical" (Dkt. #58 at p. 14).  The Brave Parties have also attempted to change their Facebook page to reflect that the Stores' are now Brave Optical Stores (Dkt. #58 at p. 15).  However, "as recently as December 30, 2022, 'Luxottica Group' changed Store 8683's Facebook page from 'Brave Optical' to 'Pearle Vision Village at Collin Creek' and redirected visitors to Pearle Vision's website"  (Dkt. #58 at p. 15).  "Similar trespasses occurred on Store 8655's page as recently as October 23, 2022"  (Dkt. #58 at p. 15).

The following photos represent Store 8655, as well as the signage outside Store 8655, as it looks today:







(Dkt. #58 at p. 10).  Additionally, the following photos represent Store 8683, as well as the signage outside Store 8683, as it looks today:










(Dkt. #58 at p. 11).

## V.       The Current Action

On March 28, 2022, Luxottica filed suit against the Brave Parties in this Court (Dkt. #1).

On December 20, 2022, Luxottica filed its First Amended Complaint (Dkt. #54).   Initially,

Luxottica only complained of the Brave Parties' use of the Pearle Vision Marks at Store 8655.

*See generally* (Dkt. #1).   Since the filing of the First Amended Complaint, however, Luxottica

now also complains of the Brave Parties' use of the Pearle Vision Marks at Store 8683.  *See generally* (Dkt. #54).  Additionally, in its original complaint, Luxottica did not bring any trade dress infringement claims.  *See generally* (Dkt. #1).  Now, Luxottica alleges that the continued use of the Pearle Vision Marks constitutes trademark infringement, trade dress infringement, false designations of origin, unfair competition, and trademark dilution, in violation of 15 U.S.C. §§ 1114, 1125, as well as common law trademark infringement, trade dress infringement, unfair competition, breach of contract, and unjust enrichment (Dkt. #54).

On April 5, 2022, Luxottica filed a motion for a temporary restraining order (the "TRO") (Dkt. #10).  Ultimately, the Court denied the motion (Dkt. #29).  The Court determined that the Anti-Injunction Act, which prohibits federal courts from issuing injunctions that countermand a state court injunction, prevented the Court from granting the TRO without directly risking interfering with active state proceedings (Dkt. #29 at p. 11).

Now, Luxottica again seeks injunctive relief from the Court.  On December 27, 2022, Luxottica filed the present motion, requesting the Court enjoin the Brave Parties from further use of the Pearle Vision Marks (Dkt. #55 at p. 7).  In addition, Luxottica requests the Court enjoin the Brave Parties from further breach of the non-compete provisions in the License Agreement (Dkt. #55 at p. 7).  On January 1, 2023, the Brave Parties responded (Dkt. #58).  On January 19, 2023, Luxottica filed its reply (Dkt. #58).  And, on January 26, 2023, the Brave Parties filed their sur-reply (Dkt. #67).  On February 15, 2023, the Court held a hearing regarding the preliminary injunction (Dkt. #76).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer

irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.*  Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing.*" Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)).  The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

At a high level, Luxottica seeks a preliminary injunction enjoining (1) the Brave Parties from any continued use of the Pearle Vision Marks, and (2) the Grays from engaging or participating in a competing business until October 19, 2023.  The Court will first address whether it should grant on injunction preventing the Brave Parties from using the Pearle Vision Marks.  The Court will then turn to whether it should grant an injunction preventing the Grays from competing against Luxottica in violation of the Non-Compete Agreements.

## I.    Whether the Court Should Grant an Injunction Regarding the Pearle Vision Marks

Luxottica failed to present evidence—both in its motion and during the February 15 hearing—that would allow the Court to find that Luxottica has "clearly carried" its burden on the four preliminary-injunction elements as to the Brave Parties' alleged continued use of the Pearle Vision.  Thus, Luxottica is not entitled to the extraordinary remedy of a preliminary injunction on that issue.

### A.  There is Not a Likelihood of Success on the Merits

Luxottica has not shown that it is likely to succeed on the merits of its trademark and trade dress infringement claims.  "The Lanham Act establishes liability against '[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .'"  *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-00227, 2020 WL 4016110, at *9 (E.D. Tex. July 16, 2020) (quoting 15 U.S.C. § 1125(a)(1)(A)).  Specifically, for trademark and trade dress infringement claims, the Lanham Act requires Luxottica to show: (1) that it owns a legally protectable trademark; and (2) that the Brave Parties' use of its marks creates a likelihood of confusion as to source, affiliation, or sponsorship.  *See Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 483 (E.D. Tex. 2020); *Blue Bell Bio-Med v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989).  The Court will first address whether Luxottica is likely to succeed on the merits of its trade dress infringement claim.  Then, the Court will turn to whether Luxottica is likely to succeed on the merits of its trademark infringement claim.

### 1.  Luxottica Has Not Shown That It is Likely to Succeed on Its Trade Dress Infringement Claim

At this juncture, Luxottica has not shown that it is likely to succeed in proving that the Pearle Vision Trade Dress is protected.  Trade dress "refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterizes a particular product."  *Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th. Cir. 2015) (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010)).

Trade dress has been expanded to also include the overall "motif" of a retail store.  *Cf. Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, No. 4:19-CV-00067, 2019 WL 1560442, at *4 (E.D. Tex. Apr. 10, 2019) (trade dress includes the overall "motif" of a restaurant).

Luxottica does not possess a federal registration for its trade dress.  However, the Pearle Vision Trade Dress may still be protected under the Lanham Act.  To gain protection, unregistered trade dress must be: (1) distinctive; and (2) nonfunctional.  *Id.*  Trade dress "can be distinctive in one of two ways."  *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  First, a mark can be "inherently distinctive if its intrinsic nature serves to identify a particular source."  *Id.*  Second, a mark can acquire distinctiveness when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  *Id.* at 211.  Trade dress, like a mark, can be inherently distinctive, even without acquiring secondary meaning.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774–76 (1992).

*Sparrow Barns* and *Taco Cabana* provide guidance on how courts should handle issues of inherent distinction for trade dress.  In *Sparrow Barns*, this Court followed *Taco Cabana*'s lead and looked towards the actual description of the party's trade dress; Sparrow Barns described its trade dress for the "White Sparrow" as:

> a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed, decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers; rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall.

*Sparrow Barns*, 2019 WL 1560442, at *4. And in *Taco Cabana*, Taco Cabana described its trade dress as:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings, and murals.  The patio includes interior and

14

exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors.  The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes.  Bright awnings and umbrellas continue the theme.

*Sparrow Barns*, 2019 WL 1560442, at *4 (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir. 1991), *aff'd sub nom*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)).  In *Sparrow Barns*, this Court found that, like Taco Cabana, Sparrow Barns could "likely show the trade dress of the Grand Hall [was] inherently distinctive because its intrinsic nature serves to identify its source as the White Sparrow." *Id.*

Luxottica's definition of the Pearle Vision Trade Dress does not similarly serve to identify Pearle Vision as its source.  As noted, Luxottica defines the Pearle Vision Trade Dress as

consist[ing] of the distinctive design and layout of a retail store featuring a clean modern appearance, consisting of light-colored wood wall panels and desk furniture, light-colored wood shelving and accents, and beige seating and flooring.  The interior is marked by square décor panels above square multitiered shelving, incorporating distinctive department and header graphics and brand and storytelling fixtures

(Dkt. #55 at p. 12).  In their response, the Brave Parties point out that many optical stores unaffiliated with Pearle Vision have developed a modern look with the same elements of the Pearle Vision Trade Dress defined by Luxottica (Dkt. #58 at p. 12).  After comparing the Pearle Vision Trade Dress and the examples of other optical stores provided by the Brave Parties, the Court finds that significant factual disputes prevent it from determining that Luxottica is likely to succeed in showing that the intrinsic nature of the Pearle Vision Trade Dress serves to identify Pearle Vision as the particular source.[1] *See Goodman v. Dell Publ'g Co.*, No. 94-CV-3028, 1995 WL 301380, at *2 (E.D. La. May 15, 1995) (finding that a factual dispute "preclude[d] the Court

---

[1] The Court notes that the parties agreed to a bench trial.  However, if the parties would rather have a jury of their peers decide these factual disputes instead of the Court, the Court will set this case for a jury trial.

from determining the likelihood of success on the merits" and concluding plaintiff therefore "failed to meet her heavy burden" on the likelihood-of-success element).

Furthermore, Luxottica has not shown, at this stage, that it is likely to succeed in showing that the Pearle Vision Trade Dress has developed a secondary meaning.  Even if trade dress is not inherently distinct, it "acquires distinctiveness . . . if it has developed secondary meaning." *AMID*, 241 F. Supp. 3d at 808 (citing *Wal-Mart*, 529 U.S. at 211).  "[S]econdary meaning . . . occurs when, in the minds of the public, the primary significance of a [trade dress] is to identify the source."  *Wal-Mart*, 529 U.S. 205 at 211.  In examining the evidence, the Court's "focus is on how [the evidence] demonstrates that the meaning of the . . . trade dress has been altered in the minds of consumers."  *Amazing Spaces*, 608 F.3d at 248.  "The inquiry is one of the public's mental association between the [trade dress] and the alleged [trade dress] holder."  *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008).  Thus, "the determination [of] whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry."  *Amazing Spaces*, 608 F.3d at 248.  To determine whether a plaintiff has established that the claimed trade dress has acquired secondary meaning, the Court examines the following seven factors: (1) length and manner of use of the trade dress; (2) volume of sales; (3) amount and manner of advertising; (4) nature of use of the trade dress in newspapers and magazines; (5) consumer survey evidence; (6) direct consumer testimony; and (7) the defendant's intent in copying the trade dress.  *See Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 544 (5th Cir. 2015) (quoting *Amazing Spaces*, 608 F.3d at 248).  "While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers between a product and its source."  *Id.* (cleaned up).

16

Luxottica does not address these factors whatsoever.  In fact, other than its conclusory statement that "Pearle Vision's trade dress also has secondary meaning due to the public's association and familiarity with the look of a Pearle Vision store, as seen on Main Streets and in malls all over the U.S.," Luxottica offers no support for its proposition that the Pearle Vision Trade Dress has developed any kind of secondary meaning in the eyes of the public (Dkt. #55 at p. 20).  Without more, the Court does not believe that Luxottica has shown it is likely to succeed in showing that the Pearle Vision Trade Dress has acquired a secondary meaning at this stage.

Because the Court determined that Luxottica is not likely to succeed in showing that the Pearle Vision Trade Dress is distinctive or has developed a secondary meaning, the Court need not determine whether Luxottica is likely to succeed in showing that the Pearle Vision Trade Dress is nonfunctional.  Nor does the Court need to address whether Luxottica is likely to succeed in showing that there is a likelihood of confusion regarding the Pearle Vision Trade Dress.

In sum, the Court cannot hold that Luxottica has not sufficiently established it is likely to prevail on the merits of its trade dress infringement claim.  Thus, this factor weighs against granting a preliminary injunction.  The Court notes, however, that this holding does not preclude Luxottica from later proving up and succeeding on its trade dress infringement claim.  To be sure, Luxottica could still ultimately prevail on this issue.

### 2. Luxottica Has Not Shown That It is Likely to Succeed on Its Trademark Infringement Claim

The Court now turns to whether Luxottica is likely to succeed on the merits of its trademark infringement claim.  "A plaintiff must establish both that the mark is 'eligible for protection' and that the plaintiff is the 'senior user' of the mark to have a legally protectable interest in the mark." *Fletcher's*, 434 F. Supp. 3d at 483.  In determining the protectability of a

17

mark, courts must determine whether the mark is registered—registered marks are afforded the presumption of validity.  15 U.S.C. § 1115 ("Any registration . . . of a mark . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . .").  Here, neither party disputes that the Pearle Vision Trademarks are registered.  As such, the Court presumes the validity and registration of the Pearle Vision Trademarks.

Having shown that the Pearle Vision Trademarks are likely eligible for protection, the Court must determine if Luxottica is likely to succeed in showing that it is the senior user of the Pearle Vision Trademarks.  *See e.g.*, *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 844.  "The first one to use a mark is generally held to be the 'senior' user."  *Fletcher's*, 434 F. Supp. 3d at 486 (internal citations omitted).  Luxottica has used the Pearle Vision Trademarks since the founding of Pearle Vision in 1961 (Dkt. #55 at pp. 11–12).  Luxottica has established, and the Brave Parties do not dispute, that Luxottica owns all rights, title, and interest in and to the Pearle Vision Trademarks.  As such, Luxottica is likely to succeed in showing that it is the senior user of the Pearle Vision Trademarks.

Luxottica will likely establish that it has an interest in legally protectable marks and that Luxottica is the senior user of those marks.  Accordingly, Luxottica is likely to succeed on the first element of its trademark infringement claim.  However, the Court cannot hold, at this time, that Luxottica is likely to succeed on the merits of the second element of its trademark infringement claim because of factual disputes.

The second element of a trademark infringement claims requires courts to determine whether a defendant's use of the plaintiff's mark caused a likelihood of confusion about the plaintiff's mark.  The Fifth Circuit has identified a non-exhaustive "digits of confusion" to guide

courts in determining whether use of a mark has created a likelihood of confusion.  *Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019).  These digits include:

> (1) Strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.

*Id.*  No one factor is dispositive.  *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 310 (5th Cir. 2008).  Indeed, "a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'"  *Id.* (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)).  "These digits are flexible," serving only as guides for how courts should evaluate whether there is a likelihood of confusion.  *Id.*  Accordingly, courts should "keep in mind two important principles while applying these digits: (1) '[they] must consider the application of each digit in light of the specific circumstances of the case'; and (2) '[they] must consider the marks in the context that a customer perceives them in the marketplace.'"  *Id.* (internal citations omitted).

Luxottica argues that the digits demonstrate it is likely to succeed in showing a likelihood of confusion.  The Court disagrees.  As with Luxottica's trade dress infringement claim, the Court finds that the digits of confusion are marred with factual disputes that prevent the Court from currently determining that Luxottica is likely to show a likelihood of confusion.  *Goodman*, 1995 WL 301380, at *2.  Accordingly, this factor weighs against granting a preliminary injunction.

Again, this does not preclude Luxottica from later succeeding on its trademark infringement claim.  Indeed, Luxottica could still ultimately prevail.

### B.  Luxottica Has Not Suffered Irreparable Harm

Luxottica must demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A harm is

irreparable where there is no adequate remedy at law.  *Paulsson Geophysical*, 529 F.3d at 311.

Generally, this occurs when the harm cannot be undone through monetary damages.  *Id.*  But

"the mere fact that economic damages may be available does not always mean that a remedy at

law is 'adequate.'"  *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  "An injunction is

appropriate only if the anticipated injury is imminent and not speculative."  *Cyrus One LLC v.*

*Levinsky*, No. 4:19-CV-00043, 2019 WL 4305613, at *7 (E.D. Tex. Sept. 11, 2019) (citing

*Winter*, 555 U.S. at 22). "Grounds for irreparable injury include loss of control of reputation, loss

of trade, and loss of goodwill."  *Fletcher's*, 434 F. Supp. 3d at 496 (internal citations removed).

      Luxottica argues that it is currently suffering irreparable harm because the Brave Parties

are actively infringing on its trademarks and trade dress.  The Court finds that the Brave Parties

presented evidence that their rebranding processes likely remedied any harm.  Indeed, the

affidavit provided by Luxottica's own representative, Womack, reveals that the Brave Parties

took down all the Pearle Vision signs before he visited the Stores on December 1, 2022 (Dkt.

#55 at p. 34).  Luxottica also has not presented evidence showing that it has experienced a loss of

control of reputation, a loss of goodwill, or a loss of trade.  Luxottica has pointed to nothing that

would indicate it is currently suffering irreparable harm or would continue to suffer from

irreparable harm without injunctive relief.

      The Court will not issue a preliminary injunction when the only evidence presented

shows that any harm done to Luxottica has likely ended—past injury is usually compensable

through monetary damages.  *Cf. Miller v. Harrison Cnty.*, 1:07CV541, 2008 WL 11435639, at

*8 (S.D. Miss. Nov. 20, 2008) (citing *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d

831, 847–48 (5th Cir. 2004) ("The Court finds that his past injuries and loss, if proven, are

capable of being remedied by damages.")).  Accordingly, this factor weighs against granting a

preliminary injunction.

### C.  The Balance of Hardships is Neutral

When deciding whether to grant a preliminary injunction, "court[s] must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987).  This element helps courts assess "the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied."  11A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2948.2 (3d ed. 2020).

With respect to the Pearle Vision Marks, the Court finds that the balance of equities is neutral.  The Court already found that Luxottica is not currently suffering irreparable harm.  As for the hardship on the Brave Parties were the Court inclined to issue an injunction, the evidence shows that the Brave Parties already de-identified and rebranded the Stores; so, the Brave Parties already incurred the cost of compliance.  As such, there is little to no harm that would be felt by either party here.  Thus, this factor is neutral, and Luxottica has not carried its burden on this element.

### D.  An Injunction Would Disserve the Public Interest

Finally, Luxottica must show that granting this injunction would not disserve the public interest.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)).  While "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing

marks," Luxottica has not shown that any ongoing infringement is likely. *Scrum*, 2020 WL 4016110 at *17 (quoting *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 928 (S.D. Tex. 2014) (Rosenthal, J.) (internal citations removed)). So, at best, this factor is neutral.

## II.   Whether the Court Should Grant an Injunction Regarding the Non-Compete Agreements

Turning to the issue of the parties' Non-Compete Agreements, Luxottica has "clearly carried" its burden to show that it is entitled to a preliminary injunction prohibiting the Grays from engaging or participating in a competing business.

### A.   Luxottica Has Shown That It is Likely to Succeed on Its Claim That the Grays Breached the Parties' Non-Compete Agreement

The Court now turns to whether Luxottica has shown that it is likely to succeed on its claim that the Grays are in violation of the parties' Non-Compete Agreement. Under Texas law, the elements of a breach-of-contract claim are (1) a valid contract, (2) performance, (3) breach, and (4) damages resulting from the breach. *Myan Mgmt. Grp., L.L.C. v. Adam Sparks Fam. Revocable Tr.*, 292 S.W.3d 750, 754 (Tex. App.—Dallas 2009, no pet.). The Texas Covenants Not to Compete Act imposes additional requirements to enforce a contract's noncompete provision. Specifically, the noncompete provision (1) must be ancillary to or part of an otherwise enforceable agreement; (2) must contain reasonable limitations as to time, geographical area, and scope of activity to be restrained; and (3) must not impose a greater restraint than necessary to protect the interests of the promisee. TEX. BUS. & COM. CODE § 15.50(a).

Determining whether a covenant not to compete is ancillary to an otherwise enforceable agreement consists of two steps. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009). First, the Court must identify an otherwise enforceable agreement. *Id.* In other words, the Court must "set aside the Agreement's noncompete

covenants and determine whether any other promises remain to bind the parties under the Agreement." *31–W Insulation Co. v. Dickey*, 144 S.W.3d 153, 157 (Tex. App.—Fort Worth 2004, pet. withdrawn).  Second, the Court must determine whether the noncompete covenant is ancillary to this otherwise enforceable agreement. *Fielding*, 289 S.W.3d at 849.  "An agreement is ancillary to an otherwise enforceable agreement if 'it is part of and subsidiary to an otherwise valid transaction or relationship which gives rise to an interest worthy of protection . . . . Examples of legitimate, protectable interests include business goodwill, trade secrets, and other confidential or proprietary information.'" *Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 123 (5th Cir. 1993) (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991).

Here, Luxottica has shown that it is likely to succeed on its claim that the Brave Parties are currently in breach of the Non-Compete Agreements.  First, Luxottica has presented evidence that the Non-Compete Agreements are likely to be found to be "ancillary to or part of an otherwise enforceable agreement"—the License Agreements.  *Id.* ("The covenant not to compete was ancillary to the licensing agreement which created mutually enforceable interests in the operation of a Meineke franchise.").  The evidence before the Court at this stage indicates that the License Agreements constitute a valid transaction or relationship that gives rise to an interest worthy of protection, i.e., the Pearle Vision Marks.  *See Id.*  Indeed, under the License Agreements, Luxottica authorized the Brave Parties to use their proprietary system and operate the Stores using the Pearle Vision Marks in exchange for the Brave Parties' consideration.  As such, the Non-Compete Agreements are ancillary to the License Agreements because the Non-Compete Agreements are part of and subsidiary to an otherwise valid transaction or relationship that gives rise to Luxottica's interest in its proprietary system and marks.

Nonetheless, the Grays argue that the License Agreements are invalid and unenforceable. The Grays base this proposition on the state court jury's finding of fraud as it relates to the License Agreements.  According to the Grays, this finding precludes the License Agreements from constituting an "otherwise enforceable agreement."  The Court disagrees with the Brave Parties.  The Grays ignore that they elected actual damages as their remedy in the State Action. According to the Final Judgment, the Brave parties were awarded $4,612,203.00, in part, as an award for the jury's finding that Luxottica acted fraudulently with respect to the License Agreements (Dkt. #55, Exhibit 1 at pp. 8–9).  A contract found to be procured by fraud is voidable, not void.  *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied).  Accordingly, it is still a valid and enforceable contract unless the defrauded party elects to rescind the contract, rendering it void.  *Lockwood Int'l, Inc. v. Wells Fargo Bank, N.A.*, 459 F. Supp. 3d 827, 831 (S.D. Tex. 2020), *aff'd sub nom. Lockwood Int'l, Inc. v. Wells Fargo, Nat'l Ass'n*, No. 20-40324, 2021 WL 3624748 (5th Cir. Aug. 16, 2021) ("A contract which is voidable because it was the product of fraud is voided only if the defrauded party proves a right to avoid the contract and chooses to do so." (citing Texas law)).  Here, the preliminary injunction evidence before the Court reflects that the Brave Parties did not rescind the License Agreements. Thus, the License Agreements are still enforceable contracts.

Furthermore, the restrictions imposed by the Non-Compete Agreements appear to contain reasonable limitations on time, geographical area, and scope.   Under the Non-Compete Agreements, the Grays agreed that they would not

> either directly or indirectly, engage or participate in a Competing Business, either:
> (i) while [they are] an owner, employee, or otherwise associated with the
> Licensed Operator, or (ii) for a period of one year after my ownership or
> employment ends for any reason and within a three (3) mile radius of the
> Licensed Location . . .

(Dkt. #55, Exhibit 1 at p. 157).  Whether a noncompete is a reasonable restraint of trade is a

question of law for the court.  *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991); *Martin v. Credit Prot. Ass'n*, 793 S.W.2d 667, 668–69 (Tex. 1990).  "Texas law . . . mandate[s] that a geographical limitation cannot impose a greater restraint than is necessary to protect the goodwill or other business interest of the employer."  *Cobb v. Caye Publ'g Grp., Inc.*, 322 S.W.3d 780, 785 (Tex. App.—Fort Worth 2010, no pet.).  "A reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer."  *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 754 (S.D. Tex. 2009) (citing *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ)).

Here, the preliminary injunction evidence shows that, under the Non-Compete Agreements, the Brave Parties are only prohibited from competing against Luxottica within a three-mile radius of the Stores.  That is, the restriction only covers a small area immediately around the Stores.  Additionally, this ban on competition is only for one year.  A one-year restriction within a three-mile radius is not considered an unreasonable restriction on competition.  *See Meineke*, 999 F.2d at 123 ("As a diversity court we are Erie bound to apply Texas law, and using this benchmark, we conclude that the one year/twenty mile restriction is not unreasonable as a matter of law.") (collecting cases).  And, given the substantial time, money, and other resources that Luxottica claims it has expended to promote and protect its legitimate business interests—such as its Pearle Vision Marks and name recognition for the products and services it offers—the restraints imposed by the Non-Compete Agreements are reasonable.  *See id.*

Accordingly, the Court finds that Luxottica has shown a likelihood of success as to its claim that the Grays are in breach of the Non-Compete Agreements.  This factor weighs in favor of granting a preliminary injunction.

### B.  Luxottica Has Suffered Irreparable Harm

Next, Luxottica must demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  Here, Luxottica has shown that it will suffer irreparable harm if the Brave Parties are not enjoined from operating competing stores. "In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury." *Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996); *see Paulsson Geophysical*, 529 F.3d at 313 (affirming grant of preliminary injunction where irreparable harm was shown, among other ways, by a loss of business and customers). Indeed, if the Grays "were allowed to continue operating as competitors, [their] business and goodwill would increase while that of [Luxottica] diminished." *See Miracle Appearance Reconditioning Specialists Int'l, Inc. v. Harris*, No. 4:07-CV-524, 2007 WL 9718310, at *3 (N.D. Tex. Oct. 9, 2007).  In other words, Luxottica would suffer a loss of trade and goodwill, both of which are grounds for finding irreparable harm. *Fletcher's*, 434 F. Supp. 3d at 496.

Furthermore, the Grays specifically agreed in the License Agreements that Luxottica would suffer irreparable harm if they were to breach the Non-Compete Agreements and, if breached, that Luxottica may seek an injunction enjoining the Grays' violative conduct. *Miracle Appearance*, 2007 WL 9718310, at *3 (holding that a plaintiff suffered irreparable harm after the defendant breach the parties' covenant not to compete because, among other things, the parties specifically agreed that the plaintiff would suffer irreparable harm and has the right to seek an injunction).

Accordingly, Luxottica has shown irreparable harm and this factor weighs in favor of granting a preliminary injunction.

### C.  Balance of Hardships Weighs in Favor of Luxottica

Moving on to the balance of hardships, the Court finds that the balance of hardships weighs in favor of granting a preliminary injunction.  Although it is true that the Grays will "face an immediate closure of their business" if the Court grants the preliminary injunction, this is not enough to push the balance in their favor (Dkt. #58 at p. 21).  To start, the Court points out that Luxottica is only asking the Court to prohibit the Grays from operating a competing business until October 19, 2023.  As of the date of this Order, that means that the Grays would only be forced to close their doors for roughly three months.  This cuts against the balance of hardships weighing in the Grays' favor.

Furthermore, as the Court already pointed out, the Grays had the option to rescind the License Agreements in the State Action and, instead, chose to enforce the terms of the contract and receive actual damages.  Now, the Grays wish to receive the benefit of the License Agreement by way of actual damages in the State Action, while being subject to none of the detriments in this action.  In other words, the Grays want to have their cake and eat it too.  This would be inequitable to Luxottica.  To be sure, the Grays "cannot complain of the self-inflicted harm which arises from their . . . breach of the" Non-Compete Agreement that they chose to enforce.  *See Mr. Appliance LLC v. JMG Assocs., Inc.*, No. 6:20-CV-1077, 2021 WL 5197426, at *1 (W.D. Tex. Aug. 24, 2021).

Given the Grays' choice to enforce rather than rescind the License Agreement and the short period of time for which the Stores would be closed, this factor weighs in favor of granting a preliminary injunction.

### D.  An Injunction Would Not Disserve the Public Interest

Finally, refusing to grant the preliminary injunction as to the Non-Compete Agreement

would disserve the public interest.  The public interest is disserved when courts choose not to uphold contracts entered into by private parties.  *Amerispec, Inc. v. Metro Inspection Servs., Inc.*, No. CIV.A.3:01-CV-0946, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001); *see also Miracle Appearance*, 2007 WL 9718310, at *3 ("[F]ailure to grant a preliminary injunction would disserve the public interest insofar as the law favors the ability of private parties to enter into enforceable contracts without fear and uncertainty that they will subsequently be rewritten by the court."); *Cicciarella v. Arnica Mut. Ins. Co.*, 66 F.3d 764, 767–68 (5th Cir. 1995) ("[Under] the rules of construction that are applicable to contracts generally[, the court] will not rewrite the terms of the [contract]; instead, we enforce it as written. Our primary concern is to give effect to the intentions of the parties as expressed in the instrument.").  The parties entered into a covenant not to compete.  And, again, rather than rescind the License Agreement and not to be bound by its terms, the Grays chose to enforce the contract in the State Action.  To allow the Grays the benefits of the contract without suffering the detriments would disserve the public interest.  Accordingly, this factor weighs in favor of granting injunctive relief.

### E.  Bond

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  The amount of that security "is a matter for the discretion of the trial court."  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

Luxottica contends that, given the strong likelihood of success on the merits for all of its claims, a reasonable bond in this case is $10,000.00.  The Brave Parties do not argue what a

reasonable bond would be.  The Court finds that it is proper to require of Luxottica a bond in the amount of $7,000.00 as a condition for issuance of the preliminary injunction.

## CONCLUSION

Luxottica has not shown that any of the four preliminary-injunction factors weigh in favor of injunctive relief insofar as the Pearle Vision Marks are concerned.  However, Luxottica has shown that all four preliminary-injunction factors weigh in favor of injunctive relief with respect to the Non-Compete Agreements.  It is therefore **ORDERED** that Plaintiff Luxottica of America, Inc.'s Motion for Preliminary Injunction (Dkt. #55) is hereby **GRANTED in part** and **DENIED in part**.

It is further **ORDERED** that the Grays will not, either directly or indirectly, engage or participate in a competing business within a three (3) mile radius of the Stores as a proprietor, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant thereof for that competing business until October 19, 2023.

**IT IS SO ORDERED.**

 **SIGNED this 18th day of July, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE